UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IKB INTERNATIONAL S.A. IN LIQUIDATION and IKB DEUTSCHE INDUSTRIEBANK AG,<br><br>                Plaintiffs,<br><br>      v.<br><br>JPMORGAN CHASE & CO.; JPMORGAN CHASE BANK, N.A.; J.P. MORGAN SECURITIES LLC; J.P. MORGAN MORTGAGE ACQUISITION CORPORATION; J.P. MORGAN ACCEPTANCE CORPORATION I; CHASE HOME FINANCE LLC; EMC MORTGAGE CORPORATION; STRUCTURED ASSET MORTGAGE INVESTMENTS II INC.; BEAR STEARNS ASSET BACKED SECURITIES I, LLC; BEAR STEARNS & CO. INC.; CARRINGTON HOLDING COMPANY, LLC; CARRINGTON CAPITAL MANAGEMENT L.L.C.; CARRINGTON SECURITIES, LP; and STANWICH ASSET ACCEPTANCE COMPANY, L.L.C.,<br><br>                Defendants. | 12-cv-04617 (LTS)(KNF)<br><br>ECF CASE |

# DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION TO DISMISS

### SIDLEY AUSTIN LLP

ATTORNEYS FOR THE JPMORGAN DEFENDANTS

787 SEVENTH AVENUE
NEW YORK, NEW YORK 10019
(212) 839-5300

### MAYER BROWN LLP

ATTORNEYS FOR THE CARRINGTON DEFENDANTS

1675 BROADWAY
NEW YORK, NEW YORK 10019
(212) 506-2500

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................ 1

FACTUAL BACKGROUND ................................................................ 3

ARGUMENT ................................................................ 16

I.   IKB FAILS TO PLEAD RELIANCE ON PROSPECTUS SUPPLEMENTS IT
     RECEIVED AFTER MAKING ITS INVESTMENT DECISIONS.................................... 17

II.  IKB's NEGLIGENCE AND CERTAIN FRAUD CLAIMS ARE TIME BARRED. .......... 18

     A.   IKB's Negligence Claims Are Time-Barred.......................................... 18

     B.   Certain Fraud Claims Against Carrington Are Time-Barred............................. 19

III. IKB'S CLAIMS FAIL TO SATISFY RULE 9(b). ............................................... 20

     A.   IKB Fails To Plead Knowing or Reckless Misstatements with
          Particularity.......................................................................... 23

          1.   Underwriting Guidelines....................................................... 23

               a)   The Prospectus Supplements Do Not Promise Uniform
                    Application of Underwriting Guidelines. .................................... 24

               b)   The Prospectus Supplements Disclosed The Presence of
                    Non-Conforming Loans......................................................... 26

               c)   The Complaint Fails To Plead That The Securitizations
                    Contained Non-Conforming Mortgage Loans. ........................... 27

               d)   The Prospectus Supplement Descriptions of Underwriting
                    Guidelines Are Non-Actionable Statements of Opinion. ............. 30

               e)   The Complaint Fails To Plead That Defendants Knew of
                    Loans That Failed to Conform or Disbelieved The
                    Statements Regarding Underwriting Standards. ......................... 30

          2.   LTV and CLTV Ratios ........................................................ 33

          3.   Owner Occupancy............................................................. 34

          4.   Loan Assignments............................................................. 36

     B.   IKB's General Allegations of Scienter Fail. ....................................... 38

1.     IKB's Allegations Based on Corporate Structure Do Not Plead Fraud. ................................................................................... 38

2.     IKB's Allegations of Motive Do Not Plead Fraud. ................................. 40

C.     Plaintiffs Fail to Plead Reliance With Particularity. ............................................. 40

IV.  IKB FAILS TO PLEAD REASONABLE RELIANCE ......................................................... 41

V.   IKB FAILS TO PLEAD A DUTY TO DISCLOSE. ............................................................. 46

VI.  IKB FAILS TO STATE AN AIDING AND ABETTING CLAIM. ...................................... 48

A.     IKB Fails To Allege Actual Knowledge. ................................................................. 48

B.     IKB Fails To Allege Substantial Assistance ........................................................... 49

CONCLUSION ................................................................................................................................ 50

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*,
   1998 WL 159059 (S.D.N.Y. Apr. 1, 1998)..............................................................21

*Abrahami v. UPC Constr. Co.*,
   638 N.Y.S.2d 11 (N.Y. App. Div. 1996) ...............................................................44

*Alki Partners, L.P.* v. *Vatas Holding GMBH*,
   769 F. Supp. 2d 478 (S.D.N.Y. 2011)...................................................................39

*Armstrong v. McAlpin*,
   699 F.2d 79 (2d Cir. 1983)............................................................................22, 49

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).....................................................................................16, 17

*Ashland v. Morgan Stanley & Co.*,
   652 F.3d 333 (2d Cir. 2011)................................................................................43

*Atkins Nutritionals, Inc. v. Ernst & Young, LLP*,
   754 N.Y.S.2d 320 (N.Y. App. Div. 2003) ...........................................................46

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)..................................................................................20

*Banque Arabe v. Maryland Nat'l Bank*,
   57 F.3d 146 (2d Cir. 1995)..................................................................................46

*Barrios v. Pacos Pharm. Servs., Inc.*,
   816 F. Supp. 243 (S.D.N.Y. 1993)......................................................................26

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................16

*Berman v. Morgan Keegan & Co., Inc.*,
   2011 WL 1002683 (S.D.N.Y. Mar. 14, 2011) .....................................................48

*Berman v. Morgan Keegan & Co., Inc.*,
   2012 WL 147907 (2d Cir. Jan. 19, 2012) ............................................................21

*Boilermakers Nat'l Annuity Trust Fund v. WAMU Mortg. Pass Through Certificates,*
   *Series AR1*,
   748 F. Supp. 2d 1246 (W.D. Wash. 2010)...........................................................29

*Bond v. Progressive Ins. Co.*,
 917 N.Y.S.2d 756 (N.Y. App. Div. 2011) ............................................................19

*Borsellino v. Goldman Sachs Grp., Inc.*,
 477 F.3d 502 (7th Cir. 2007) ............................................................................21

*Botti v. Russell*,
 580 N.Y.S.2d 505 (N.Y. App. Div. 1992) ...........................................................18

*Brass v. American Film Technologies Inc.*,
 987 F. 2d 142 (2d Cir. 1993)..............................................................................46

*Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V..*,
 952 N.E.2d 995 (N.Y. 2011)..............................................................................46

*Chill v. Gen. Elec. Co.*,
 101 F.3d 263 (2d Cir. 1996)...............................................................................23

*City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortg. Loan Trust, Inc.*,
 703 F. Supp. 2d 253 (E.D.N.Y. 2010) ...............................................................29

*Colon v. Banco Popular N. Am.*,
 874 N.Y.S.2d 44 (N.Y. App. Div. 2009) .............................................................19

*Curran, Cooney, Penney, Inc. v. Young & Koosmans, Inc.*,
 583 N.Y.S.2d 478 (N.Y. App. Div. 1992) ...........................................................44

*DeBlasio v. Merrill Lynch & Co.*,
 2009 WL 2242605 (S.D.N.Y. July 27, 2009) ...............................................20, 39

*Desideri* v. *D.M.F.R. Grp.*,
 660 N.Y.S.2d 714 (N.Y. App Div. 1997) .............................................................21

*Destino v. Reiswig*,
 630 F.3d 952 (9th Cir. 2011) .............................................................................41

*Dodona I, LLC v. Goldman, Sachs & Co.*,
 2012 WL 935815 (S.D.N.Y. Mar. 21 2012) .........................................................17

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
 837 F.Supp.2d 162 (S.D.N.Y. 2011)...................................................................17

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
 343 F.3d 189 (2d Cir. 2003).........................................................................42, 44

*Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of N.Y.*,
 375 F.3d 168 (2d Cir. 2004)...............................................................................22

*Eurycleia Partners, LP v. Seward & Kissel, LLP*,
  910 N.E.2d 976 (N.Y. 2009) ............................................................................17, 21, 41

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011) ........................................................................23, 30, 33, 34

*Fed. Ins. Co. v. Distinguished Props. Umbrella Managers Inc.*,
  721 F. Supp. 2d 293 (S.D.N.Y. 2010) ..........................................................................19

*Federal Housing Finance Agency v. UBS Americas, Inc.*,
  858 F. Supp. 2d 306 (S.D.N.Y. 2012) ..........................................................................47

*Filler v. Hanvit Bank*,
  2003 WL 22110773 (S.D.N.Y. Sept. 12, 2003) .......................................................20, 21

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
  385 F.3d 159 (2d Cir. 2004) ..........................................................................................22

*Footbridge Ltd v. Countrywide Home Loans*,
  2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) ....................................................... passim

*Galiano v. Fidelity Nat'l Title Ins. Co.*,
  684 F.3d 309 (2d Cir. 2012) .....................................................................................17, 29

*Giannacopoulos v. Credit Suisse*,
  37 F. Supp. 2d 626 (S.D.N.Y. 1999) ........................................................................45, 48

*Global Fin. Corp. v. Triarc Corp.*,
  715 N.E.2d 482 (N.Y. 1999) ..........................................................................................18

*Global Minerals & Metals Corp. v. Holme*,
  824 N.Y.S.2d 210 (N.Y. App. Div. 2006) .....................................................................43

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*,
  58 F. Supp. 2d 228 (S.D.N.Y. 1999) .............................................................................42

*Greenberg v. Chrust*,
  198 F. Supp. 2d 578 (S.D.N.Y. 2002) ...........................................................................47

*Harsco Corp. v. Segui*,
  91 F.3d 337 (2d Cir. 1996) ............................................................................................20

*High Tides, LLC v. De Michele*,
  931 N.Y.S.2d 377 (N.Y. App. Div. 2011) .....................................................................18

*HSH Nordbank AG v. UBS AG*,
  941 N.Y.S.2d 59 (N.Y. App. Div. 2012) ..................................................................43, 46

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
  2:11-ML-02265-MRP, slip op. (C. D. Cal. Jun. 29, 2012) (Ex. 15.)..........................16, 36, 37

*In re IndyMac Mortg.-Backed Sec. Litig.*,
  718 F. Supp. 2d 495 (S.D.N.Y. 2010)..............................................................................33, 34

*In re Lehman Bros. Sec. & ERISA Litig.*,
  684 F. Supp. 2d 485 (S.D.N.Y. 2010).....................................................................................30

*In re Parmalat Secs. Litig.*,
  377 F. Supp. 2d 390 (S.D.N.Y. 2005).....................................................................................48

*In re Salomon Analyst Level 3 Litig.*,
  373 F. Supp. 2d 248 (S.D.N.Y. 2005).....................................................................................34

*In re Sec. Capital Assurance, Ltd. Sec. Litig.*,
  729 F. Supp. 2d 569 (S.D.N.Y. 2010).....................................................................................39

*In re Sharp Int'l. Corp.*,
  403 F.3d 43 (2d Cir. 2005).......................................................................................................49

*In re WorldCom, Inc. Sec. Litig.*,
  382 F. Supp. 2d 549 (S.D.N.Y. 2005).....................................................................................50

*J.A.O. Acquisition Corp. v. Statitsky*,
  863 N.E.2d 585 (N.Y. 2007).............................................................................................17, 46

*Kaufman v. Cohen*,
  760 N.Y.S.2d 157 (N.Y. App. Div. 2003) ...............................................................................49

*Kolbeck v. LIT Am.*,
  939 F. Supp. 240 (S.D.N.Y. 1996)..........................................................................................49

*Krause v. Forex Exch. Mkt., Inc.*,
  356 F. Supp. 2d 332 (S.D.N.Y. 2005).....................................................................................48

*Lachmund v. ADM Inv. Servs., Inc.*,
  191 F.3d 777 (7th Cir. 1999) ...................................................................................................21

*Landesbank Baden-Württemberg v. Goldman, Sachs & Co.*,
  2012 WL 1352590 (2d Cir. Apr. 19, 2012) ("*Landesbank II*") ...................................... passim

*Landesbank Baden-Württemberg v. Goldman, Sachs & Co.*,
  821 F. Supp. 2d 616 (S.D.N.Y. 2011) ("*Landesbank I*")................................................ passim

*Lanzi v. Brooks*,
  388 N.Y.S.2d 946 (N.Y. App. Div. 1976) ...............................................................................37

*Lazard Freres & Co. v. Protective Life Ins. Co.*,
   108 F.3d 1531 (2d Cir. 1997)...............................................................45

*Lerner v. Fleet Bank, N.A.*,
   459 F.3d 273 (2d Cir. 2006)...............................................................17, 48, 49

*Lone Star Fund V (US), L.P. v. Barclays Bank PLC*,
   594 F.3d 383 (5th Cir. 2010) .............................................................26

*Lovett v. Allstate Ins. Co.*,
   446 N.Y.S.2d 65 (N.Y. App. Div. 1982) ...............................................36

*Marchig v. Christie's Inc.*,
   430 Fed. App'x 22 (2d Cir. 2011)........................................................19

*Martinez v. Capital One, N.A.*,
   2012 WL 1027571 (S.D.N.Y. March 27, 2012) ....................................16

*Mass. Mut. Life Ins. Co. v. Residential Funding Co.*,
   2012 WL 479106 (D. Mass. Feb. 14, 2012) .........................................35

*Mazza v. Berk & Michaels, P.C.,*,
   1991 WL 177646 (S.D.N.Y. Sept. 4, 1991)...........................................20

*MBIA Ins. Co. v. GMAC Mortg. LLC*,
   914 N.Y.S.2d 604 (N.Y. Sup. Ct. 2010) ...............................................47

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
   928 N.Y.S.2d 229 (N.Y. App. Div. 2011) .............................................47

*MBIA Ins. Corp. v. Residential Funding Co.*,
   2009 WL 5178337 (Sup. Ct. N.Y. Co. Dec. 22, 2009)...........................47

*MBIA Ins. Corp. v. Royal Bank of Canada*,
   2010 WL 3294302 (N.Y. Sup. Ct. Aug. 19, 2010)...........................42, 48

*Mills v. Polar Molecular Corp.*,
   12 F.3d 1170 (2d Cir. 1993)................................................................32

*Morin v. Trupin*,
   711 F. Supp. 97 (S.D.N.Y. 1989)........................................................50

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
   2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) .......................................33

*N.J. Carpenters Health Fund v. Novastar Mortg.*,
   2011 WL 1338195 (S.D.N.Y. Mar. 31, 2011) ("*NovaStar I*") ...............34

*N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.*
   2012 WL 1076143 (S.D.N.Y. Mar. 29, 2012) ("*Novastar II*")..........................27, 29

*Old Republic Nat'l Title Ins. Co.* v. *Cardinal Abstract Corp.*,
   790 N.Y.S.2d 143 (N.Y. App. Div. 2005) ...............................................................22

*Olkey v. Hyperion 1999 Term Trust*,
   98 F.3d 2 (2d Cir. 1996).........................................................................................23

*Orlando v. Kukileka*,
   836 N.Y.S.2d 252 (N.Y. App. Div. 2007) ...............................................................48

*P.T. Bank Cent. Asia v. ABN AMRO Bank N.V.*,
   754 N.Y.S.2d 245 (N.Y. App. Div. 2003) ...............................................................46

*Papp v. Debbane*,
   790 N.Y.S. 2d 450 (N.Y. App. Div. 2005) ..............................................................37

*Premium Mortg. Corp. v. Equifax Inc.*,
   583 F.3d 103 (2d Cir. 2009).....................................................................................40

*Renner v. Chase Manhattan Bank*,
   2000 WL 781081 (S.D.N.Y. Jun. 14, 2000) ............................................................48

*Republic Bank & Trust Co. v. Bear Stearns & Co.*,
   683 F.3d 239 (6th Cir. 2012) .............................................................26, 27, 29, 33

*Public Empls.' Ret. Sys. Of Miss. v. Merrill Lynch & Co.*,
   714 F. Supp. 2d 475 (S.D.N.Y. 2010).....................................................................49

*Rey-Willis v. Citibank, N.A.*,
   2004 WL 315267 (S.D.N.Y. Feb. 18, 2004).............................................................21

*Rodas v. Manitaras*,
   552 N.Y.S.2d 618 (N.Y. App. Div. 1990) ...............................................................45

*Schlaifer Nance & Co. v. Estate of Warhol*,
   119 F.3d 91 (2d Cir. 1997).......................................................................................44

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994)......................................................................................22

*Societe Nationale D'Exploitation Industrielle Des Tabacs Et Allumettes v. Salomon Bros.
Int'l Ltd.*,
   702 N.Y.S.2d 258 (N.Y. App. Div. 2000) ...............................................................47

*Stuart Lipsky, P.C. v. Price*,
   625 N.Y.S.2d 563 (N.Y. App. Div. 1995) ...............................................................44

*Stuart Silver Assocs. v. Baco Dev. Corp.*,
  665 N.Y.S.2d 415 (N.Y. App. Div. 1997) .............................................................44

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
  250 F.3d 87 (2d Cir. 2001).................................................................................22

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008)...........................................................................22, 39

*Terra Sec. Asa Konkursbo v. Citigroup, Inc.*,
  740 F. Supp. 2d 441 (S.D.N.Y. 2010)..............................................................42, 43

*Terrydale Liquidating Trust v. Gramlich.*,
  549 F. Supp. 2d 529 (S.D.N.Y. 1982).................................................................50

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
  692 F. Supp. 2d 387 (S.D.N.Y. 2010)...............................................................28, 33

*UST Private Equity Investors Fund v. Salomon Smith Barney*,
  733 N.Y.S.2d 385 (N.Y. App. Div. 2001) ............................................................44

*Water St. Leasehold LLC v. Deloitte & Touche LLP*,
  796 N.Y.S.2d 598 (N.Y. App. Div. 2005) ............................................................17

*Zutty v. Rye Select Broad Market Prime Fund, L.P.*,
  2011 WL 5962804 (N.Y. Sup. Ct. Apr. 15, 2011)...................................................40

## STATUTES & RULES

CPLR § 202.........................................................................................................18

CPLR § 214(4)...............................................................................................18, 19

Gen Constr. L. § 25-b .........................................................................................19

Fed. R. Civ. P. 8 ................................................................................................28

Fed. R. Civ. P. 9(b) ................................................................................... passim

Fed. R. Civ. P. 12(b)(6)...................................................................................1, 16

The JPMorgan Defendants[1] and the Carrington Defendants[2] (together, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Consolidated Complaint ("Complaint" or "CC") filed by IKB International S.A. in Liquidation ("IKB SA") and IKB Deutsche Industriebank AG ("IKB AG") (together, "Plaintiffs" or "IKB") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).

## PRELIMINARY STATEMENT

IKB, a major German bank advised by prominent and sophisticated financial advisors BlackRock and Standish Mellon, invested over $17 billion in residential mortgage-backed securities ("RMBS") and other mortgage-backed instruments ("MBS") through June 2007 – many months after the downturn in the mortgage market.  Today, with IKB SA and other of its entities in liquidation, and its CEO convicted of fraud for concealing IKB's knowledge of the crisis, IKB seeks to shift the losses from its investments to the American banks that sold it MBS.[3]  But its Complaint fails to state a claim, let alone with the requisite particularity.

*First*, IKB's claims of reliance on misrepresentations by Defendants are a transparent and implausible pretext, as more than half of its purchases of the RMBS certificates at issue ("Certificates") were made before the offering prospectus supplements ("Prospectus Supplements") were delivered to IKB or its advisors.  An investor who buys first and reads later cannot sue for fraud.

---

[1] The JPMorgan Defendants are JPMorgan Chase & Co. ("JPMC"), JPMorgan Chase Bank, N.A. ("JPMCBNA"), J.P. Morgan Securities LLC, formerly known as J.P. Morgan Securities Inc. ("JPMSI"), J.P. Morgan Mortgage Acquisition Corporation ("JPM Acquisition"), J.P. Morgan Acceptance Corporation I ("JPM Acceptance"), Chase Home Finance LLC ("CHF"), EMC Mortgage Corporation ("EMC"), Structured Asset Mortgage Investments II Inc. ("SAMI II"), Bear Stearns Asset Backed Securities I ("BSABS"), and Bear Stearns & Co. Inc. ("BSC").

[2] The Carrington Defendants are Carrington Holding Company, LLC ("CHC"), Carrington Capital Management L.L.C. ("CCM"), Carrington Securities, LP, and Stanwich Asset Acceptance Company, L.L.C. ("Stanwich")

[3] IKB has filed separate lawsuits against at least Credit Suisse, Bank of America, Citigroup, and Ally Financial. IKB since has withdrawn the latter two.  The total amount of MBS at issue in those cases alone exceeds $774 million.  (Ex. 1 ("Ex." means Exhibit to Spenner Declaration)).

*Second*, IKB may pursue only those of its claims that sound in fraud, because under New York law, any claims sounding in negligence are time-barred.  But none of IKB's claims are pleaded with the particularity required by Rule 9(b).  IKB mischaracterizes the actual disclosures in the Prospectus Supplements, which contained significant cautions and included statements of opinion rather than objective fact (and would have been understood as such by any major institutional investor), and fails to plead facts showing that those disclosures were false.  None of IKB's various grievances about MBS are connected by factual allegations *to the Certificates IKB purchased*.  Indeed, the Complaint does not cite one single mortgage loan backing any particular Certificate at issue in the Complaint ("Mortgage Loans") that deviated from the factual descriptions in the Prospectus Supplements.  And the Complaint's heavy reliance on two sets of purported retrospective analyses also lack the necessary particularity.  The alleged analysis performed by third-party due diligence vendor Clayton Holdings, LLC ("Clayton") relates to flawed loans that Clayton reviewed, but the Complaint *nowhere alleges that Clayton actually did due diligence on any of the Mortgage Loans*, so there is no basis for connecting the Clayton allegations to any Certificate bought by IKB.  The alleged analysis of loan-to-value ratios ("LTVs") and rates of owner occupancy for some unspecified subset of the Mortgage Loans likewise fails to allege any objective facts that were available to Defendants at the time.  Courts have repeatedly dismissed similar MBS claims for precisely the same failing.

*Third*, IKB's Complaint fails to plead the scienter of any Defendant with particularity.  It alleges no facts establishing that *any* of Defendants' officers, directors, executives, or high-level employees reviewed any due diligence reports or other documents showing problems with any of the MBS offerings at the time.  There is not one allegation that any individual employed by any Defendant knew any particular fact about any of the offerings at any relevant time.  And there is

2

not one allegation that any Defendant disbelieved any statement at the time it was made, which is required because IKB challenges statements of opinion.

*Fourth*, IKB asserts claims for fraudulent concealment and negligent misrepresentation, but both of these causes of action require a duty of disclosure owed by Defendants to IKB, and the law plainly does not impose such a duty in the context of the type of arm's-length dealings between financial institutions here.  IKB and its advisors were sophisticated players, capable of understanding the extensive disclosures in the Prospectus Supplements and doing their own diligence.  Indeed, IKB admits that its advisors conducted some diligence prior to its investments.  Investing $180 million (as part of a larger $17 billion MBS portfolio), IKB had a duty to try to seek concrete warranties or verification of facts it claims to have relied upon, especially given that IKB frequently purchased the Certificates before even reading the Prospectus Supplements.

*Finally*, the Complaint fails to state a claim for aiding and abetting because it lacks particular allegations of knowledge of or participation in the conduct at issue and clumps together the Defendants without allegations specific to them.

## FACTUAL BACKGROUND

**The Housing Boom:**  In the decade prior to 2006, U.S. housing prices increased at an "unusually rapid rate."[4]  Home prices nationwide "rose about 85% from 1997 to 2006 adjusted for inflation," making it the "biggest national housing boom in U.S. history."[5]  While the consequences of this housing price bubble are clear in hindsight, scores of investors invested hundreds of billions of dollars in the housing market during this period, chasing returns in spite

---

[4] Michael Fratantoni, Ph.D., *et al., Housing & Mortgage Markets: An Analysis*, Mortgage Bankers Assoc., September 6, 2005 (Ex. 2 at 6).
[5] Emily Peck, *Yale's Shiller: U.S. Housing Slump May Exceed Great Depression*, Wall St. J. Online, April 22, 2008 (Ex. 3).

of the inherent risks.  Seeking to capitalize on this market, various IKB entities invested heavily in RMBS.  However, many of the disclosed risks that IKB knowingly took have materialized.

**The Housing Bust**:  By August 2006, the *Wall Street Journal* cited "a growing concern among consumer advocates and regulators over the home-lending industry's increasing reliance on reduced documentation, particularly unverified income, to speed up the loan-approval process . . . for so-called nontraditional mortgage loans . . . such as pay-option adjustable-rate mortgages and interest-only loans [that] allow borrowers to defer payment of principal and sometimes interest."[6]  The lack of verification, and the greater sensitivity of such loans to downturns in housing prices, were seen as raising risks to "investors in securities backed by mortgage loans."[7]

By late 2006, the U.S. housing market was collapsing.  In December 2006, the *Wall Street Journal* reported that MBS buyers faced growing risks due to a "surge in mortgage delinquencies . . . *Delinquency rates have been rising steadily since the middle of 2005.  But the trend has accelerated sharply in the past two to three months*, according to an analysis by UBS.  Fraud has also increased [in] no- or low-documentation loans . . . [including buyers who] couldn't afford even their first mortgage payment."[8]  Plunging housing prices would overwhelm the RMBS market as a whole: "there is substantial evidence in the academic literature that the decline in housing prices was in fact substantially more important as an explanatory factor for the spike in delinquencies and foreclosures in 2007 and 2008 than poor underwriting quality."[9]

**IKB**:  IKB AG is a commercial bank incorporated in Germany.  CC ¶ 28.  IKB SA,

---

[6] Lingling Wei, *'Stated Income' Home Mortgages Raise Red Flags*, Wall St. J., Aug. 22, 2006 (Ex. 4).
[7] A report to the Mortgage Bankers Association looking at one sample of stated-income loans found that "almost 60% of the stated incomes were inflated by more than 50%, while 90% of the stated amounts were exaggerated by 5% or more." *Id.*
[8] Ruth Simon and James R. Hagerty, *More Borrowers With Risky Loans Are Falling Behind --- Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006 (emphasis added) (Ex. 5).
[9] Allen Ferrell & Atanu Saha, *Securities Litigation and the Housing Market Downturn*, 35 J. Corp. L. 97, 106-08 (2009)) (Ex. 6).  *See also* Edmund L. Andrews & Jeremy W. Peters, *Persistent Fear Drives Stocks Down Sharply*, N.Y. Times, Aug. 29, 2007 (Ex. 7) (discussing decline in demand for RMBS).

previously a subsidiary of IKB AG, is a commercial bank in liquidation with a main office in

Munsbach, Luxembourg.  CC ¶ 29. At issue here are IKB SA's purchases between October 2005

and June 2007 of 43 RMBS Certificates in connection with 20 MBS offerings

("Securitizations"),[10] totaling approximately $179,632,000.  CC ¶ 63 Table 1.[11]  With the

exception of one Certificate sold in the secondary market in August 2006, all were sold and

assigned by IKB SA to IKB AG "by contract dated November 20, 2008."  CC ¶ 62.

IKB is a sophisticated bank with extensive experience investing in RMBS: along with its

subsidiaries, including a controversial offshore subsidiary known as Rhineland Funding, IKB

built a $17.5 billion portfolio of securities backed by the U.S. housing market between 2002 and

2007, the failure of which led to a $10.8 billion bailout by the German government.[12]  Much of

that portfolio consisted of U.S.-issued RMBS, either directly or through collateralized debt

obligations.  *Id.*  In addition, IKB also filed lawsuits against other financial institutions relating to

its purchases of at least $774 million in RMBS Certificates between 2001 and 2007.[13]

As a major bank with a multi-billion-dollar portfolio, IKB could afford professional

institutional investment advice – it was advised by BlackRock Financial Management Inc.

("BlackRock") and Standish Mellon Asset Management Company LLC ("Standish Mellon"),

two prominent, sophisticated American investment management firms with full authority to act

on IKB's behalf.  CC ¶¶ 92, 219-26.  IKB alleges that it gave "specific criteria" to BlackRock

and Standish Mellon "that were strictly adhered to when RMBS purchases were considered or

---

[10] Although Paragraph 1 of the Complaint states that the RMBS Certificates were purchased in connection with 19 Securitizations, Table 1 of the Complaint shows 20 Securitizations at issue.
[11] IKB's total purchases of RMBS Certificates during the relevant time period from Defendants was even higher, totaling $312 Million.  *See* Summons with Notice filed with the Supreme Court of the State of New York, County of New York, on February 23, 2012, included in Exhibit 5 to the JPMorgan Defendants' Notice of Removal in 12-cv-04618.  [Docket No. 1]
[12] *See Sold down the river Rhine*, Economist, Aug. 9, 2007 (Ex. 8).
[13] *See* (Ex. 1).

approved":

> Plaintiffs' investment policy was to make long-term investments in ABS transactions with stable credit profiles, based among other things on *the quality of the credit enhancement structure (e.g., the level of subordination)* and the *underwriting and servicing processes of parties such as the originator and servicer* involved in any such transaction.
>
> . . . If the Securitization complied with IKB's investment criteria and policies based on such factors as *the risk/return profile of the proposed investment, the quality and character of the underlying loan pool, and the underwriting practices of the parties involved*, the Investment Managers would purchase Certificates of the Securitization for IKB's account . . .
>
> . . . [P]laintiffs used the data supplied by Defendants' [sic] regarding the loan pool in conducting their own analysis of the risk/return profile.

CC ¶¶ 219, 221-22, 224 (emphasis added).

IKB alleges that BlackRock and Standish Mellon "relied on Defendants' representations and statements in the Offering Documents in performing their due diligence, and in determining whether the Securitization complied with their investment criteria." CC ¶ 223.  But IKB's own behavior tells a different story: it purchased over half of the Certificates before the Prospectus Supplements on which it supposedly relied were even issued.  *See* Ex. 9 § I.

IKB  does not allege it, BlackRock, or Standish Mellon did any due diligence other than (1) reviewing the offering documents and the Certificates' ratings and (2) conducting their own analyses using the data contained therein.  CC ¶ 226.  IKB contends that detailed "loan files" were "fundamental to verifying the accuracy of the data presented by Defendants," yet unavailable to it when it made its investments.  CC ¶¶ 226.  But IKB does not allege that it or its advisors asked for any information that was denied them.  Instead, IKB alleges that, "[u]pon *information and belief* and industry custom and practice, *had Plaintiffs requested access to the loan files*, such request *would have been* denied it."  CC ¶¶ 66, 242 (emphasis added).

In any event, like the rest of the market, IKB was fully aware of the deteriorating

conditions of the housing market by mid-to-late 2006; IKB acknowledged as much in its own public statements in early 2007.[14]  But it nonetheless kept on buying for months: $32.5 million of the Certificates in 2005, $45.2 million between January and May 2006, $21.8 million in July and August 2006, $27.88 million (including a single $15 million purchase) in November and December 2006, and $51.5 million between January and June 2007.  It was over four years before IKB, by then in significant hot water of its own doing, filed this action.

Following IKB's July 2007 bailout, IKB's former CEO, Stefan Ortseifen, was convicted in German criminal court of misleading IKB investors in 2007 about his and IKB's knowledge about risks surrounding RMBS and other investments.  (Ex. 10 ¶ 351).  Ten days before IKB accepted the bailout, and not long after the last RMBS purchases at issue here, Ortseifen authorized a press release assuring IKB investors that exposure from subprime mortgages was limited and that IKB remained on track to meet its profit outlook.  (Ex. 10 ¶¶ 110-16).  After an extensive evidentiary hearing, the Regional Court of Dusseldorf found that Mr. Ortseifen was able, on July 20, 2007, to assess the full scope of the subprime-market fallout, and that he had deliberately misled investors about the true danger of the subprime crisis to IKB's finances.  (Ex. 10 ¶¶ 45-89, 373).  He was given a 10-month suspended sentence (Ex. 10 ¶¶ 379-83), and his appeals were dismissed by the Federal Court of Justice (Ex. 13).

German civil courts have similarly affirmed IKB's responsibility for concealing the extent of its knowledge of the risks of a declining housing market.  IKB was sued by its shareholders for the tort of willful and immoral behavior in connection with the July 2007 press release.  (Ex. 14).  The German Court found that, "since the spring 2007 the losses on real estate mortgages, also traded in the form of structured securities, mounted on the US mortgage market

---

[14] See (Ex. 11) (noting the "massive widening of credit spreads that led to corresponding losses in the markets"); (Ex. 12) (noting the "continuing deterioration in market conditions").

due to the substantial interest rate increases, the general deterioration of real estate prices and the very poor lending standards." (Ex. 14 at 3).  The court ruled that because IKB had knowledge of these facts when it issued its misleading press release in July 2007, it could be held liable to its shareholders.  (Ex. 14 at 4, 15-17).

**The Certificates:**  The RMBS Certificates were created by pooling individual Mortgage Loans into a trust and securitizing them so investors could invest in the returns they hoped the loans would generate.  CC ¶ 64.  The securitization process begins when an "originator" makes loans to borrowers, and then sells those loans to a "sponsor."  CC ¶¶ 65, 85.[15]  The sponsor, in turn, sells the loans to the "depositor," who forms a trust and deposits the loans into the trust. CC ¶¶ 65, 70, 87-88.[16]  The trust issues various certificates representing different interests in the trust's portfolio of loans.  The depositor sells the certificates to an underwriter, who in turn sells them to investors.  CC ¶ 72.[17]  The certificates issued by the trust are divided into "tranches," of varying seniority, that "entitle the certificate-holder to receive a portion of the principal and interest payments that the borrowers make on their mortgage loans."  CC ¶ 71.

**The Offering Documents:**  Investors in a securitization may receive a series of documents at various stages of the transaction, beginning with preliminary descriptions of the proposed deal (*i.e.,* a term sheet) and increasing in specificity as the loans are assembled. Because other documents predate the formation of the loan pools, only the Prospectus Supplement contains detailed discussion of aspects such as LTVs and owner occupancy rates.

---

[15] IKB sues EMC and JPMCBNA as "Originator Defendants," CC ¶¶ 13, 85, and EMC, CHF, JPM Acquisition, and Carrington Securities as "Sponsor Defendants."  CC ¶¶ 13, 86.

[16] IKB sues SAMI II, BSABS, JPM Acceptance, and Stanwich as "Depositor Defendants," CC ¶ 87 and, collectively with the "Sponsor Defendants," as the "Issuer Defendants."  CC ¶¶ 10, 89.  The actual issuers (the trusts) are not parties.

[17] IKB sues JPMSI and BSC as "Underwriter Defendants."  CC ¶¶ 12, 90.  JPMC is named solely on the basis of corporate ownership of other defendants; JPMC, JPMCBNA, and CHC are sued as "Controlling Parent Defendants." CC ¶¶ 14, 84.

IKB alleges that the Certificates were marketed through "Offering Documents" including "registration statements, prospectuses . . . prospectus supplements . . . free writing prospectuses, offering circulars and offering circular supplements, untitled collateral reports . . . and term sheets" CC ¶¶ 2, 112.  But the Prospectus Supplements expressly warned the reader that "[y]ou should rely only on the information provided in this prospectus supplement or the accompanying prospectus or incorporated by reference herein.  We have not authorized anyone else to provide you with different information."  JPMAC 2006-CW2, dated August 3, 2006 (Ex. 18) ("CW2 PS"), at ii  (*see* Appendix A § I).[18]  Every statement quoted in the Complaint (or Appendix A thereto) is taken from a Prospectus Supplement.  CC ¶¶ 103 & Table 4, 104 & Table 5, 122 & Table 6, 153, 155-57 & Appx. A.

Also often available to RMBS investors is a "loan tape" or mortgage loan schedule (collectively, "Loan Tapes") providing information on individual Mortgage Loans.  For example, the JPMAC 2006-CW2 Loan Tape provided 44 categories of information for each Mortgage Loan, including the city, state and zip code of the borrower and type of property; the date of origination; the interest terms and any second liens; whether the loan was based on documentation as opposed to unverified "stated" representations; and the original loan amount and LTV, from which the appraised value at origination could be computed.  Ex. 16.  The CW2 loan tape was filed in a "free writing prospectus" on the SEC EDGAR website on July 12, 2006, three weeks before IKB's purchases of four of the CW2 Certificates.[19]

The information in the Prospectus Supplements was generally determined as of a "cut-off

---

[18] Except where expressly noted, the disclosures discussed below come from the CW2 PS, which is cited in the Complaint (*see* CC ¶¶ 123, 156) and is representative of – though not identical to – those in other Prospectus Supplements.  As to each cited statement, Appendix A ("App. A") details which other Prospectus Supplements contained identical or similar disclosures.

[19] Overall, IKB purchased 23 of the 43 Certificates after the Loan Tape was filed on EDGAR, and 1 after the Loan Tape was made available upon request.  Of the rest, the Loan Tape was on EDGAR within 23 days of IKB's purchase of 13 Certificates, and was filed on paper or available on request within 34 days in 6 others.  Ex. 17.

date" that predated the Prospectus Supplement but that often long postdated the Prospectus.  For

example, the CW2 PS, issued on August 3, 2006, (more than three months after the April 24

Prospectus), disclosed that the information regarding the Mortgage Loans and Loan Pools was as

of July 1, 2006, and "does not take into account defaults, delinquencies and prepayments that

may have occurred with respect to the mortgage loans since such date."  CW2 PS, at S-10.[20]

(*See* App. A § II)  The Prospectuses warned investors that they should review information

included in the Prospectus Supplements for a specific and full picture of the securities.  CW2 PS,

at 2.  (*See* App. A § I)  They also warned that underwriting standards and the representations and

warranties made by the originator would be subject to the specific disclosures in the Prospectus

Supplement.  CW2 PS, at 18, 29.  (*See* App. A § III)

   **Prospectus Supplement Disclosures:**  The Prospectus Supplements disclosed the

process used to originate the Mortgage Loans and their characteristics.  *See* CC ¶¶ 65-69.  IKB

alleges that Defendants misrepresented (1) the underwriting standards used to originate the

Mortgage Loans, CC ¶¶ 5-8, 152-160; (2) LTV ratios for the Mortgage Loans and combined-

loan-to-value ("CLTV") ratios for the pools of Mortgage Loans, CC ¶¶ 3-4, 94-111; (3) rates of

owner occupancy among the properties backing the Mortgage Loans, CC ¶¶ 3-4, 112-123; and

(4) Defendants' intent to assign the loans to the trusts.  CC ¶¶ 15-18, 199-218.

   *Underwriting Standards*:  IKB alleges that the Prospectus Supplements falsely assured it

that the Mortgage Loans were originated (1) in accordance with the originator's underwriting

guidelines *or* (2) pursuant to exceptions to such guidelines when originators believed that the

loan contained "specifically identified compensating factors" warranting such an exception.  *See*

---

[20] Because of prepayments and the risk that Mortgage Loans would be "removed for incomplete documentation or otherwise," the CW2 PS warned that "the information regarding the Mortgage Loans may vary from comparable information based upon the actual composition of the Mortgage Groups as of the Closing Date, although such variance will not be material."  CW2 PS, at S-27.  (*See* App. A § II)

CC ¶¶ 68, 155, 157-60.[21]  But the Prospectus Supplements did *not* state that all loans were originated in accordance with guidelines.  For example, IKB cites the CW2 PS, which stated, in the "Risk Factors" section of the Prospectus Supplement under the heading "**Delinquencies May Adversely Affect Investment,**" that "[t]he mortgage loans were either originated or acquired in accordance, *generally,* with the underwriting guidelines described in this prospectus supplement."  CC ¶ 156; CW2 PS, at S-23 (italics added; bold in original).  (*See* App. A § IV)

Notably, the CW2 PS opened its discussion of Risk Factors by warning that the Mortgage Loans – originated, in that Securitization, by Countrywide Home Loans ("Countrywide") – were underwritten pursuant to lower than "traditional" standards:

> **The Underwriting Standards of the Originator Are Not as Stringent as those of Fannie Mae and Freddie Mac, Which May Result in Losses**
>
> *. . . The originator provides loans primarily to borrowers who do not qualify for loans conforming to Fannie Mae and Freddie Mac guidelines* but who generally have equity in their property. While the primary consideration in underwriting a mortgage loan is the value and adequacy of the mortgaged property as collateral, *the originator also considers, among other things*, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property. *The originator's underwriting standards do not prohibit a mortgagor from obtaining secondary financing at the time of origination of the first lien, which secondary financing would reduce the equity the mortgagor would otherwise have in the related mortgaged property as indicated in the originator's loan to value ratio determination.*
>
> *The mortgage loans may have been made to mortgagors with imperfect credit histories*, ranging from minor delinquencies to bankruptcy or mortgagors with relatively high ratios of monthly mortgage payments to income or relatively high ratios of total monthly credit payments to income.
>
> *As a result of these underwriting standards, the mortgage loans are likely to experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in a more traditional manner.*

---

[21] IKB cites statements in the JPMAC 2007-HE1 PS detailing the "extensive quality control procedures" used by ResMAE, one of the originators, CC ¶ 153, but does not allege that ResMAE or any other originator failed to perform any particular quality control procedure.

> Furthermore, *changes in the values of mortgaged properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the mortgage loans in the mortgage group than on mortgage loans originated in a more traditional manner.* We cannot assure you that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related mortgage loans.

CW2 PS, at S-15 (italics added; bold in original).  (*See* App. A § V)  The CW2 PS went on to

describe in detail, in a 3-page section "provided by Countrywide Home Loans," the nature of

Countrywide's underwriting practices, including its use of exceptions and the limited-

documentation programs that leave important information about the borrower unverified:

> Credit Blemished Mortgage Loans. . . . *On a case by case basis, Countrywide Home Loans may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception.* Compensating factors *may include* low loan-to-value ratio or combined loan-to-value ratio, as applicable, low debt-to-income ratio, stable employment, time in the same residence or other factors. *It is expected that a significant number of the Mortgage Loans will have been originated based on these types of underwriting exceptions* .. . .
>
> . . . Variations in the monthly debt-to-income ratios limit are permitted based on compensating factors.
>
> . . . Variations in maximum loan amount limits are permitted based on compensating factors . . . .
>
> Countrywide Home Loans' Credit-Blemished Mortgage Loan underwriting standards are more flexible than the standards generally acceptable to Countrywide Home Loans for its non-credit blemished mortgage loans . . . *Borrowers who qualify generally have payment histories and debt-to income ratios which would not satisfy more traditional underwriting guidelines* and may have a record of major derogatory credit items . . . .

CW2 PS, at S-68-69 (emphasis added).[22]  The CW2 PS disclosed that 37.41% of the principal

value of the Mortgage Loans consisted of "Stated Documentation" loans as to which "the

borrower's income as stated on the application *is not independently verified.*"  CW2 PS, at S-35,

---

[22] Other Prospectus Supplements disclosed that "it is expected that a **substantial** portion of the mortgage loans . . . will represent . . . exceptions" [to the stated guidelines]  (emphasis added).  (*See* App. A § VI).

S-69.  (*See* App. A § VII)  It likewise disclosed that, while Countrywide considered a borrower's

credit scores, such scores were sometimes unavailable and, even when available, were "used as

an aid to, not a substitute for, *the underwriter's judgment*."  CWS PS, at S-73 (emphasis added).

(*See* App. A § VIII)

IKB contends that some undetermined number of non-conforming Mortgage Loans

without sufficient compensating factors were included in the Securitizations.  *See* CC ¶¶ 124-

129.[23]  The Prospectus Supplements, however, expressly disclosed that the existence of

compensating factors was frequently unverified by Defendants because of the use of limited

documentation programs.  The CW2 PS disclosed a standard procedure for repurchase by the

originator of non-conforming loans in the pool and the risk that "the seller or the originator may

not be capable of repurchasing or substituting any defective mortgage loans, for financial or

other reasons," which would "likely cause the mortgage loans to experience higher rates of

delinquencies, defaults and losses."  CW2 PS, at S-23, S-119-21.  (*See* App. A § IX)

The Prospectus Supplements revealed other inherent instabilities, making clear the risks

of the Mortgage Loans during this time period.  The very first page of the CW2 PS warned that

"[t]he assets of the trust fund will primarily consist of a pool of **subprime**, first and second lien

adjustable-rate and fixed-rate mortgage loans."  CW2 PS, at i (emphasis added); *see also* CW2

PS at S-10.  (*See* App. A § X)  It disclosed that 63.13% of the Mortgage Loans were adjustable-

rate mortgage loans, 29.36% were interest-only loans, and as many as 12.01% of some

subgroups of the Mortgage Loans were "balloon loans," and "[t]he ability of such a borrower to

repay a balloon loan at maturity frequently will depend on such borrower's ability either to

---

[23] Even on the face of these allegations, the Complaint alleges that such loans amounted to only 6.8% of the Bear Stearns loans reviewed (16.3% of the loan files, of which 41.8% were "waived in" and accepted) and 13.7% for JPMorgan.  CC ¶¶ 127, 129.  As discussed below, the Complaint fails to connect them to the Securitizations.

timely refinance the loan or to timely sell the mortgaged property."  CW2 PS, at S-18, S-26, S-34, S-43.[24]  (*See* App. A § XI)  It also disclosed that as many as 26.8% of the Mortgage Loans in some subgroups were on properties with a second lien, another risk factor for higher foreclosure rates.  CW2 PS, at S-21.  (*See* App. A § XI)  More than 38% were located in just two states, California and Florida.  CW2 PS, at S-37.  (*See* App. A § XII)

   *LTV and CLTV Ratios*:  IKB alleges that the Prospectus Supplements understated LTV and CLTV ratios due to "[t]he failure to accurately appraise the pooled properties" collateralizing the Mortgage Loans.  CC ¶¶ 99-100, 102-104, 110.  IKB emphasizes that "[a]ccurate appraisals are the crucial factor in the accuracy of LTV and CLTV ratios."  CC ¶ 99.  The Complaint offers scattered references to problems with some originators' appraisal processes,[25] but otherwise relies on a retrospective analysis (discussed below) to claim that the appraisals, and thus LTVs and CLTVs were faulty.

   The Prospectus Supplements disclosed that the appraisals and resulting LTV and CLTV ratios were not statements of fact, but merely *estimates* of value at a particular point in time.  The CW2 PS warned that "the originator's determination of the value of a mortgaged property used in the calculation of the loan-to-values ratios of the mortgage loans *may differ from the actual value of such mortgaged properties*."  CW2 PS, at S-21 (emphasis added).[26]  (*See* App. A § XIII)

   For refinancings and other loans where there was not a contemporaneous sale of the

---

[24] Other Certificates were backed entirely by adjustable rate mortgages.  (*See* App. A § X)

[25] *See, e.g.*, CC ¶¶ 183-84 (New Century "appraisers faced extreme pressure from their superiors, and deliberately distorted data"); 186 (Option One's appraisers "'frequently . . . inflated the appraised value'" of properties and Option One failed to implement adequate procedures to prevent this); 192 (People's Choice COO faced resistance in 2004-05 to implementing more controls; "'[t]he chief appraiser once said, 'Fraud is what we do. That's how we got where we are today.'"").  No Defendant is alleged to have known any facts about these appraisal issues.

[26] The BALTA 2005-2 Prospectus warned that "even when current, an appraisal is not necessarily a reliable estimate of value for" certain types of properties such as multi-family homes because an appraisal can based on various methods, including automated valuations, each of which present "analytical difficulties;" "[w]here more than one of these appraisal methods are used and provide significantly different results, an accurate determination of value . . . is even more difficult."  Ex. 19 at 13.  (*See* App. A § XIV)

property to fix a value, the CW2 PS disclosed that the appraisal value used for LTVs was "based solely upon the value determined by an appraisal made for the originator . . . at the time of origination" (CW2 PS, at S-30) or that new appraisals may be made only in limited circumstances.  (*See* App. A. § XV)  For example, the CW2 PS warned:

> *No assurance can be given that the value of any Mortgaged Property has remained or will remain at the level that existed on the appraisal or sales date.*  If residential real estate values overall or in a particular geographic area decline, the LTVs might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur on the Mortgage Loans.

CW2 PS, at S-30 (emphasis added).  (*See* App. A § XVI)  Originations were often months prior to the cut-off dates: "[m]any of the mortgage loans were originated within twelve months prior to the sale to the trust."  CW2 PS, at S-26.  The CW2 Loan Tape, for example, revealed 69 loans originated as far back as 2005.  Ex. 16.  (*See* App. A. § XVII)

*Owner Occupancy*:  The Prospectus Supplements disclosed the percentage of owner-occupied properties underlying mortgages backing the Certificates.  CC ¶¶ 112, 122-23 & Table 6.  IKB alleges that the Prospectus Supplements misrepresented these owner-occupancy rates, and that owner-occupancy is important in assessing the likelihood of default.  CC ¶¶ 112-22.  The CW2 PS, however, expressly disclosed that:

> Typically, the basis for a representation that a given percentage of the loans is secured by single family properties that are owner occupied will be either (1) the *making of a representation by the borrower at the loan's origination* either that the underlying property will be used by the borrower for a period of at least six months every year or that the borrower intends to use the property as a primary residence *or* (2) a finding that the address of the underlying property is the borrower's mailing address.

CW2 Prospectus, at 15 (emphasis added).[27]  IKB does not allege that any Defendant actually

---

[27] Other Prospectus Supplements stated that owner occupancy representations were "[b]ased upon representation of the related mortgagors at the time of origination" (*see* App. A § XVIII) and/or warned investors that "certain characteristics of the Mortgage Loans may vary" from the representations made (*see* App. A § II).

warranted that it had verified the accuracy of these representations.

*Loan Assignments:*  IKB claims that the Prospectus Supplements misrepresented that the notes and mortgages underlying the Securitizations would be transferred to the trusts at closing. CC ¶¶ 204-05.  The Prospectus Supplements, however, disclosed that the transfer and assignment of mortgages and notes would be "pursuant to the pooling [and servicing] agreements" ("PSAs") that governed each Securitization.  *See, e.g.,* CW2 PS, at S-119.[28]  In a securitization, the pooling and servicing agreement is not finalized until after the RMBS is marketed and sold.[29]  Thus, Prospectus Supplements merely described the contemplated terms regarding the transfer and assignment of notes and mortgages.  *Id.*  IKB does not allege that the Prospectus Supplements inaccurately describe those terms.

## ARGUMENT

A Rule 12(b)(6) motion to dismiss should be granted if the complaint does not contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A "pleading that only offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Martinez* v. *Capital One, N.A.*, 2012 WL 1027571, at *3 (S.D.N.Y. March 27, 2012) (quoting *Twombly*, 550 U.S. at 570).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Iqbal*, 556 U.S. at 679.  Those allegations must connect the conduct of the particular defendant to the harm suffered by the particular plaintiff; "'[t]he plausibility standard . . . asks for more than a sheer possibility

---

[28]Other Prospectus Supplements (i) disclosed that the loans to be transferred will be "identified in a schedule appearing as an exhibit to the pooling and servicing agreement" and/or (ii) listed various loan assignment and transfer procedures that would be performed "to the extent provided in the Pooling and Service Agreement" or "as described in the Pooling and Service Agreement."  (Ex. 26 at S-35.)  (*See* App. A § XIX)

[29] *See In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 2:11-ML-02265-MRP, slip op. at 8  (C. D. Cal. Jun. 29, 2012) (Ex. 15.)

that a defendant has acted unlawfully.'"  *Galiano v. Fidelity Nat'l Title Ins. Co.*, 684 F.3d 309,

313 (2d Cir. 2012) (*quoting Iqbal*, 556 U.S. at 678).

The legal elements of IKB's common law claims are well-settled.  Under New York law,

a cause of action for fraud requires "[1] material misrepresentation of a fact, [2] knowledge of its

falsity, [3] an intent to induce reliance, [4] justifiable reliance by the plaintiff and [5] damages."

*Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976, 979 (N.Y. 2009).  Claims for

fraudulent concealment and negligent misrepresentation share a number of these elements, "with

the additional requirement that the plaintiff must demonstrate that the defendant had a duty to

disclose material information," *Dodona I, LLC v. Goldman, Sachs & Co.*, 2012 WL 935815, at

*22 (S.D.N.Y. Mar. 21 2012) (fraudulent concealment), or "the existence of a special or privity-

like relationship imposing a duty to impart correct information to the plaintiff."  *J.A.O.*

*Acquisition Corp. v. Statitsky*, 863 N.E.2d 585, 587 (N.Y. 2007) (negligent misrepresentation).

A claim for aiding and abetting fraud requires (1) the existence of a fraud, (2) a defendant's

"actual knowledge" of the fraud, and (3) that the defendant provided substantial assistance to

advance the fraud's commission.  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006).

IKB's Complaint must also meet the heightened pleading requirements under Rule 9(b).

I.      **IKB FAILS TO PLEAD RELIANCE ON PROSPECTUS SUPPLEMENTS IT**
        **RECEIVED AFTER MAKING ITS INVESTMENT DECISIONS.**

Actual, reasonable reliance is an essential element of all of IKB's claims.[30]  IKB claims it

reasonably relied on representations in the Prospectus Supplements, and that these

representations were material to its investment decisions.  But, for 23 of the 43 Certificates IKB

---

[30] *See Water St. Leasehold LLC v. Deloitte & Touche LLP*, 796 N.Y.S.2d 598, 599 (N.Y. App. Div. 2005) (fraud);
*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F.Supp.2d 162, 201-02 (S.D.N.Y. 2011)
(fraudulent concealment); *J.A.O. Acquisition Corp.*, 863 N.E.2d at 587 (negligent misrepresentation); *Lerner*, 459
F.3d at 292 (aiding and abetting claim must be premised on a properly pleaded primary fraud).  No basis for
presuming reliance applies to Plaintiffs' common law claims.

purchased – more than 50% – IKB cannot possibly plead *any* actual reliance because it purchased them *before the dates on which the Prospectus Supplements were issued.  See* Ex. 9 § I.  IKB's allegation that it or its investment advisors reviewed and relied on documents they had yet to receive is not plausible.  *See High Tides, LLC v. De Michele*, 931 N.Y.S.2d 377, 381 (N.Y. App. Div. 2011) (emphasis added) ("These alleged misrepresentations and omissions may not form the basis for [Plaintiffs'] fraud [and fraudulent concealment] claims to the extent that they were made *after* such investment, since the element of reliance is necessarily absent.") (emphasis added); *Botti v. Russell*, 580 N.Y.S.2d 505, 507 (N.Y. App. Div. 1992).  Accordingly, all of IKB's claims for the 23 Certificates listed in Exhibit 9 § I must be dismissed.

## II.   IKB's NEGLIGENCE AND CERTAIN FRAUD CLAIMS ARE TIME BARRED.

"When a nonresident sues on a cause of action accruing outside of New York," New York's borrowing statute, CPLR § 202, "requires the cause of action to be timely under the limitations periods of *both* New York *and* the jurisdiction where the cause of action accrued." *Global Fin. Corp. v. Triarc Corp.*, 715 N.E.2d 482, 484 (N.Y. 1999) (emphasis added).  Here, both Plaintiffs are non-residents: IKB SA was a resident of Luxembourg, IKB AG of Germany. CC ¶¶ 28-29.  In determining where a cause of action accrued, courts look to "the place of the injury," which, for economic injuries, "usually is where the plaintiff resides."  *Global Fin*, 715 N.E.2d at 485.  Thus, both Plaintiffs' claims must satisfy the New York statute of limitations.

### A.   IKB's Negligence Claims Are Time-Barred.

IKB's claims for negligent misrepresentation should be dismissed as time-barred under the 3-year statute of limitations provided in CPLR § 214(4).[31]  CPLR Section 214(4) grants a three-year limitations period to "an action to recover damages for an injury to property," defined

---

[31] IKB purports to plead its negligent misrepresentation claim "in the alternative."  CC ¶ 18 & pg, 88.  To the extent that IKB has thus disclaimed that its negligent misrepresentation claim sounds in fraud, it is untimely.

as "an actionable act, whereby the estate of another is lessened, other than a personal injury, or

the breach of a contract."  Gen Constr. L. § 25-b.  Section 214(4) applies to all economic torts

not specifically excluded by other CPLR provisions, such as the limitations period for fraud.  *See*

*Fed. Ins. Co. v. Distinguished Props. Umbrella Managers Inc.*, 721 F. Supp. 2d 293, 297

(S.D.N.Y. 2010) (applying CPLR § 214(4) to negligent misrepresentation claim sounding in

tort); *Colon v. Banco Popular N. Am.*, 874 N.Y.S.2d 44, 44 (N.Y. App. Div. 2009) (applying 3-

year statute of limitations to negligent misrepresentation claim where plaintiffs did not allege

fraud).  The 3-year statute of limitations for IKB's negligent misrepresentation claim began to

run when IKB was injured by the alleged misrepresentations and thus accrued on the dates of its

purchases.[32]  *See Marchig v. Christie's Inc.*, 430 Fed. App'x 22, 25 (2d Cir. 2011); *Colon*, 874

N.Y.S.2d at 44; *Bond v. Progressive Ins. Co.*, 917 N.Y.S.2d 756, 758-59 (N.Y. App. Div. 2011).

Because IKB purchased all of the Certificates more than 3 years before it commenced this action

on September 1, 2011,[33] IKB's negligent misrepresentation claim must be dismissed.

### B.  Certain Fraud Claims Against Carrington Are Time-Barred.

A fraud claim must be brought within six years of the date of the fraud or within two

years from the date on which the plaintiff could have discovered the fraud.  CPLR § 213(8).  IKB

concedes that it purchased certain securities from Carrington in March and May 2006,

respectively.  CC ¶ 63 Table 1.  As discussed above, IKB knew of any alleged fraud in

connection with the sale of these RMBS by July 2007.  (*See supra* at 7).  Thus, to be timely,

claims concerning these RMBS must have been brought by the later of July 2009 (2 years from

---

[32] The Complaint alleges that IKB was injured when it "paid a purchase price for the Certificates that was far in excess of what those securities were actually worth *at the time of purchase*."  CC ¶¶ 26, 227 (emphasis added).
[33] *See* Summons with Notice filed in Supreme Court of the State of New York, County of New York, on September 1, 2011, included in Exhibit 1 to the JPMorgan  Defendants' Notice of Removal [Doc. No. 1].  IKB first asserted claims against the Carrington Defendants on July 13, 2012.  *See* Summons with Notice.  [Doc. No. 14].

its discovery of the alleged fraud) or March/May 2012 (6 years after the alleged fraud occurred). *See* Ex. 38.

IKB did not assert claims against the Carrington Defendants until *July 2012*, more than six years after it purchased the securities, and more than two years after it discovered any alleged fraud.  As a result, these claims are time-barred and must be dismissed.  *Mazza v. Berk & Michaels, P.C.,* 1991 WL 177646, at *2 (S.D.N.Y. Sept. 4, 1991) (calculating limitations period based on when plaintiff serves defendant with a summons and dismissing fraud claims based on failure to bring claims within six years of the investment).

## III.   IKB'S CLAIMS FAIL TO SATISFY RULE 9(b).

IKB's fraud claims must be pled with particularity, as required by the heightened pleading standards of Rule 9(b).  Fed. R. Civ. P. 9(b).  To the extent that IKB's negligent misrepresentation claim is based upon the same set of facts as the fraud claims,[34] it "sounds in fraud" and is also subject to Rule 9(b)'s heightened pleading requirements.  *Harsco Corp. v. Segui*, 91 F.3d 337, 347-48 (2d Cir. 1996) (applying Rule 9(b) to negligent misrepresentation claim); *DeBlasio v. Merrill Lynch & Co.*, 2009 WL 2242605, at *12 (S.D.N.Y. July 27, 2009).  Under Rule 9(b), a complaint must "(1) specify the statements that the plaintiff[s] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  "Rhetoric is not a substitute for specificity" – it is not sufficient to allege statements that "specify the 'what,' but not the 'who, where and when' required for Rule 9(b)."  *Filler v. Hanvit Bank*, 2003 WL 22110773, at *3 (S.D.N.Y. Sept. 12, 2003).

---

[34] *See* CC ¶ 257 (repeating and re-alleging facts supporting their fraud claim); ¶264 (asserting that negligent misrepresentation claim is based on  "Defendants [being] *aware* that the misrepresentations were false and misleading…") (emphasis added).  As discussed above, IKB has no choice but to assert fraud in connection with its negligent misrepresentation claims, because they are otherwise time-barred.

***Pleading Statements:***  To state a claim for fraud, a plaintiff must plead "a material

misrepresentation of a fact." *Eurycleia Partners*, 910 N.E.2d at 979.  A fraud claim may not be

based upon generic allegations of the falsity of general types of documents or statements without

identifying the speaker, the precise content, and the time of each statement.  *See, e.g., Lachmund

v. ADM Inv. Servs., Inc.*, 191 F.3d 777, 784 n.9 (7th Cir. 1999) (claim based on "confirmations,

monthly statements and other commodity futures contracts" not sufficiently particular); *A.I.A.

Holdings, S.A. v. Lehman Bros., Inc.*, 1998 WL 159059, *7 (S.D.N.Y. Apr. 1, 1998) (claims of

forged monthly account statements failed to identify particular false statements).

***Pleading Speakers:***  Rule 9(b) is not satisfied by pleadings that clump together a variety

of defendants without identifying which defendant made which statement (or had what

knowledge), when, and in what context.  "[A] complaint must . . . identify those responsible for

the statements," and when it alleges fraud against multiple defendants, must set forth separately

the acts complained of *as to each defendant*.  *See Filler*, 2003 WL 22110773, at *2 (collecting

cases).  Where the defendants are corporations, Rule 9(b) requires pleading with particularity

"which individuals at" a corporate defendant engaged in misconduct.  *Borsellino v. Goldman

Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007); *Rey-Willis v. Citibank, N.A.*, 2004 WL

315267, at *2 (S.D.N.Y. Feb. 18, 2004) (Rule 9(b) requires express identification of "the persons

who engaged in fraudulent activity" and not just the corporate entity).

***Pleading Intent:***  To plead claims for common law fraud, IKB must establish that each

Defendant knowingly made a material misstatement and acted with scienter, *i.e.*, an "intent to

deceive."  *Desideri* v. *D.M.F.R. Grp.*, 660 N.Y.S.2d 714, 716 (N.Y. App Div. 1997); *Berman v.

Morgan Keegan & Co., Inc.*, 2012 WL 147907, at *2 (2d Cir. Jan. 19, 2012).  "[M]ere

conclusory language, absent specific and detailed allegations establishing . . . knowledge of

21

falsity . . . [and] scienter . . . is insufficient to state a cause of action for fraud." *Old Republic Nat'l Title Ins. Co.* v. *Cardinal Abstract Corp.*, 790 N.Y.S.2d 143, 145 (N.Y. App. Div. 2005). Allegations of scienter fail if they "do not give defendants notice of the particulars: the 'who, what, when, where and how . . .' required to support a fraud claim." *Landesbank Baden-Württemberg v. Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 622 (S.D.N.Y. 2011) ("*Landesbank I*"), *aff'd*, 2012 WL 1352590 (2d Cir. Apr. 19, 2012) ("*Landesbank II*") (citation omitted).

Under Rule 9(b), IKB "must allege facts that give rise to a *strong* inference of fraudulent intent." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 179 (2d Cir. 2004) (quotation omitted; emphasis in original); *see Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128-29 (2d Cir. 1994) (Rule 9(b) not satisfied where facts not pleaded to support general allegations of knowledge). This same rule applies to the knowledge of alleged aiders/abettors. *See, e.g., Armstrong v. McAlpin*, 699 F.2d 79, 93 (2d Cir. 1983) (complaint "fails to particularize adequately how and why [the alleged aider/abettor] should have anticipated" that its conduct would be used by primary wrongdoers to further scheme). Moreover, a plaintiff must tie allegations of "knowledge" to the individual corporate officers who are responsible for the defendant's alleged misconduct. *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100 (2d Cir. 2001) (complaint based on forgery of report dismissed where "[n]othing in the complaint suggests that [named officer] or anyone else at [corporation] knew the contents of the [undoctored report] or that *anyone in the employ of [parent] recklessly misbehaved while negotiating with plaintiffs*") (emphasis added).[35]

---

[35] *See also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008);

## A.  IKB Fails To Plead Knowing or Reckless Misstatements with Particularity.

IKB contends that the Prospectus Supplements made false statements on four topics: (1) underwriting guidelines, (2) LTV and CLTV ratios, (3) owner occupancy, and (4) intent to transfer loans.  As to each category, the Complaint fails to plead either (i) a materially false statement or (ii) scienter with the particularity required by Rule 9(b).

Notably, in determining whether a plaintiff has pleaded an actionable material misrepresentation, "the central issue . . . is not whether . . . particular statements, taken separately, were literally true, but whether defendants' representations taken together and in context, would have mis[led] a reasonable investor about the nature of the [securities]."  *Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2, 5-6 (2d Cir. 1996).  There is no actionable misrepresentation if statements were not misleading in light of the surrounding cautionary language, *id.* at 8-9, or if they were statements of opinion that were not "both objectively false and disbelieved by the [speaker] at the time they were expressed."  *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011).  Here, many of the alleged misstatements were plainly statements of opinion and/or were accompanied by sufficient cautionary language, and IKB has not pleaded with particularity that any Defendant disbelieved them.

### 1.    Underwriting Guidelines

IKB alleges that the Prospectus Supplements stated, falsely, that the Mortgage Loans were made either (i) in accordance with the originator's stated underwriting guidelines or (ii) on the basis of "specifically identified compensating factors" justifying an exception to those guidelines.  *See* CC ¶¶ 68, 155-60 & Appx. A.  This theory fails to satisfy Rule 9(b) for five reasons.  *First*, it is not a reasonable reading of the statements actually made in the Prospectus

---

*Chill v. Gen. Elec. Co.*, 101 F.3d 263, 266, 269-71 (2d Cir. 1996) (knowledge of employee of subsidiary not imputed to corporation's management).

Supplements.  *Second*, the Prospectus Supplements warned investors that the inclusion of non-conforming Mortgage Loans was contemplated.  *Third*, IKB has failed to plead that these particular Securitizations contained a material quantity of Mortgage Loans that were outside both the described guidelines and any possible compensating factors.  *Fourth*, the statements regarding "compensating factors" are, at best, non-actionable statements of opinion.  And *fifth*, IKB fails to plead facts showing that that each Defendant knew this at the time of the Prospectus Supplements, or, as to statements of opinion, that each Defendant disbelieved them.

### a) The Prospectus Supplements Do Not Promise Uniform Application of Underwriting Guidelines.

To start with, IKB's premise is contradicted by the very documents IKB quotes.  The CW2 PS, like the other Prospectus Supplements, stated, under the heading "**Delinquencies May Adversely Affect Investment,**" that "[t]he mortgage loans were either originated or acquired in accordance, *generally,* with the underwriting guidelines described in this prospectus supplement."  CC ¶ 156; CW2 PS, at S-23 (italics added; bold in original).  (*See* App. A § IV)  It included extensive disclosures of the high-risk nature of the borrowers and the loans: the very first page warned that "[t]he assets of the trust fund will primarily consist of a pool of *subprime,* first and second lien adjustable-rate and fixed-rate mortgage loans," CW2 PS, at i (emphasis added) (s*ee* App. A § X); and described the borrowers as, among other things, "mortgagors with imperfect credit histories," "primarily . . . borrowers who do not qualify for loans conforming to Fannie Mae and Freddie Mac guidelines," and "credit blemished" borrowers who "would not satisfy more traditional underwriting guidelines."  CW2 PS, at S-15, S-68-69.  (*See* App. A § V)

IKB alleges that, "[a]ccording to the representations made in the Offering Documents, if a loan is found not to comply with underwriting guidelines then *the loan cannot and will not be included in the securitized loan pool unless the loan is specifically found to have . . . additional*

*specifically identified compensating factors.*"  CC ¶¶ 68, 155 (emphasis added).  But the

Prospectus Supplements never purported to offer a binding, exclusive list of "specifically

identified compensating factors," and explicitly disclosed that the determination of such factors

was within the broad discretion of the loan underwriters.  The CW2 PS, for example, disclosed

that, "*[o]n a case by case basis,* Countrywide Home Loans may determine that, based upon

compensating factors, a prospective borrower not strictly qualifying under the underwriting risk

category guidelines described below warrants an underwriting exception.  Compensating factors

*may include* low loan-to-value ratio or combined loan-to-value ratio, as applicable, low debt-to-

income ratio, stable employment, time in the same residence or other factors.  *It is expected that*

*a significant number of the Mortgage Loans will have been originated based on these types of*

*underwriting exceptions.. . .*"  CW2 PS, at S-68-69 (emphasis added).  (*See* App. A § XX)  It

disclosed, without further explication of the factors used, that "compensating factors" could also

be used to vary the "maximum loan amount limits" and "monthly debt-to-income ratios limit."

*Id.*  And it disclosed that a borrower's credit score, while considered, was sometimes unavailable

and, even when available, was "used as an aid to, not a substitute for, the underwriter's

judgment."  CWS PS, at S-73.  (*See* App. A § VIII)  Moreover, it explicitly warned that 37.41%

of the principal value of the Mortgage Loans consisted of "Stated Documentation" loans as to

which "the borrower's income as stated on the application *is not independently verified."*  CW2

PS, at S-35, 35, S-69  (emphasis added).  (*See* App. A § VII)

      Nothing in these disclosures could be read as a promise that borrowers or loans would

satisfy any "specifically identified" checklist of underwriting standards; to the contrary, they

clearly warned the reader that these were case-by-case decisions that might not be adequately

documented.  The absence of any more concrete assurances bars IKB's claim.  *See, e.g.,*

*Footbridge Ltd v. Countrywide Home Loans,* 2010 WL 3790810, at *12 (S.D.N.Y. Sept. 28, 2010) (disclosures that loans "would be issued under a 'more flexible' set of underwriting guidelines" precluded claims that originators were "too flexible in the underwriting decisions"). Simply put, the Prospectus Supplements do not say what IKB says they say; indeed, they warned of the very risks about which IKB claims ignorance.  As such, IKB's claims of departures from promised underwriting guidelines cannot support a fraud claim.  *See, e.g., Barrios v. Pacos Pharm. Servs., Inc.*, 816 F. Supp. 243, 252 (S.D.N.Y. 1993) (no actionable misstatement "when an offering document exactly states the cautionary 'fact' that the plaintiff claims has been covered up or misrepresented"); *Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 262 (6th Cir. 2012) (affirming dismissal in part "because the [Bear Stearns] offering documents warned of the risks about which [plaintiff] claims ignorance").

> **b)     The Prospectus Supplements Disclosed The Presence of Non-Conforming Loans.**

The Prospectus Supplements explicitly contemplated that some non-conforming Mortgage Loans would be included in the Securitizations.  They disclosed that, as was standard in the industry, relevant contracts included specific mechanisms for dealing with such loans. Specifically, they disclosed that the loan purchase contracts underlying each transaction included repurchase, substitute, and cure provisions that obligated originators to repurchase loans that did not conform to contractual representations and warranties regarding appraisals, underwriting, and the like and that there was a "likely" risk of loss to investors in the event that the originators were financially unable to honor their repurchase obligations.

The existence of these repurchase provisions warned investors that the parties expected there to be loans in the pool that did not conform to the stated underwriting guidelines.  *See Lone Star Fund V (US), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 389-90 (5th Cir. 2010)

("'repurchase or substitute' clauses" fundamentally "change the nature" of disclosures about the underlying mortgages by making clear to all investors that the mortgage pools could contain noncompliant loans); *Footbridge,* 2010 WL 3790810, at *16 ("repurchase or substitute" provisions "change the nature of [the] representation" so as to make statements regarding loan characteristics non-actionable).  IKB, as a sophisticated investor, had no basis to ignore these provisions and cannot now claim that deviations from underlying guidelines constitute fraud.  *Id.*

> ### c)        *The Complaint Fails To Plead That The Securitizations Contained Non-Conforming Mortgage Loans.*

Where "Plaintiff[s] ha[ve] not alleged facts to show one instance of [an originator] granting an exception where [it] didn't believe compensating factors existed that warranted the exception," their claim must be dismissed.  *See N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.* 2012 WL 1076143, at *5 (S.D.N.Y. Mar. 29, 2012) ("*Novastar II*").  *See also Republic Bank*, 683 F.3d at 257.  Here, IKB never actually alleges what guidelines were violated, or identifies even a single Mortgage Loan that failed to conform to the (purportedly specific but never specified) standards, with or without any particular "specifically identified compensating factor."  *Id.*  IKB alleges that its "analysis of appraisal values and owner-occupancy data demonstrates that a substantial percentage of the loans in the Securitizations did not comply with the underwriting guidelines."  CC ¶ 158.  But the Complaint lacks any factual explanation of how appraisal values and owner-occupancy data failed to comply with specific underwriting guidelines in effect at the time of origination.  This is fatal under Rule 9(b).

*Allegations About Due Diligence Reports***:**  IKB's main argument is that Clayton, a third party vendor, conducted a retrospective analysis of its past due diligence reports and found loans that failed to comply with underwriting standards, yet were "waived in" to transactions without

compensating factors.  CC ¶¶ 125-129, 134.[36]  IKB's theory is that these reports were provided

to Defendants at the time of the Securitizations.  But even assuming *arguendo* that this states a

proper *theory* of fraud, it does not plead a claim under Rule 9(b) because the Complaint (1) does

not allege that Clayton provided a due diligence report for any of the Securitizations, and

(2) does not allege that any Mortgage Loan in any of the Securitizations was found to be outside

of the stated underwriting standards.

    The Complaint extols at length the conclusions of Clayton's after-the-fact analysis of its

general business with JPMorgan and Bear Stearns.  CC ¶¶ 124-134.  But the Complaint *never*

*identifies Clayton as the due diligence vendor for any Mortgage Loan at issue in this case*.  It

alleges instead that "[t]he JPMorgan and Bear Stearns Defendants completed their own due

diligence and also used Clayton *or similar companies* to perform due diligence on the pools of

mortgages that purportedly went into their RMBS securitizations" and alleges that a due

diligence review "[t]ypically . . . is done through a third-party vendor, as was done here by

vendors *including* Clayton . . ."  CC ¶ 67, 124 (emphasis added).  Thus, as in other cases citing

such reports, there is no "connection between the mortgages reviewed in the Clayton [due

diligence] and those collateralizing" the Securitizations.  *Landesbank I*, 821 F. Supp. 2d at 622,

*aff'd at Landesbank II*, 2012 WL 1352590, at *2; *see also Tsereteli v. Residential Asset*

*Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 394 (S.D.N.Y. 2010) (dismissing fraud

claims based on OIG report about originators' practices where complaint did not "contain any

suggestions that the loans the OIG examined were in the pools underlying the Certificates").

IKB does not satisfy Rule 9(b)'s particularity requirements.

---

[36] IKB makes no allegation whatsoever with respect to any due diligence performed by the Carrington Defendants.
Thus IKB has failed to allege that the Carrington Defendants acted with the requisite scienter.

***Allegations About Industry Practices*:**  IKB also alleges misconduct in mortgage

origination, both industry-wide and regarding the originators involved in the various

Securitizations.  None of these allegations, individually or collectively, can sustain Plaintiffs'

fraud claim under Rule 9(b).

Generalized allegations concerning purportedly improper underwriting practices across

the industry, CC ¶¶ 154, 159-198, cannot support a fraud claim unless those practices are

connected to the Mortgage Loans.  *See NovaStar II,* 2012 WL 1076143, at *4-5 (finding that a

plaintiff must provide "details that would tie its claim of loosened underwriting guidelines to the

specific loans that secured the [Certificates] that plaintiff bought," and dismissing claims where

plaintiff "d[id] not cite one specific loan that should not have been included in the

[securitization]").  Even under Rule 8, a complaint that simply "presume[s]" a connection

between "a supposed industry-wide practice" and a plaintiff's cause of action  is "mere

conjecture . . . without specifics as to the date, time, or amount . . . or any connections between

*these* plaintiffs . . . and *these* defendants."  *Galiano*, 684 F.3d at 315 (emphasis in original).

IKB likewise grasps at other lawsuits (CC ¶¶ 162, 166, 169, 179-81, 184-88, 195, 196,

198), investigations (CC ¶¶ 163, 165, 170, 191-94), and reports about originators' practices (CC

¶¶ 160, 161, 167-69, 174-78, 190, 194, 197), without connecting any of them to the

Securitizations or the Defendants.  This is insufficient.  *See Republic Bank*, 683 F.3d at 256;

*NovaStar II*, 2012 WL 1076143, at *4-5; *Boilermakers Nat'l Annuity Trust Fund v. WAMU*

*Mortg. Pass Through Certificates, Series AR1*, 748 F. Supp. 2d 1246, 1256 (W.D. Wash. 2010)

(rejecting allegations from other complaints because they "offer[] no nexus to the Certificates at

issue"); *see also City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortg. Loan Trust, Inc.*,

703 F. Supp. 2d 253, 263 (E.D.N.Y. 2010) (requiring plaintiffs to plead how the

misrepresentations "are tied to the loans in which they invested").

> **d)** **The Prospectus Supplement Descriptions of Underwriting Guidelines Are Non-Actionable Statements of Opinion.**

As set forth above, the Prospectus Supplements disclosed that the originators made exceptions to stated underwriting guidelines on a case-by-case basis, based upon a finding by a loan underwriter that sufficient compensating factors justified the exception. Plainly, an originator's determination as to what was a compensating factor and whether such factors were sufficient to warrant an exception was within its complete discretion – a classic matter of opinion.

As the Second Circuit has held, statements of valuation – such as "management's 'fair value' of the assets acquired and liabilities assumed" in a corporate acquisition – "are not matters of objective fact" and cannot be tested against "any objective standard," but rather "reflect management's opinion or judgment." *Fait*, 655 F.3d at 110. Such statements are not actionable unless facts are pleaded showing that the statement was "both objectively false *and* disbelieved by the [speaker] at the time it was expressed." *Id.* (emphasis added); *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 495 (S.D.N.Y. 2010); *see also infra* Point III.A.2. IKB's Complaint pleads nothing of the sort.

> **e)** **The Complaint Fails To Plead That Defendants Knew of Loans That Failed to Conform or Disbelieved The Statements Regarding Underwriting Standards.**

IKB fails to plead facts raising a strong inference of scienter as to non-conformance with underwriting guidelines statements under either the conventional scienter standard or the *Fait* standard for statements of opinion. IKB asserts that all Defendants "knew or were reckless or, in the alternative, negligent in not knowing," CC ¶ 12, or "would have known," CC ¶ 73, or "knew, or should have known," CC ¶ 77 of problems with statements in the Prospectus Supplements.

But no particularized facts support these theories.  Nothing in the Complaint details the 'who, when, where or what' of any representative of any Defendant learning any fact regarding any of the Securitizations.  Nothing is alleged to show that originators disbelieved the representations made as to particular Securitizations, let alone that *Defendants* did so.  IKB takes four stabs at pleading scienter, but none is tied to the Mortgage Loans.

*Allegations About Due Diligence Reports*:  IKB never identifies, let alone pleads with particularity, any due diligence reports received by any Defendant as to any Mortgage Loans at any time.  *See Landesbank II*, 2012 WL 1352590, at *2 ("[G]eneralized references" to "other due diligence reports" cannot sustain plaintiff's "pleading burden as to intent").  IKB's allegations of due diligence reports are thus insufficient on their face.[37]

*Allegations About ZiPPY*:  IKB alleges in general terms that employees of JPMorgan made improper use of "[CHF's] automated underwriting system, 'Zippy'" (CC ¶¶ 136, 143),[38] but plead no connection to any Mortgage Loans or Securitization.  Even as to the quoted memorandum, IKB never alleges who drafted and prepared it, or which Defendants, if any, reviewed it, or when.  Absent such allegations, IKB's allegations cannot support any strong inference of intent on the part of any Defendant.  *See Landesbank I*, 821 F. Supp. 2d at 621.

*Allegations About Defendants' Officers*:  With respect to the JP Morgan Officers, IKB cites statements made by JPMorgan executives Jamie Dimon, CC ¶¶ 137-39, 143, William Collins Buell VI CC ¶ 140, and Barry Zubrow CC ¶ 141.  Mr. Dimon is alleged in the most general terms to have had knowledge "that subprime positions were risky and dangerous."  CC ¶ 143.  But the allegations as to these individuals are all hindsight statements to regulators, except

---

[37] IKB does not allege any specific facts with regard to the Carrington Defendants whatsoever with respect to due diligence reports.

[38] No similar allegations are made with respect to the Carrington Defendants.

for certain alleged October 2006 statements by Mr. Dimon to William A. King.  CC ¶ 137.

Those statements – which do not differ materially from what the *Wall Street Journal* was saying

at the same time about subprime risks – postdate Securitizations such as CW2, and in any event,

IKB alleges no facts to show that either Mr. Dimon or Mr. King were involved in or even aware

of the Securitizations, much less had knowledge of any alleged misrepresentations.  *See*

*Landesbank I*, 821 F. Supp. 2d at 623 (plaintiffs' allegations that defendant should have known

about the origination of non-conforming loans by originators "given subsequent revelations

about toxic mortgages . . . are paradigmatic 'fraud by hindsight' and cannot survive a motion to

dismiss.") (citation omitted).  As for subsequent statements, things said during a public

controversy do not raise a strong inference of intent to deceive many months earlier.  *See Mills v.*

*Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993) (conduct in August 1990 "does not

bear on [defendant's] intent in *April* 1990" when alleged fraud occurred) (emphasis in original).

IKB does not make any specific allegations with respect to the Carrington officers.  It

identifies not one officer, director, or statement by any such person that it alleges is misleading

or incorrect.  IKB cannot state a claim when it did not include any allegations of knowledge of

the Carrington Defendants, beyond conclusory allegations, in its Complaint.

***Allegations About The Originator Defendants*:**  Finally, IKB asserts that the Originator

Defendants must have had knowledge of the relevant facts regarding the Securitizations because

of their positions in the offering process.  CC ¶¶ 19, 135, 145-46.  But again, at most, these

allegations show that they possessed files from which they could have reached different

conclusions – not that any employee of any Originator Defendant ever actually learned any fact

contradicting statements in any Prospectus Supplement.

For all of these reasons, IKB's underwriting guidelines fail to state any claim.

### 2.     *LTV and CLTV Ratios*

IKB alleges that it analyzed and sampled certain unidentified Mortgage Loans and concludes that the Prospectus Supplements misstated the appraised value of properties and therefore LTV and CLTV ratios.  CC ¶¶ 100, 102-104.  IKB alleges appraiser misconduct in general terms, CC ¶¶ 100, 102-104, 183, 186, 192, but never links any bad appraisal to any Mortgage Loan, nor does it allege that any Defendant was informed of any such appraisal inflation for any specific Mortgage Loan at any relevant time.  Indeed, IKB never pleads even generalized facts pre-dating IKB's purchase of the Certificates.  These failures require dismissal under Rule 9(b).  *See Republic Bank.*, 683 F.3d at 257 ("Without some factual allegation suggesting that appraisers of the properties at issue here employed unsound valuation practices in connection with these loans, [plaintiff's] unsound-valuation claims must fail.")

IKB's claims regarding misstated LTV and CLTV ratios also fail because statements as to value, such as appraisals, are classic statements of opinion that are not actionable unless they "were both objectively false and disbelieved by the [speaker] at the time they were expressed." *Fait*, 655 F.3d at 110 (emphasis added).  Courts addressing MBS claims have agreed.  *See In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 511 (S.D.N.Y. 2010) (dismissing LTV ratio claims because ratios based on appraisals are themselves statements of opinion); *Tsereteli*, 692 F. Supp. 2d at 393 (same); *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2010 WL 1473288, at *7-8 (S.D.N.Y. Mar. 29, 2010) (same).  Here, IKB fails to establish a plausible inference that any "speaker did not truly have" its stated opinion as to the value of any specific mortgaged property at the time of the appraisal or facts suggesting that Defendants did not accurately report the appraisals as given.  *Tsereteli*, 692 F. Supp. 2d at 393 (dismissing fraud claims regarding appraisal practices because plaintiff failed to allege any facts supporting its claim that appraisals of mortgages underlying the certificates were false or disbelieved by

33

defendants); *In re IndyMac*, 718 F. Supp. 2d at 510-11 (same); *N.J. Carpenters Health Fund v. Novastar Mortg.*, 2011 WL 1338195, at *11 (S.D.N.Y. Mar. 31, 2011) (dismissing claims where plaintiff "fails to allege that any Defendant made knowingly false statements at the time they published their appraisals") ("*NovaStar I*").

Subsequent second-guessing evaluations by IKB's counsel, CC ¶¶ 100, 183, 186, 192, do not show Defendants' purported contemporaneous knowledge of the falsity of the original appraisals.  IKB's "AVM" analyses, CC ¶¶ 107-111, are at most alternative opinions concerning value, which like all valuation models, do nothing to show that other opinions were false at the time they were made.  *See In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005) ("valuation models depend so heavily on the discretionary choices of the modeler . . . that the resulting models and their predictions can only fairly be characterized as subjective opinions"); *Fait*, 655 F.3d at 112 (plaintiff's contention that "defendants should have reached different conclusions regarding" statements of goodwill, which are opinions, were insufficient to "plausibly allege that defendants did not believe the statements regarding goodwill at the time they made them").  Notably, IKB does not allege that its valuation models used data and inputs that were contemporaneous to those that were available to Defendants (but not IKB) at the time of the original appraisals.  Any AVM analysis conducted with years of data that was unavailable to both IKB and Defendants at the time the loans were originated cannot support any inference that any valuations were inaccurate, much less that Defendants did not believe the appraised values at the time of the securitizations.  Accordingly, because the ratios are non-actionable statements of opinion and the Prospectuses adequately warned of this, IKB's allegations about LTV and CLTV ratios fail to state any claim.

### 3.    *Owner Occupancy*

IKB asserts that its loan-level analyses show that the Prospectus Supplements

misrepresented the percentage of Mortgage Loans that were made to owner-occupied properties. CC ¶¶ 117-123.  These allegations fail to state a claim because (1) the Prospectus Supplements disclosed that the reported owner-occupancy information was based on the representation of borrowers at the time of origination, and the Complaint does not allege that Defendants incorrectly reported the borrowers' representations, and (2) as with LTV ratios, IKB's after-the-fact analyses do not show the state of facts as of the time of origination of the Mortgage Loans.

The CW2 Prospectus states plainly that in the absence of a home address (which would be available only for refinancings), "[t]ypically, the basis for a representation that a given percentage of the loans is secured by single family properties that are owner occupied will be . . . the making of a representation by the borrower at the loan's origination."  CW2 Prospectus, at 15; *see also* NC5 Prospectus, at 13 (disclosing owner occupancy rates as self-reported by borrowers).  (*See* App. A § XVIII)  In the absence of an allegation that Defendants misreported the information given by buyers, this alone defeats IKB's claims.  *See Footbridge*, 2010 WL 3790810, at *19 (no misstatement where offering documents "include[ed] additional limiting language that explains that the [occupancy status] percentages reported are '[b]ased upon representations of the related borrowers at the time of origination'"); *Mass. Mut. Life Ins. Co. v. Residential Funding Co.*, 2012 WL 479106, at *8 (D. Mass. Feb. 14, 2012) ("[B]ecause the offering documents explicitly stated that all occupancy rates were based only on borrowers' representations and because Plaintiff[s] do[] not alleged that Defendants falsely reported the borrowers' representations, the [Prospectus Supplements] contain no misstatements or omissions concerning owner-occupancy as a matter of law.").[39]

Moreover, IKB's review of loan level data relies on information that was not even

---

[39] IKB's allegations arising from the Clayton reports, *see* CC ¶¶ 122, 134, are similarly unavailing regarding owner occupancy for the reasons stated above.

available at the time Mortgage Loans were originated: a borrower's credit history as of six

months after origination. CC ¶¶ 120-21.  The Prospectus Supplements disclosed that the

representations were as of the date of origination.  A review of data that did not exist at that time,

by definition, cannot demonstrate that owner occupancy representations were knowingly false.

*See Footbridge,* 2010 WL 3790810, at *9; *Lovett v. Allstate Ins. Co.*, 446 N.Y.S.2d 65, 67 (N.Y.

App. Div. 1982) ("In proving an allegation of fraud, an essential element is that the

representation must have been false when it was made.").

### 4.    *Loan Assignments*

IKB alleges that the Prospectus Supplements falsely represented that the "notes and

mortgages underlying the Securitization were to be transferred to the Trust as of the date of the

issuance," CC ¶ 204, and that "the endorsed mortgage notes were to be delivered to the Trustee

at or about the time of issuance."  CC ¶ 205.  Based on IKB's purported investigations, IKB

alleges that "a substantial number of the sampled notes and mortgages underlying the

Securitizations were apparently never transferred to the Trusts."  CC ¶ 206.

These allegations fail to state any claim because they are based on a mischaracterization

of the statements at issue.  IKB wrongly assumes that the Prospectus Supplements obligated the

Defendants to *guarantee* the timely transfer of the notes and mortgages to the Trusts.  As one

court has explained in dismissing nearly identical claims, the alleged statements concerning loan

assignments and transfers, when placed in proper context, are merely descriptions of the

procedures for the assignments and transfers to be taken under the relevant PSAs, and are

insufficient to allege a misstatement.  *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,

2:11-ML-02265-MRP, slip op. at 5-6, 8  (C. D. Cal. Jun. 29, 2012) (Ex. 15.)

As in *Countrywide*, the alleged loan transfer and assignment misstatements in the

Complaint appear in sections of the Prospectus Supplements titled "Assignment of the Mortgage

Loans."  For 10 of the 20 deals at issue here, these "Assignment of the Mortgage Loans" sections include disclosures that the loan assignments and transfers would be made "pursuant to the Pooling Agreement," CW2 PS, at S-119, or "under the Pooling and Servicing Agreements."  (Ex. 32 at S-17.)  (*See* App. A § XIX)  As explained by the *Countrywide* court, because RMBS are sold and marketed through a prospectus supplement before the PSA is "finalized and made available to investors," the prospectus supplement "will typically summarize the PSA for investors that would not otherwise have access to its terms" at the time.  Ex. 15 at 8.  Thus, because the "PSA [not the PS] is the actual governing document for the trust," "[a]n RMBS investor reading the 'Assignment of the Mortgage Loans' section [of a prospectus supplement] would understand that the 'pursuant to the pooling and service agreement' language indicates that the section is meant as a description of the PSA rather than an independent manifestation of present intent."  *Id.*  Because IKB "has not alleged that the Prospectus Supplement[s] state[] any of the terms of the PSA [s] inaccurately," it fails to allege an actionable misrepresentation for any of these deals or for the remaining deals, which similarly disclosed that loan transfer and assignment was governed by the PSA.  *Id.*

Moreover, IKB's title transfer allegations are based on alleged representations that amount to non-actionable promises or intention to act in the future.   In order to plead intentional or reckless fraud for such statements, the Complaint must allege that Defendants never intended to transfer the notes and mortgages.[40]  IKB makes no specific allegation that any particular Defendant never intended to transfer the notes and mortgages according to the disclosed process.

Finally, IKB does not plead a single example of a loan that was unable to be foreclosed

---

[40] *See Papp v. Debbane*, 790 N.Y.S. 2d 450, 451 (N.Y. App. Div. 2005); *Lanzi v. Brooks*, 388 N.Y.S.2d 946, 948 (N.Y. App. Div. 1976), *aff'd*, 373 N.E.2d 278, (N.Y. 1977) ("Absent a present intention to deceive, a statement of future intentions . . . is not actionable on the grounds of fraud.").

upon.  Thus, the Complaint's discussion of possible legal risks to proper foreclosure, CC ¶¶ 216-18, is entirely speculative.

**B.  IKB's General Allegations of Scienter Fail.**

As set forth above, IKB fails to plead facts connecting any Defendant to any Mortgage Loan or any pool of loans that failed to comply with statements in the Prospectus Supplements, and IKB fails to plead facts showing that any Defendant disbelieved any statement of opinion or future intent in the Prospectus Supplements.  IKB seeks to remedy this by means of two types of general allegations of scienter: allegations based on the corporate structure of the JPMorgan and Carrington Defendants, and allegations that Defendants were motivated to commit fraud. Neither is an adequate substitute for particularized allegations of conscious misbehavior.

### *1.  IKB's Allegations Based on Corporate Structure Do Not Plead Fraud.*

In lieu of particularized facts showing knowledge by *each* Defendant, IKB resorts to conclusory allegations that *all* of the JPMorgan Defendants had knowledge of everything known by every other Defendant because Defendants "shared officers, directors, executives, and high-level employees," CC ¶ 73 who had knowledge of mortgage loans CC ¶¶ 73-74, 143, and loan assignments CC ¶ 215.  With respect to the Carrington Defendants, IKB alleges that "individuals that owned CHC were, at all relevant times, also owners and employees of CCM, which is the general partner of Carrington Securities, which in turn is the sole member of Stanwich."  *Id.* ¶ 75.[41]  However, IKB's allegations purportedly demonstrating the Defendants' vertical integration structure, CC ¶¶ 73-74, 124-135, fail for four independent reasons.

*First*, IKB wholly fails to plead that *any* of Defendants' officers, directors, executives, or high-level employees reviewed any due diligence reports, or were involved in the loan

---

[41] IKB does not make allegations more specific to the Carrington Defendants' corporate structure.

assignment process, for any of the relevant Certificates.  Absent such allegations, there is no

single Defendant whose knowledge could be attributed to others.[42]  *Second*, IKB cannot attribute

"knowledge or intent from one defendant to another."[43]  *Third*, IKB does not particularize its

allegations of vertical integration.  It does not list dates for when any of the shared officers,

directors, executives, or high-level employees were in their positions.  *See* CC Table 2.  Without

such facts, it is impossible to infer what information employees gained, or could have gained,

while employed with one Defendant that they would allegedly "take[]" "with them as they

fulfill[ed] their roles for the various other Defendants."  CC ¶¶ 73.  With respect to the

Carrington Defendants, the claims against CHC and CCM in particular must fail because IKB

simply repeats CHC's current corporate structure as a substitution for proof of any knowledge or

intent attributed to these entities.  Indeed, IKB does not even attempt to allege with the required

particularity that CCM had any knowledge of the transactions *at all*.  As IKB acknowledges,

CCM had *no* role whatsoever in the questioned deals.  CCM cannot possibly be liable for the

alleged misrepresentations and alleged omissions when it did not have any role in those

transactions.  *Fourth and finally*, CHC cannot be liable because CHC *did not yet exist* as a

corporate entity when the securities were issued or when IKB purchased the securities.  This fact

alone is sufficient to dismiss CHC from the case.[44]

---

[42] *See, e.g., Landesbank*, 821 F. Supp. 2d at 621 (to satisfy Rule 9(b), plaintiffs who allege defendants were put on notice of contrary facts by reports must "'specify the [] reports, who prepared them and when, how firm the numbers were or which company officers reviewed them'"); *Dynex*, 531 F.3d at 196.

[43] *In re Sec. Capital Assurance, Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 595 (S.D.N.Y. 2010); *see also Alki Partners, L.P.* v. *Vatas Holding GMBH*, 769 F. Supp. 2d 478, 493 (S.D.N.Y. 2011) (plaintiffs "may not lump separate defendants together in vague and collective fraud allegations but must inform each defendant of the nature of his alleged participation in the fraud"); *DeBlasio*, 2009 WL 2242605, at *13.

[44] IKB alleges that the "individuals that owned CHC were, at all relevant times, also owners and employees of CCM . . ." CC ¶75.  It would be impossible that individuals that owned CHC were at all *relevant time* owners and employees of CCM because during the relevant time period CHC did not exist.  These claims must be dismissed because CHC was not in existence at the time of the issuance of the securities or at the time that IKB purchased the securities in 2006.  CHC could not have the alleged knowledge and intent required of a corporate parent for any fraud claim when CHC was not a corporate entity at the time the securities were issued.

### 2.     *IKB's Allegations of Motive Do Not Plead Fraud.*

IKB falls back on the last refuge of the conclusory pleading of fraud: allegations of motive.  It does not succeed.  IKB alleges that Defendants made intentional misstatements in order to profit from the sale of the Certificates, CC ¶ 131, or avoid the costs associated with effecting loan assignments.  CC ¶ 213.  These generalized motives, being universally shared, are insufficient as a matter of law to create a strong inference that Defendants committed deliberate fraud.  *See Landesbank II*, 2012 WL 1352590, at *2 ("a general profit motive common to all corporations" does not suffice to establish a strong inference of fraudulent intent); *Footbridge*, 2010 WL 3790810, at *18 (conclusory allegations "that defendants intended to deceive the plaintiffs in order to "maximize [their] own profits and market share" insufficient); *Zutty v. Rye Select Broad Market Prime Fund, L.P.*, 2011 WL 5962804, at *11 (N.Y. Sup. Ct. Apr. 15, 2011) ("desire for higher compensation . . .  is found in virtually all commercial transactions, making it an ill-suited motive from which to draw an inference of intent to defraud') (citation omitted).

### C.     Plaintiffs Fail to Plead Reliance With Particularity.

Plaintiffs are also required to plead reasonable reliance under the heightened pleading standards.  *See Premium Mortg. Corp. v. Equifax Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (dismissing complaint that provided no basis for reasonable reliance).  IKB has not done so.

*IKB SA's Purchases***:**  IKB asserts in general, conclusory fashion that, before purchasing the Certificates for IKB's account, its "Investment Managers were obligated to, and did, review for Plaintiffs the Offering Documents provided to the Investment Managers by the Underwriter Defendants."  CC ¶ 222.  As discussed above, this is demonstrably untrue: more than half of the Certificates were purchased before the Investment Managers even received the Prospectus Supplements.  IKB's remaining reliance allegations fail to provide any of the particulars required under Rule 9(b).

IKB does not allege *which* specific "Offering Documents" for each Certificate were reviewed by either IKB or its Investment Managers; the Complaint does not allege that IKB, the Investment Managers, or both reviewed *all* the Prospectus Supplements for *every* Certificate, nor does it give any indication of who reviewed what or when.  Indeed, given its habit of making purchases before even *receiving* a Prospectus Supplement, and the fact that 11 other Certificates were purchased on the same day that the corresponding Prospectus Supplements were issued (*see* Ex. 9 § II), there is no plausible inference to be drawn that even in the cases where IKB *did* purchase after receiving a Prospectus Supplement, it actually reviewed that document before making its investment decision.

IKB's generalized allegations about its purported review of unspecified "Offering Documents" – a matter exclusively within *IKB's* knowledge – do not adequately "inform [Defendants] of the complained-of incidents."  *Eurycleia Partners,* 910 N.E.2d at 979.  This alone requires dismissal of Plaintiffs' fraud and fraudulent concealment claims.  *See Destino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011) ("everyone did everything allegations" are insufficient to plead fraud and fail as a matter of law).

**IKB AG's Purchases**:  To the extent that IKB AG asserts claims independent of those of IKB SA, no facts are alleged, much less particularized, showing *any* reliance on *any* statement at the time that IKB SA purportedly sold the Certificates to IKB AG on November 20, 2008.  CC ¶ 62.  IKB's failure to allege *who* reviewed *any* Prospectus Supplements at the time of IKB AG's purchase, *when* they did so, or *which* Prospectus Supplements were reviewed for each Certificate precludes a finding of reasonable reliance by IKB AG.

## IV.   IKB FAILS TO PLEAD REASONABLE RELIANCE.

IKB also fails to plead even unparticularized facts showing that it reasonably relied on any of the statements at issue, and its claims should be dismissed on that independent basis.

41

New York courts evaluate reasonable reliance by considering the level of sophistication and experience of the parties, *see, e.g., MBIA Ins. Corp. v. Royal Bank of Canada*, 2010 WL 3294302, at *30 (N.Y. Sup. Ct. Aug. 19, 2010); *Terra Sec. Asa Konkursbo v. Citigroup, Inc.*, 740 F. Supp. 2d 441, 448 (S.D.N.Y. 2010), as well as by reference to the transaction's "complexity and magnitude." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003). IKB "cannot be held to the standard of an ordinary investor in terms of the type and amount of diligence that would be expected prior to making a purchase or investment" in light of its sophistication and the magnitude of its RMBS investments and experience. *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 58 F. Supp. 2d 228, 260 (S.D.N.Y. 1999).

As set forth above, the Prospectus Supplements bristled with warnings and uncertainties beyond the public warnings of lax underwriting standards and a housing decline apparent in the market. Underwriting guidelines were described only generally, and there was mention of numerous exceptions, but nowhere did the Prospectus Supplements promise or detail that any particular proportion of the Mortgage Loans would meet any particular standard. LTVs were based on appraisals, but the reader was cautioned that some appraisals could be outdated in a changing or declining market, and any reasonable RMBS investor knew (as the Prospectus Supplements warned) that appraisal could be an imprecise business. Owner occupancy, like many aspects of the borrowers' credit files, was unverified and described as such.

Moreover, the Prospectus Supplements not only warned of these weaknesses in the available information; they also clearly indicated the risky characteristics of the loan pools and their sensitivity to declining home prices. Yet, warnings in hand, IKB bought more than $79 million of the Certificates between November 2006 and June 2007, when the housing market was already sliding and problems in the mortgage origination industry were already widely

reported.  IKB "should be charged with knowledge of the offering circular's risk disclosures," *HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59, 70 (N.Y. App. Div. 2012), and in that context, the Prospectus Supplements "should have resulted in a dissonant picture that looked decisively like a red flag." *Terra Sec. Asa Konkursbo*, 740 F. Supp. 2d at 450.  In such circumstances, IKB "cannot now in hindsight rely . . . and characterize [the disclosures] as misrepresentations when they were sufficiently on notice of them and their potential implications before investing."  *Id.* at 451; *see also Ashland v. Morgan Stanley & Co.*, 652 F.3d 333, 338 (2d Cir. 2011) (sophisticated investor "not justified in relying" on statements to the contrary where document "explicitly disclosed the very liquidity risks about which appellants claim to have been misled").

IKB alleges that "the loan files contained the detailed information on each borrower" that "was fundamental to verifying the data presented by Defendants."  CC ¶¶ 226.  Indeed, *Defendants'* alleged access to such data is the linchpin of IKB's theory of how they allegedly knew or should have known their statements were false.  CC ¶¶ 66, 242.  But, IKB *admits* that it *never* asked for loan files, and indeed does not allege that it ever asked for *any* information outside the four corners of the written offering materials: its "review and analysis of the Securitizations was limited to the information, data, and representations supplied by Defendants," CC ¶ 226, of which only the Prospectus Supplements are quoted.  The Complaint nowhere alleges that IKB or its advisors ever once asked for any information and failed to receive it.

With so much money at stake, if it expected the law's protection, IKB had a duty to ask for more.  "New York law imposes an affirmative duty on sophisticated investors to protect themselves from misrepresentations . . . by investigating the details of the transactions." *Global Minerals & Metals Corp. v. Holme*, 824 N.Y.S.2d 210, 215 (N.Y. App. Div. 2006).  IKB was a

large bank assisted by prominent and sophisticated financial advisors, investing vast sums of money on behalf of its own investors and depositors.  IKB *knew* that it lacked the loan files, and thus that it lacked the "fundamental" data on which it claims its assumptions rested, yet it never even tried to obtain them.  *See Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 101 (2d Cir. 1997) (no fraud claims where facially incomplete list of artist's works should have "led any reasonably diligent attorney or corporate officer" to conduct "a lawyerly review" of files that would have revealed misrepresentation).  IKB's failure to investigate the unverified facts regarding the quality of the mortgage pool – the very subject matter about which it now complains – precludes a finding of reasonable reliance.  *See UST Private Equity Investors Fund v. Salomon Smith Barney*, 733 N.Y.S.2d 385, 386 (N.Y. App. Div. 2001); *Stuart Silver Assocs. v. Baco Dev. Corp.*, 665 N.Y.S.2d 415, 417-18 (N.Y. App. Div. 1997) (plaintiffs could have requested supporting documents about real estate partnerships, reviewed leases and construction contract, and investigated site).[45]

IKB asserts – backed by no particular facts – that, even given the huge amounts of money IKB was investing, Defendants would have refused to provide any additional information or any further assurances to such a valuable customer.  But even had that happened, IKB could always walk away.  *See Emergent Capital*, 343 F.3d at 195 (where due diligence should have put the investor "on notice of the existence of material facts which have not been documented and [it] nevertheless proceeds with a transaction without securing the available documentation … [it] may truly be said to have willingly assumed the business risk that the facts may not be as

---

[45] *Abrahami v. UPC Constr. Co.*, 638 N.Y.S.2d 11, 14 (N.Y. App. Div. 1996) (plaintiffs could have conducted an audit of real estate venture); *Stuart Lipsky, P.C. v. Price*, 625 N.Y.S.2d 563, 564 (N.Y. App. Div. 1995) (affirming motion to dismiss; plaintiff could have reviewed financial statements of law practice); *Curran, Cooney, Penney, Inc. v. Young & Koosmans, Inc.*, 583 N.Y.S.2d 478, 479 (N.Y. App. Div. 1992) (no fraud claim where defendants refused to provide particular year's tax return and plaintiffs failed thereafter to demand it).

represented").[46]  IKB's boilerplate assertion does not excuse its lack of diligence.  *See*

*Giannacopoulos v. Credit Suisse*, 37 F. Supp. 2d 626, 633 (S.D.N.Y. 1999) ("Custom is not

always the legal standard of when the law protects reliance . . . [I]t is not always the custom to

double-check everybody and everything . . . The standard for legal protection of reliance,

however, is higher.  Parties cannot demand judicial protection when they could have protected

themselves with a reasonable inquiry into any misrepresented facts.").

      Even without the loan files, IKB could clearly have done more.  If a "loan-level" analysis

was of decisive importance to IKB's investments at the time, it could have done what its counsel

did before filing suit: use its own AVM analyses to check the LTV ratios and use credit histories

to check owner occupancy rates, both of which IKB claims to have done *without* access to the

loan files.[47]  CC ¶ 122.

      If these equivocal, unverified representations were so critical to IKB, why did IKB fail to

ask either for more concrete assurances or for the underlying data?  Perhaps, as suggested by its

willingness to buy half of the Certificates before the Prospectus Supplements even arrived, IKB

simply did not care what they said.  Perhaps, as the Complaint's reference to IKB's "specific

criteria" and "own analysis of the risk/return profile" suggests, IKB was evaluating the promised

returns using its own models.  But on a motion to dismiss, IKB's reasons are irrelevant.  It had an

obligation to either obtain enforceable warranties or to check the data itself.  Having done

neither, it assumed the risk that it could be wrong, and it cannot now shift that risk to

---

[46] *See also Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1543 (2d Cir. 1997) (sophisticated party had duty to require review of documents); *Rodas v. Manitaras*, 552 N.Y.S.2d 618, 620 (N.Y. App. Div. 1990) (dismissing fraud claim: plaintiffs were refused access to books and records, went ahead with the purchase).
[47] IKB had access to, but admittedly never availed itself of, publicly filed Loan Tapes that provided much of the same granular information used in the AVMs.  IKB also claims that "the underwriting and servicing processes of parties such as the originator and servicer involved in any such transaction" were among the material factors it considered, CC ¶ 221, but it does not allege that it ever did any diligence on any of the various originators to determine how they actually ran their businesses.

Defendants.  IKB's "failure to undertake . . . an independent appraisal of the risks in the

transaction…necessarily leads to the conclusion that [Plaintiffs] w[ere] 'so lax in protecting

[themselves] that [they] cannot fairly ask for the law's protection.'"  *HSH Nordbank AG*, 941

N.Y.S.2d at 67 (quoting *Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V.*,

952 N.E.2d 995, 1002 (N.Y. 2011)); *see Banque Arabe v. Maryland Nat'l Bank*, 57 F.3d 146,

156-57 (2d Cir. 1995) (plaintiff "could not have reasonably relied" on defendant's representation

concerning "a known and disclosed risk" where plaintiff could have done due diligence).

## V.    IKB FAILS TO PLEAD A DUTY TO DISCLOSE.

IKB's fraudulent concealment and negligent misrepresentation claims also fail because

IKB has not sufficiently pled the existence of a duty to disclose or special relationship.  *P.T.*

*Bank Cent. Asia v. ABN AMRO Bank N.V.*, 754 N.Y.S.2d 245, 250 (N.Y. App. Div. 2003)

(fraudulent concealment requires "an allegation that the defendant had a duty to disclose material

information and that it failed to do so"); *J.A.O. Acquisition Corp.*, 863 N.E.2d at 587 (negligent

misrepresentation claim requires "the existence of a special or privity-like relationship imposing

a duty on the defendant to impart correct information to the plaintiff").

IKB nowhere alleges facts showing a fiduciary relationship that could give rise to such a

duty, nor could it.  IKB plainly alleges only an arm's length relationship that is not fiduciary in

nature.  *See, e.g., Atkins Nutritionals, Inc. v. Ernst & Young, LLP*, 754 N.Y.S.2d 320, 322 (N.Y.

App. Div. 2003) ("[A]n arm's length business relationship does not give rise to a fiduciary

duty."); *Landesbank I*, 821 F. Supp. 2d at 624 ("New York courts generally do not permit

negligent misrepresentation claims based on arm's-length transactions between sophisticated

counterparties"), *aff'd at Landesbank II*, 2012 WL 1352590, at *2-3.[48]

---

[48] *See also Brass v. American Film Technologies Inc.*, 987 F. 2d 142, 150 (2d Cir. 1993) ("A duty to speak cannot

IKB's general allegations that Defendants had "superior knowledge" – about loan quality, origination practices, and alleged failures to transfer notes and mortgages, CC ¶¶ 242-45, 260-261– are insufficient to remove these multi-million-dollar RMBS transactions from the arm's length business relationships that ordinarily govern that marketplace.  Courts in RMBS actions have routinely dismissed claims premised upon similar allegations of "superior knowledge." *See, e.g., Federal Housing Finance Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 335 (S.D.N.Y. 2012) ("[T]he fact that, with regard to the securities at issue . . . the defendants had greater knowledge of the underlying loan files and the practices of third-party due diligence providers is not sufficient to establish a 'special relationship.'"); *MBIA Ins. Co. v. GMAC Mortg. LLC*, 914 N.Y.S.2d 604, 611 (N.Y. Sup. Ct. 2010) (holding "[m]ere possession of the loan files and servicing files does not create the type of specialized knowledge" that would give rise to a special relationship); *Landesbank I*, 821 F. Supp. 2d at 624.

A mere disparity of knowledge between sophisticated parties, by itself, does not impose any duty to disclose.  *See Societe Nationale D'Exploitation Industrielle Des Tabacs Et Allumettes v. Salomon Bros. Int'l Ltd.*, 702 N.Y.S.2d 258, 259 (N.Y. App. Div. 2000). Moreover, a "company's knowledge of the particulars of its own business is not the type of unique or specialized knowledge" that overcomes the presumption that no duty of disclosure exists between sophisticated commercial parties in an arm's length transaction.  *MBIA Ins. Corp. v. Residential Funding Co.*, 2009 WL 5178337, at *5 (Sup. Ct. N.Y. Co. Dec. 22, 2009).[49]

---

arise simply because two parties may have been on opposite sides of a bargaining table when a deal was struck between them, for under New York law the ancient rule of caveat emptor is still alive and well."). *Greenberg v. Chrust*, 198 F. Supp. 2d 578, 585 (S.D.N.Y. 2002) ("an arm's length business relationship is not enough to create that relationship" of trust giving rise to a duty); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 928 N.Y.S.2d 229, 235 (N.Y. App. Div. 2011) ("Generally, a special relationship does not arise out of an ordinary arm's length business transaction between two parties.").

[49] *See also GMAC Mortg. LLC*, 914 N.Y.S.2d at 611; *Countrywide Home Loans, Inc.*, 87 A.D.3d at 296, 928 N.Y.S.2d at 235 ("superior knowledge of the particulars of its own business practices is insufficient to sustain" a

Finally, as discussed above, IKB concedes that it never requested loan files; as a matter

of law, the failure to seek the information now alleged to have been concealed similarly

precludes a finding of a duty to disclose it.  *See Orlando v. Kukileka*, 836 N.Y.S.2d 252, 255

(N.Y. App. Div. 2007) (granting summary judgment to defendants on negligent

misrepresentation claim); *Giannacopoulos*, 37 F. Supp. 2d at 633.  Accordingly, IKB states no

claim for fraudulent concealment or negligent misrepresentation.

## VI.    IKB FAILS TO STATE AN AIDING AND ABETTING CLAIM.

IKB asserts a claim of aiding and abetting fraud against each of the Underwriter,

Originator, and Controlling Parent Defendants.  A claim for aiding and abetting fraud requires

Plaintiffs allege with particularity against each defendant, (1) the existence of an underlying

fraud, (2) knowledge of the fraud, and (3) that the defendant provided substantial assistance to

advance the fraud's commission.  *Lerner*, 459 F.3d at 292 (2d Cir. 2006).  Besides failing to

plead the underlying fraud, the Complaint also fails to plead either of the other two elements.

### A.   IKB Fails To Allege Actual Knowledge.

IKB fails to allege *any* facts raising a strong inference that any of the Underwriter,

Originator, or Controlling Parent Defendants *actually knew* that statements in the Prospectus

Supplements were false.  Constructive knowledge or recklessness is insufficient, as an aiding and

abetting claim requires actual knowledge.  *See Lerner*, 459 F.3d at 292-293.[50]

For the Controlling Parent and Underwriter Defendants, IKB merely asserts that these

Defendants had knowledge of alleged misstatements in the Offering Documents because such

---

negligent misrepresentation claim); *Royal Bank of Can.*, 2010 WL 3294302, at *34 ("a party's unique or special expertise alone is insufficient to create an issue of fact concerning the existence of a special relationship.").
[50] *See also Berman v. Morgan Keegan & Co., Inc.*, 2011 WL 1002683, at *10 (S.D.N.Y. Mar. 14, 2011); *In re Parmalat Secs. Litig.*, 377 F. Supp. 2d 390, 411-12 (S.D.N.Y. 2005); *Krause v. Forex Exch. Mkt., Inc.*, 356 F. Supp. 2d 332, 338-39 (S.D.N.Y. 2005); *Renner v. Chase Manhattan Bank*, 2000 WL 781081, at *5, 7, 11 (S.D.N.Y. Jun. 14, 2000), *aff'd*, 85 Fed. Appx. 782 (2d Cir. 2004).

knowledge is inferable from involvement in the securitization process or because certain officers and directors of these defendants also maintained positions with other defendants involved in the securitizations.  CC ¶¶ 73-74, 251-252.  These allegations do not detail anyone's knowledge of anything.  *See Kaufman v. Cohen*, 760 N.Y.S.2d 157, 169 (N.Y. App. Div. 2003); *Public Empls.' Ret. Sys. Of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010) ("The parent/subsidiary relationship is an insufficient basis from which to infer control . . .").

For the Originator Defendants, IKB summarily asserts that they had knowledge of the low quality of loans they originated, which purportedly were included in the mortgage pools of the Securitizations, and of the failure to transfer notes and mortgages.  CC ¶¶ 85, 253-254.  More is required.  Plaintiffs provide no particularized allegations, however, establishing how, when, or why any of the Originator Defendants actually knew of any alleged misstatements as to the Securitizations at issue.  *See Armstrong*, 699 F.2d at 93 (complaint "fails to particularize adequately how and why [the alleged aider/abettor] should have anticipated that its conduct would be used by primary wrongdoers to further scheme").

**B.  IKB Fails To Allege Substantial Assistance**

In addition to knowledge, aiding and abetting requires substantial assistance in the wrong for which the plaintiff claims damages.  *In re Sharp Int'l. Corp.*, 403 F.3d 43, 50 (2d Cir. 2005). The test is one of causation; "'[b]ut-for' causation does not suffice; the breach must proximately cause the loss."  *Kolbeck v. LIT Am.*, 939 F. Supp. 240, 249 (S.D.N.Y. 1996) (collecting cases).

IKB nowhere alleges that the Originator or Controlling Parent Defendants controlled or dictated the descriptions of the allegedly misrepresented facts in the Prospectus Supplements. The mere fact that related entities securitized transactions that were ultimately allegedly mischaracterized is insufficient.  IKB alleges, at most, that the Originator Defendants' conduct was a 'but for' cause of the issuance of false statements.  That is not enough.  *See Lerner*, 318

49

F.3d at 119, 122-23 (proximate causation not shown where fraud might not have continued 'but

for' bank's mischaracterization of bad checks and noncompliance with reporting requirements).

Moreover, where the damages claim is premised upon written misrepresentations, the complaint

must allege that the defendant *actually participated* in drafting, disseminating, or lending its

name to the false documents.  *See Morin v. Trupin*, 711 F. Supp. 97, 113 (S.D.N.Y. 1989) (no

"substantial assistance" alleged where defendants had "no involvement in the preparation or

dissemination of the offending documents") (citing *Terrydale Liquidating Trust v. Gramlich*, 549

F. Supp. 529, 531 (S.D.N.Y. 1982)); *see also In re WorldCom, Inc. Sec. Litig.*, 382 F. Supp. 2d

549, 560 (S.D.N.Y. 2005).  Because IKB alleges nothing about these Defendants' preparation or

dissemination of any of the Prospectus Supplements, it has not alleged substantial participation.

Indeed, IKB does not alleged with particularity how or when the Originator or

Controlling Parent Defendants, or any of their employees, assisted with any purported

misstatements made in the Prospectus Supplements.  IKB  alleges in conclusory terms that the

Controlling Parent Defendants "knowingly provided substantial assistance to the Issuer

Defendants' fraud."  CC ¶¶ 73-84, 251-252, 256.  For the Originator Defendants, IKB only states

that due to their role in originating loans they "played an essential role in the Issuer Defendants'

fraud."  CC ¶ 253.  Those are not particularized allegations setting forth each defendant's role in

anything.  Accordingly, IKB's aiding and abetting must be dismissed.

## CONCLUSION

The Complaint should be dismissed as to each Defendant with prejudice.

Dated: New York, New York
        October 19, 2012

SIDLEY AUSTIN LLP                          MAYER BROWN LLP

By: _____s/ Dorothy J. Spenner _____    By: _____s/ Henninger S. Bullock_____

A. Robert Pietrzak                         Richard A. Spehr

Dorothy J. Spenner                          Henninger S. Bullock
Daniel A. McLaughlin                        Lisa R. Plush
Marcus A. Cordova
Joseph K. Aoun

787 Seventh Avenue                          1675 Broadway
New York, NY 10019                          New York, NY 10019
Telephone: (212) 839-5300                   Telephone: (212) 506-2500

*Attorneys for the JPMorgan Defendants*     *Attorneys for the Carrington Defendants*

NY1 8479352v.16