## APPENDIX A – OFFERING DOCUMENT DISCLOSURES CHART

Civ. Action No. 12 CV 4617

| I.    The Disclosures Warned Investors to Rely Only On Prospectus Supplements and Prospectuses | |
| --- | --- |
| **Securitization** | **Selected Relevant Disclosures and Page Citations** |
| JPMAC 2006-CW2 | **"You should rely only on the information provided in this prospectus supplement or the accompanying prospectus or incorporated by reference herein. We have not authorized anyone else to provide you with different information." (PS at ii.)[1]** <br> **The Prospectus warned readers that it "provides general information, some of which may not apply to your series of securities." And that "[i]f the terms of a particular series of securities vary between this prospectus and the accompanying prospectus supplement, you should rely on the information in the prospectus supplement."  (Pros. at 2.)** |
| BALTA 2005-10 | "You should rely only on the information contained in this document. We have not authorized anyone to provide you with different information. <br> We provide information to you about the offered certificates in two separate documents that progressively provide more detail: <br> • the accompanying prospectus, which provides general information, some of which may not apply to this series of certificates; and <br> • this prospectus supplement, which describes the specific terms of this series of certificates. <br> If the description of your certificates in this prospectus supplement differs from the related description in the prospectus, you should rely on the information in this prospectus supplement." (PS at 2.) |
| BALTA 2005-9 | "You should rely only on the information contained in this document. We have not authorized anyone to provide you with different information. <br> We provide information to you about the offered certificates in two separate documents that progressively provide more detail: <br> • the accompanying prospectus, which provides general information, some of which may not apply to this series of certificates; and <br> • this prospectus supplement, which describes the specific terms of |

---

[1] Cited excerpts from each set of Offering Documents are in Exhibits 18 through 37 to the Spenner Declaration: JPMAC 2006-CW2 (Ex. 18), BALTA 2005-10 (Ex. 19), BALTA 2005-9 (Ex. 20), BALTA 2006-4 (Ex. 21), BSARM 2005-10 (Ex. 22), BSARM 2005-12 (Ex. 23), BSABS 2005-AC9 (Ex. 24), BSABS 2007-HE4 (Ex. 25), BSABS 2007-HE5 (Ex. 26), CARR 2006-NC5 (Ex. 27), CARR 2006-OPT1 (Ex. 28), CARR 2006-RFC1 (Ex. 29), CBASS 2007-CB1 (Ex. 30), CFLX 2006-2 (Ex. 31), JPALT 2006-S4 (Ex. 32), JPMAC 2005-OPT2 (Ex. 33), JPMAC 2006-CW1 (Ex. 34), JPMAC 2006-FRE2 (Ex. 35), JPMAC 2007-CH1 (Ex. 36), JPMAC 2007-HE1 (Ex. 37).

| | |
|---|---|
| | this series of certificates. <br> If the description of your certificates in this prospectus supplement differs from the related description in the prospectus, you should rely on the information in this prospectus supplement."  (PS at 2.) |
| **BALTA 2006-4** | "Information about each series of securities is contained in two separate documents: <br> • this prospectus, which provides general information, some of which may not apply to a particular series; and <br> • the accompanying prospectus supplement for a particular series, which describes the specific terms of the securities of that series. <br> Although the accompanying prospectus supplement cannot contradict the information contained in this prospectus, insofar as the prospectus supplement contains specific information about a particular series of securities that differs from the more general information contained in this prospectus, you should rely on the information in the prospectus supplement. <br> You should rely only on the information contained in this prospectus and the accompanying prospectus supplement. We have not authorized anyone to provide you with information that is different from that contained in this prospectus and the accompanying prospectus supplement."  (Pros. at 2.) |
| **BSARM 2005-10** | "You should rely only on the information contained in this document. We have not authorized anyone to provide you with different information. <br> We provide information to you about the offered certificates in two separate documents that progressively provide more detail: <br> • the accompanying prospectus, which provides general information, some of which may not apply to this series of certificates; and <br> • this prospectus supplement, which describes the specific terms of this series of certificates. <br> If the description of your certificates in this prospectus supplement differs from the related description in the prospectus, you should rely on the information in this prospectus supplement."  (PS at S-2.) |
| **BSARM 2005-12** | "You should rely only on the information contained in this document. We have not authorized anyone to provide you with different information. <br> We provide information to you about the offered certificates in two separate documents that progressively provide more detail: <br> • the accompanying prospectus, which provides general information, some of which may not apply to this series of certificates; and <br> • this prospectus supplement, which describes the specific terms of this series of certificates. <br> If the description of your certificates in this prospectus supplement differs from the related description in the prospectus, you should rely on the information in this prospectus supplement." (PS at S-2.) |
| **BSABS 2005-AC9** | "We describe the certificates in two separate documents that provide |

| | varying levels of detail:<br>(a) the accompanying prospectus, which provides general information, some of which may not apply to your certificates and (b) this prospectus supplement, which describes the specific terms of your certificates. If there is conflicting information between this prospectus supplement and the accompanying prospectus, you should rely on the information in this prospectus supplement." (PS at S-3) |
|---|---|
| **BSABS 2007-HE4** | "You are encouraged to rely only on the information contained in this prospectus and the accompanying prospectus supplement. We have not authorized anyone to provide you with information that is different from that contained in this prospectus and the accompanying prospectus supplement."  (Pros. at 4.)<br> "We describe the certificates in two separate documents that provide varying levels of detail:<br>(a) the accompanying prospectus, which provides general information, some of which may not apply to your certificates and (b) this prospectus supplement, which describes the specific terms of your certificates. If there is conflicting information between this prospectus supplement and the accompanying prospectus, you should rely on the information in this prospectus supplement." (PS at S-3) |
| **BSABS 2007-HE5** | "You are encouraged to rely only on the information contained in this prospectus and the accompanying prospectus supplement. We have not authorized anyone to provide you with information that is different from that contained in this prospectus and the accompanying prospectus supplement."  (Pros. at 4.)<br>"We describe the certificates in two separate documents that provide varying levels of detail: (a) the base prospectus, which provides general information, some of which may not apply to your certificates and (b) this prospectus supplement, which describes the specific terms of your certificates."  (PS at S-3.) |
| **CARR 2006-NC5** | "You should rely only on the information provided in this prospectus and the accompanying prospectus supplement, including information incorporated by reference. . . . We have not authorized anyone to provide you with different information."  (Pros. at 2.)<br> "We provide information to you about the offered certificates in two separate documents that provide progressively more detail:<br>• the accompanying prospectus, which provides general information, some of which may not apply to your series of certificates; and<br>• this prospectus supplement, including Annex I attached hereto, which describes the specific terms of your series of certificates." (Pros. at 2.) |
| **CARR 2006-OPT1** | "You should rely only on the information provided in this prospectus and the accompanying prospectus supplement, including information incorporated by reference. . . . We have not authorized anyone to provide you with different information."  (Pros. at 2.)<br>"We provide information to you about the offered certificates in two |

| | |
|---|---|
| | separate documents that provide progressively more detail:<br>o this prospectus, which provides general information, some of which may not apply to your series of certificates; and<br>o the accompanying prospectus supplement, which describes the specific terms of your series of certificates."  (Pros. at 2.) |
| **CARR 2006-RFC1** | "You should rely only on the information provided in this prospectus and the accompanying prospectus supplement, including information incorporated by reference. . . . We have not authorized anyone to provide you with different information."  (Pros. at 2.)<br> "We provide information to you about the offered certificates in two separate documents that provide progressively more detail:<br>• this prospectus, which provides general information, some of which may not apply to your series of certificates; and<br>• the accompanying prospectus supplement, which describes the specific terms of your series of certificates."  (Pros. at 2.) |
| **CBASS 2007-CB1** | "You should rely only on the information provided in this prospectus or the accompanying prospectus supplement or incorporated by reference herein. We have not authorized anyone to provide you with different information."  (PS at ii.)<br>"We provide information to you about the offered certificates in two separate documents that progressively provide more detail:<br>(a) the accompanying prospectus, which provides general information, some of which may not apply to your series of securities and<br>(b) the accompanying prospectus supplement, which describes the specific terms of your series of securities.<br>If the terms of a particular series of securities vary between this prospectus and the accompanying prospectus supplement, you should rely on the information in the prospectus supplement."  (Pros. at 2.) |
| **CFLX 2006-2** | "Information is provided to you about the certificates in two separate documents that progressively provide more detail: (a) this prospectus, which provides general information, some of which may not apply to a particular series of certificates, including your series, and (b) the accompanying prospectus supplement, which will describe the specific terms of your series of certificates . . . If the terms of a particular series of certificates vary between this prospectus and the prospectus supplement, you should rely on the information in the prospectus supplement.<br>You should rely only on the information provided in this prospectus and the accompanying prospectus supplement, including the information incorporated by reference. No one has been authorized to provide you with different information."  (Pros. at ii.) |
| **JPALT 2006-S4** | "You should rely only on the information provided in this prospectus supplement or the accompanying prospectus or incorporated by reference herein. We have not authorized anyone else to provide you with different information."  (PS at ii.)<br>"We provide information to you about the securities in two separate |

| | documents that progressively provide more detail:<br>(a) this prospectus, which provides general information, some of which may not apply to your series of securities and<br>(b) the accompanying prospectus supplement, which describes the specific terms of your series of securities.<br>If the terms of a particular series of securities vary between this prospectus and the accompanying prospectus supplement, you should rely on the information in the prospectus supplement." (Pros. at 2.) |
|---|---|
| **JPMAC 2005-OPT2** | "You should rely only on the information provided in this prospectus supplement or the accompanying prospectus or incorporated by reference herein. We have not authorized anyone else to provide you with different information." (PS at ii.)<br>"We provide information to you about the securities in two separate documents that progressively provide more detail:<br>(a) this prospectus, which provides general information, some of which may not apply to your series of securities and<br>(b) the accompanying prospectus supplement, which describes the specific terms of your series of securities.<br>If the terms of a particular series of securities vary between this prospectus and the accompanying prospectus supplement, you should rely on the information in the prospectus supplement." (Pros. at 2.) |
| **JPMAC 2006-CW1** | "You should rely only on the information provided in this prospectus supplement or the accompanying prospectus or incorporated by reference herein. We have not authorized anyone else to provide you with different information." (PS at ii.)<br>"We provide information to you about the securities in two separate documents that progressively provide more detail:<br>(a) this prospectus, which provides general information, some of which may not apply to your series of securities and<br>(b) the accompanying prospectus supplement, which describes the specific terms of your series of securities.<br>If the terms of a particular series of securities vary between this prospectus and the accompanying prospectus supplement, you should rely on the information in the prospectus supplement." (Pros. at 2.) |
| **JPMAC 2006-FRE2** | "You should rely only on the information provided in this prospectus supplement or the accompanying prospectus or incorporated by reference herein. We have not authorized anyone else to provide you with different information." (PS at ii.)<br>"We provide information to you about the securities in two separate documents that progressively provide more detail:<br>(a) this prospectus, which provides general information, some of which may not apply to your series of securities and<br>(b) the accompanying prospectus supplement, which describes the specific terms of your series of securities.<br>If the terms of a particular series of securities vary between this prospectus and the accompanying prospectus supplement, you should |

| | |
|---|---|
| | rely on the information in the prospectus supplement." (Pros. at 2.) |
| **JPMAC 2007-CH1** | "You should rely only on the information provided in this prospectus supplement or the accompanying prospectus or incorporated by reference herein. We have not authorized anyone else to provide you with different information." (PS at ii.)<br><br>"We provide information to you about the securities in two separate documents that progressively provide more detail:<br>(a) this prospectus, which provides general information, some of which may not apply to your series of securities and<br>(b) the accompanying prospectus supplement, which describes the specific terms of your series of securities.<br>If the terms of a particular series of securities vary between this prospectus and the accompanying prospectus supplement, you should rely on the information in the prospectus supplement." (Pros. at 2.) |
| **JPMAC 2007-HE1** | "You should rely only on the information provided in this prospectus supplement or the accompanying prospectus or incorporated by reference herein. We have not authorized anyone else to provide you with different information." (PS at i.)<br><br>"We provide information to you about the securities in two separate documents that progressively provide more detail:<br>(a) this prospectus, which provides general information, some of which may not apply to your series of securities and<br>(b) the accompanying prospectus supplement, which describes the specific terms of your series of securities.<br>If the terms of a particular series of securities vary between this prospectus and the accompanying prospectus supplement, you should rely on the information in the prospectus supplement." (Pros. at 2.) |

| **II.** | **The Disclosures Warned Investors that Certain Characteristics of the Mortgage Loans May Vary** |
|---|---|
| **Securitization** | **Selected Relevant Disclosures and Page Citations** |
| **JPMAC 2006-CW2** | "[D]oes not take into account defaults, delinquencies and prepayments that may have occurred with respect to the mortgage loans since such date." (PS at S-10.) <br><br> "The information presented herein does not take into account any Mortgage Loans that have or may prepay in full or have been or may be removed because of incomplete documentation or otherwise for the period from the Cut-off Date to the Closing Date, or other Mortgage Loans that may be substituted therefor. As a result, the information regarding the Mortgage Loans may vary from comparable information based upon the actual composition of the Mortgage Groups as of the Closing Date, although such variance will not be material." (PS at S-27.) |
| **BALTA 2005-10** | "SAMI believes that the estimated information set forth herein with respect to the Mortgage Loans as presently constituted is representative of the characteristics thereof at the time the Certificates are issued, although certain characteristics of the Mortgage Loans may vary." (PS at S-33; *see also* A-1.) |
| **BALTA 2005-9** | "The Depositor believes that the estimated information set forth herein with respect to the mortgage loans as presently constituted is representative of the characteristics thereof at the time the Certificates are issued, although certain characteristics of the mortgage loans may vary." (PS at S-35; *see also* A-1.) |
| **BALTA 2006-4** | "The Depositor believes that the estimated information set forth herein with respect to the mortgage loans as presently constituted is representative of the characteristics thereof at the time the Certificates are issued, although certain characteristics of the mortgage loans may vary." (PS at S-48; *see also* A-1.) |
| **BSARM 2005-10** | "Depositor believes that the information set forth in this prospectus supplement will be representative of the characteristics of the mortgage pool as it will be constituted at the time the Offered Certificates are issued, although the range of mortgage rates and maturities and other characteristics of the mortgage loans may vary." (PS at S-28; *see also* A-1.) |
| **BSARM 2005-12** | "Depositor believes that the information set forth in this prospectus supplement will be representative of the characteristics of the mortgage pool as it will be constituted at the time the Offered Certificates are issued, although the range of mortgage rates and maturities and other characteristics of the mortgage loans may vary." (PS at S-41-42; *see also* A-1.) |
| **BSABS 2005-AC9** | "The depositor believes that the information set forth in this prospectus supplement with respect to the mortgage pool as presently constituted is representative of the characteristics of the mortgage pool as it will be |

| | |
|---|---|
| | constituted at the Closing Date, although certain characteristics of the mortgage loans in the mortgage pool may vary."  (PS at S-29.) |
| **BSABS 2007-HE4** | "The depositor believes that the information set forth in this prospectus supplement with respect to the mortgage pool as presently constituted is representative of the characteristics of the mortgage pool as it will be constituted on the closing date, although certain characteristics of the mortgage loans in the mortgage pool may vary."  (PS at S-31.) |
| **BSABS 2007-HE5** | "The depositor believes that the information set forth in this prospectus supplement with respect to the mortgage pool as presently constituted is representative of the characteristics of the mortgage pool as it will be constituted on the closing date, although certain characteristics of the mortgage loans in the mortgage pool may vary."  (PS at S-31.) |
| **CARR 2006-NC5** | "The depositor believes that the information in this prospectus supplement will be substantially representative of the characteristics of the mortgage pool as it will be constituted at the time the certificates are issued although the range of mortgage rates and maturities and some other characteristics of the mortgage loans in the mortgage pool may vary."  (PS at S-85-86.) |
| **CARR 2006-OPT1** | "The depositor believes that the information in this prospectus supplement will be substantially representative of the characteristics of the mortgage pool as it will be constituted at the time the certificates are issued although the range of mortgage rates and maturities and some other characteristics of the mortgage loans in the mortgage pool may vary."  (PS at S-78.) |
| **CARR 2006-RFC1** | "The depositor believes that the information in this prospectus supplement will be substantially representative of the characteristics of the mortgage pool as it will be constituted at the time the certificates are issued although the range of mortgage rates and maturities and some other characteristics of the mortgage loans in the mortgage pool may vary."  (PS at S-98.) |
| **CBASS 2007-CB1** | "The Sponsor believes that the information set forth in this prospectus supplement with respect to the Mortgage Pool as presently constituted is representative of the characteristics of the Mortgage Pool as it will be constituted at the Closing Date, although certain characteristics of the Mortgage Loans in the Mortgage Pool may vary."  (PS at S-19.) |
| **JPALT 2006-S4** | "[D]oes not take into account defaults, delinquencies and prepayments that may occur with respect to the mortgage loans since the cut-off date."  (PS at S-8.) <br> "As a result, the information regarding the Mortgage Loans presented herein may vary from comparable information based upon the actual composition of the mortgage pool as of the Closing Date, although such variance will not be material."  (PS at S-15.) |
| **JPMAC 2005-OPT2** | "[D]oes not take into account defaults, delinquencies and prepayments that may have occurred with respect to the mortgage loans since such date."  (PS at S-6.) <br> "The information presented herein does not take into account any |

| | Mortgage Loans that have or may prepay in full or have been or may be removed because of incomplete documentation or otherwise for the period from the Cut-off Date to the Closing Date, or other Mortgage Loans that may be substituted therefor. As a result, the information regarding the Mortgage Loans may vary from comparable information based upon the actual composition of the Mortgage Groups as of the Closing Date, although such variance will not be material." (PS at S-21.) |
|---|---|
| **JPMAC 2006-CW1** | "[D]oes not take into account defaults, delinquencies and prepayments that may have occurred with respect to the mortgage loans since such date." (PS at S-7.) <br> "The information presented herein does not take into account any Mortgage Loans that have or may prepay in full or have been or may be removed because of incomplete documentation or otherwise for the period from the Cut-off Date to the Closing Date, or other Mortgage Loans that may be substituted therefor. As a result, the information regarding the Mortgage Loans may vary from comparable information based upon the actual composition of the Mortgage Groups as of the Closing Date, although such variance will not be material." (PS at S-21.) |
| **JPMAC 2006-FRE2** | "[D]oes not take into account defaults, delinquencies and prepayments that may have occurred with respect to the mortgage loans since such date." (PS at S-7.) <br> "The information presented herein does not take into account any Mortgage Loans that have or may prepay in full or have been or may be removed because of incomplete documentation or otherwise for the period from the Cut-off Date to the Closing Date, or other Mortgage Loans that may be substituted therefor. As a result, the information regarding the Mortgage Loans may vary from comparable information based upon the actual composition of the Mortgage Groups as of the Closing Date, although such variance will not be material." (PS at S-23.) |
| **JPMAC 2007-CH1** | "[D]oes not take into account defaults, delinquencies and prepayments that may have occurred with respect to the mortgage loans since such date." (PS at S-11.) <br> "The information presented herein does not take into account any Mortgage Loans that have or may prepay in full or have been or may be removed because of incomplete documentation or otherwise for the period from the Cut-off Date to the Closing Date, or other Mortgage Loans that may be substituted therefor. As a result, the information regarding the Mortgage Loans may vary from comparable information based upon the actual composition of the Mortgage Groups as of the Closing Date, although such variance will not be material." (PS at S-29.) |
| **JPMAC 2007-HE1** | "[D]oes not take into account defaults, delinquencies and prepayments that may have occurred with respect to the mortgage loans since such |

| | |
|---|---|
| | date." (PS at S-11.)<br><br>"The information presented herein does not take into account any Mortgage Loans that have or may prepay in full or have been or may be removed because of incomplete documentation or otherwise for the period from the Cut-off Date to the Closing Date, or other Mortgage Loans that may be substituted therefor. As a result, the information regarding the Mortgage Loans may vary from comparable information based upon the actual composition of the Mortgage Groups as of the Closing Date, although such variance will not be material." (PS at S-28.) |

| III. | The Disclosures Warned that Prospective Matters Would Be Subject to Specific Disclosures in the Prospectus Supplements |
|---|---|
| **Securitization** | **Selected Relevant Disclosures and Page Citations** |
| **JPMAC 2006-CW2** | General, prospective matters such as underwriting standards and the representations and warranties made by the originator would be subject to the specific disclosures in the Prospectus Supplement. (Pros. at 18, 29) |
| **BALTA 2005-10** | General, prospective matters such as underwriting standards and the representations and warranties made by the originator would be subject to the specific disclosures in the Prospectus Supplement. (Pros. at 11, 14) |
| **BALTA 2005-9** | General, prospective matters such as underwriting standards and the representations and warranties made by the originator would be subject to the specific disclosures in the Prospectus Supplement. (Pros. at 11, 14) |
| **BALTA 2006-4** | General, prospective matters such as underwriting standards and the representations and warranties made by the originator would be subject to the specific disclosures in the Prospectus Supplement. (Pros. at 13, 19) |
| **BSARM 2005-10** | General, prospective matters such as underwriting standards and the representations and warranties made by the originator would be subject to the specific disclosures in the Prospectus Supplement. (Pros. at 12, 24) |
| **BSARM 2005-12** | General, prospective matters such as underwriting standards and the representations and warranties made by the originator would be subject to the specific disclosures in the Prospectus Supplement. (Pros. at 12, 14) |
| **BSABS 2005-AC9** | General, prospective matters such as underwriting standards and the representations and warranties made by the originator would be subject to the specific disclosures in the Prospectus Supplement. (Pros. at 26) |
| **BSABS 2007-HE4** | General, prospective matters such as underwriting standards and the representations and warranties made by the originator would be subject to the specific disclosures in the Prospectus Supplement. (Pros. at 27) |
| **BSABS 2007-HE5** | General, prospective matters such as underwriting standards and the representations and warranties made by the originator would be subject to the specific disclosures in the Prospectus Supplement. (Pros. at 26) |
| **CARR 2006-NC5** | General, prospective matters such as underwriting standards and the representations and warranties made by the originator would be subject to the specific disclosures in the Prospectus Supplement. (Pros. at 15, 16) |
| **CARR 2006-OPT1** | General, prospective matters such as underwriting standards and the representations and warranties made by the originator would be subject to the specific disclosures in the Prospectus Supplement. (Pros. at 12, 13) |
| **CARR 2006-RFC1** | General, prospective matters such as underwriting standards and the |

| | |
|---|---|
| | representations and warranties made by the originator would be subject to the specific disclosures in the Prospectus Supplement. (Pros. at 14, 15) |
| **CBASS 2007-CB1** | General, prospective matters such as underwriting standards and the representations and warranties made by the originator would be subject to the specific disclosures in the Prospectus Supplement. (Pros. at 21, 28) |
| **CFLX 2006-2** | General, prospective matters such as underwriting standards and the representations and warranties made by the originator would be subject to the specific disclosures in the Prospectus Supplement. (Pros. at 14) |
| **JPALT 2006-S4** | General, prospective matters such as underwriting standards and the representations and warranties made by the originator would be subject to the specific disclosures in the Prospectus Supplement. (Pros. at 21, 31) |
| **JPMAC 2005-OPT2** | General, prospective matters such as underwriting standards and the representations and warranties made by the originator would be subject to the specific disclosures in the Prospectus Supplement. (Pros. at 18, 29) |
| **JPMAC 2006-CW1** | and the representations and warranties made by the originator would be subject to the specific disclosures in the Prospectus Supplement. (Pros. at 21, 31) |
| **JPMAC 2006-FRE2** | General, prospective matters such as underwriting standards and the representations and warranties made by the originator would be subject to the specific disclosures in the Prospectus Supplement. (Pros. at 17-18, 29) |
| **JPMAC 2007-CH1** | General, prospective matters such as underwriting standards and the representations and warranties made by the originator would be subject to the specific disclosures in the Prospectus Supplement.  (Pros. at 21, 31) |
| **JPMAC 2007-HE1** | General, prospective matters such as underwriting standards and the representations and warranties made by the originator would be subject to the specific disclosures in the Prospectus Supplement.  (Pros. at 21, 31) |

| IV.   The Disclosures Warned that the Loans were Originated Generally in Accordance with the Underwriting Standards | |
|---|---|
| **Securitization** | **Selected Relevant Disclosures and Page Citations** |
| **JPMAC 2006-CW2** | "The mortgage loans were either originated or acquired in accordance, generally, with the underwriting guidelines described in this prospectus supplement." (PS at S-23.) |
| **BALTA 2005-10** | "The following is a description of the underwriting policies customarily employed by EMC with respect to the residential mortgage loans that EMC originated during the period of origination of the mortgage loans. EMC has represented to the depositor that the mortgage loans were originated generally in accordance with such policies." (PS at S-40.) |
| **BALTA 2005-9** | "The following is a description of the underwriting policies customarily employed by Countrywide with respect to the residential mortgage loans that Countrywide originated during the period of origination of the mortgage loans. Countrywide has represented to the Depositor that the mortgage loans originated or acquired by Countrywide, or the Countrywide mortgage loans, were originated generally in accordance with such policies." (PS at S-46.) |
| **BALTA 2006-4** | "The following is a description of the underwriting policies customarily employed by EMC with respect to the residential mortgage loans that EMC originated during the period of origination of the mortgage loans. EMC has represented to the depositor that the mortgage loans were originated generally in accordance with such policies." (PS at S-60.) |
| **BSARM 2005-10** | "All of the mortgage loans have been originated generally in accordance with credit, appraisal and underwriting standards acceptable to Wells Fargo which are referred to herein as the Wells Fargo Underwriting Guidelines." (PS at S-25.) |
| **BSARM 2005-12** | "The mortgage loans originated by Countrywide Home Loans have been originated generally in accordance with credit, appraisal and underwriting standards acceptable to Countrywide Home Loans." (PS at S-33.) |
| **BSABS 2005-AC9** | "Certain mortgage loans were underwritten generally in accordance with underwriting standards which are primarily intended to provide for single family "non-conforming" mortgage loans." (PS at S-19.) |
| **BSABS 2007-HE4** | "Certain mortgage loans were underwritten generally in accordance with underwriting standards which are primarily intended to provide for single family "non-conforming" mortgage loans." (PS at S-20.) |
| **BSABS 2007-HE5** | "Certain mortgage loans were underwritten generally in accordance with underwriting standards which are primarily intended to provide for single family "non-conforming" mortgage loans." (PS at S-20.) |
| **CARR 2006-NC5** | "The following is a general summary of the underwriting guidelines believed by the depositor to have been generally applied, with some variation, by the originators." (PS at S-79.) |
| **CARR 2006-OPT1** | "The Mortgage Loans will have been originated generally in accordance with Option One's Guidelines." (PS at S-75.) |

| CARR 2006-RFC1 | "Residential Funding Corporation's underwriting of the mortgage loans generally consisted of analyzing the following as standards applicable to the mortgage loans."  (PS at S-93.) |
|---|---|
| CBASS 2007-CB1 | "The NC Mortgage Loans were originated consistent with and generally conform  to the New Century Underwriting Guidelines' full documentation, limited documentation and stated income documentation residential loan programs."  (PS at S-63.) |
| CFLX 2006-2 | "The Mortgage Loans were originated by JPMorgan generally using underwriting guidelines as set forth below."  (PS at S-50.) |
| JPALT 2006-S4 | "The Chase Originator Mortgage Loans were originated by JPMCB generally using underwriting guidelines as set forth below."  (PS at S-27.) |
| JPMAC 2005-OPT2 | "The Mortgage Loans will have been originated generally in accordance with Option One's Guidelines."  (PS at S-56.) |
| JPMAC 2006-CW1 | "The mortgage loans were either originated or acquired in accordance, generally, with the underwriting guidelines described in this prospectus supplement."  (PS at S-17.) |
| JPMAC 2006-FRE2 | "The mortgage loans were either originated or acquired in accordance, generally. with the underwriting guidelines described in this prospectus supplement."  (PS at S-19.) |
| JPMAC 2007-CH1 | "The Mortgage Loans were originated by JPMorgan Chase Bank, National Association ("JPMorgan") or its affiliates generally using underwriting guidelines as set forth below."   (PS at S-88.) |
| JPMAC 2007-HE1 | "The Mortgage Loans will have been originated generally in accordance with Option One's Non-Prime Guidelines."  (PS at S-56.) |

| V. | The Disclosures Warned that the Underwriting Standards of the Originator Are Not as Stringent as those of Fannie Mae and Freddie Mac, Which May Result in Losses |
|---|---|
| **Securitization** | **Selected Relevant Disclosures and Page Citations** |
| **BALTA 2005-10** | **"The Underwriting Standards of Some of the Mortgage Loans Do Not Conform to the Standards of Fannie Mae or Freddie Mac, And May Present a Greater Risk of Loss with Respect to those Mortgage Loans.** <br><br> Some of the mortgage loans were underwritten in accordance with underwriting standards which are primarily intended to provide for single family 'non-conforming' mortgage loans. A 'nonconforming' mortgage loan means a mortgage loan that is ineligible for purchase by Fannie Mae or Freddie Mac due to either credit characteristics of the related mortgagor or documentation standards in connection with the underwriting of the related mortgage loan that do not meet the Fannie Mae or Freddie Mac underwriting guidelines for 'A' credit mortgagors. These credit characteristics include mortgagors whose creditworthiness and repayment ability do not satisfy such Fannie Mae or Freddie Mac underwriting guidelines and mortgagors who may have a record of credit write-offs, outstanding judgments, prior bankruptcies and other credit items that do not satisfy such Fannie Mae or Freddie Mac underwriting guidelines. These documentation standards may include mortgagors who provide limited or no documentation in connection with the underwriting of the related mortgage loan. Accordingly, mortgage loans underwritten under the related originator's non-conforming credit underwriting standards are likely to experience rates of delinquency, foreclosure and loss that are higher, and may be substantially higher, than mortgage loans originated in accordance with the Fannie Mae or Freddie Mac underwriting guidelines. Any resulting losses, to the extent not covered by credit enhancement, may affect the yield to maturity of the related offered certificates." (PS at S-22.) |
| **BALTA 2005-9** | **"The Underwriting Standards of Some of the Mortgage Loans Do Not Conform to the Standards of Fannie Mae or Freddie Mac, And May Present a Greater Risk of Loss with Respect to those Mortgage Loans.** <br><br> Some of the mortgage loans were underwritten in accordance with underwriting standards which are primarily intended to provide for single family 'non-conforming' mortgage loans. A 'nonconforming' mortgage loan means a mortgage loan that is ineligible for purchase by Fannie Mae or Freddie Mac due to either credit characteristics of the related mortgagor or documentation standards in connection with the underwriting of the related mortgage loan that do not meet the Fannie Mae or Freddie Mac underwriting guidelines for 'A' credit mortgagors. These credit characteristics include mortgagors whose creditworthiness and repayment ability do not satisfy such Fannie Mae or Freddie Mac |

| | underwriting guidelines and mortgagors who may have a record of credit write-offs, outstanding judgments, prior bankruptcies and other credit items that do not satisfy such Fannie Mae or Freddie Mac underwriting guidelines. These documentation standards may include mortgagors who provide limited or no documentation in connection with the underwriting of the related mortgage loan. Accordingly, mortgage loans underwritten under the related originator's non-conforming credit underwriting standards are likely to experience rates of delinquency, foreclosure and loss that are higher, and may be substantially higher, than mortgage loans originated in accordance with the Fannie Mae or Freddie Mac underwriting guidelines. Any resulting losses, to the extent not covered by credit enhancement, may affect the yield to maturity of the related offered certificates." (PS at S-23.) |
|---|---|
| **BALTA 2006-4** | **"The Underwriting Standards of Some of the Mortgage Loans Do Not Conform to the Standards of Fannie Mae or Freddie Mac, And May Present a Greater Risk of Loss with Respect to those Mortgage Loans.**<br><br>Some of the mortgage loans were underwritten in accordance with underwriting standards which are primarily intended to provide for single family 'non-conforming' mortgage loans. A 'nonconforming' mortgage loan means a mortgage loan that is ineligible for purchase by Fannie Mae or Freddie Mac due to either credit characteristics of the related mortgagor or documentation standards in connection with the underwriting of the related mortgage loan that do not meet the Fannie Mae or Freddie Mac underwriting guidelines for 'A' credit mortgagors. These credit characteristics include mortgagors whose creditworthiness and repayment ability do not satisfy such Fannie Mae or Freddie Mac underwriting guidelines and mortgagors who may have a record of credit write-offs, outstanding judgments, prior bankruptcies and other credit items that do not satisfy such Fannie Mae or Freddie Mac underwriting guidelines. These documentation standards may include mortgagors who provide limited or no documentation in connection with the underwriting of the related mortgage loan. Accordingly, mortgage loans underwritten under the related originator's non-conforming credit underwriting standards are likely to experience rates of delinquency, foreclosure and loss that are higher, and may be substantially higher, than mortgage loans originated in accordance with the Fannie Mae or Freddie Mac underwriting guidelines. Any resulting losses, to the extent not covered by credit enhancement, may affect the yield to maturity of the related offered certificates."  (PS at S-34.) |
| **BSABS 2005-AC9** | **"Certain mortgage loans were underwritten to nonconforming underwriting standards, which may result in losses or shortfalls to be incurred on the offered certificates**<br><br>Certain mortgage loans were underwritten generally in accordance with underwriting standards which are primarily intended to provide for single family 'non-conforming' mortgage loans. A 'non-conforming' |

| | |
|---|---|
| | mortgage loan means a mortgage loan which is ineligible for purchase by Fannie Mae or Freddie Mac due to either credit characteristics of the related mortgagor or documentation standards in connection with the underwriting of the related mortgage loan that do not meet the Fannie Mae or Freddie Mac underwriting guidelines for 'A' credit mortgagors. These documentation standards may include mortgagors who provide limited or no documentation in connection with the underwriting of the related mortgage loan. Accordingly, mortgage loans underwritten under such non-conforming credit underwriting standards are likely to experience rates of delinquency, foreclosure and loss that are higher, and may be substantially higher, than mortgage loans originated in accordance with the Fannie Mae or Freddie Mac underwriting guidelines. Any resulting losses, to the extent not covered by credit enhancement, may affect the yields to maturity of the offered certificates." (PS at S-19-20.) |
| **BSABS 2007-HE4** | **"Certain mortgage loans were underwritten to nonconforming underwriting standards, which may result in losses or shortfall to be incurred on the offered certificates**<br>Certain mortgage loans were underwritten generally in accordance with underwriting standards which are primarily intended to provide for single family 'non-conforming' mortgage loans. A 'non-conforming' mortgage loan means a mortgage loan which is ineligible for purchase by Fannie Mae or Freddie Mac due to either credit characteristics of the related mortgagor, I.e. borrowers on the mortgage loans may have an impaired or unsubstantiated credit history. or documentation standards in connection with the underwriting of the related mortgage loan that do not meet the Fannie Mae or Freddie Mac underwriting guidelines. These documentation standards may include mortgagors who provide limited or no documentation in connection with the underwriting of the related mortgage loan. Accordingly, mortgage loans underwritten under such non-conforming credit underwriting standards are likely to experience rates of delinquency. foreclosure and loss that are higher, and may be substantially higher, than mortgage loans originated in accordance with the Fannie Mae or Freddie Mac underwriting guidelines. Any resulting losses, to the extent not covered by credit enhancement, may affect the yield to maturity of the offered certificates."  (PS at S-20.) |
| **BSABS 2007-HE5** | **"Certain mortgage loans were underwritten to nonconforming underwriting standards, which may result in losses or shortfalls to be incurred on the offered certificates**<br>Certain mortgage loans were underwritten generally in accordance with underwriting standards which are primarily intended to provide for single family 'non-conforming' mortgage loans. A 'non-conforming' mortgage loan means a mortgage loan which is ineligible for purchase by Fannie Mae or Freddie Mac due to either credit characteristics of the related mortgagor, i.e. borrowers on the mortgage loans may have an |

| | |
|---|---|
| | impaired or unsubstantiated credit history, or documentation standards in connection with the underwriting of the related mortgage loan that do not meet the Fannie Mae or Freddie Mac underwriting guidelines. These documentation standards may include mortgagors who provide limited or no documentation in connection with the underwriting of the related mortgage loan. Accordingly, mortgage loans underwritten under such non-conforming credit underwriting standards are likely to experience rates of delinquency, foreclosure and loss that are higher, and may be substantially higher, than mortgage loans originated in accordance with the Fannie Mae or Freddie Mac underwriting guidelines. Any resulting losses, to the extent not covered by credit enhancement, may affect the yield to maturity of the offered certificates." (PS at S-20.) |
| **CARR 2006-NC5** | **"The mortgage loans were underwritten to standards which do not conform to the credit standards of Fannie Mae or Freddie Mac which may result in losses on the mortgage loans.**<br>Each originator's underwriting standards are intended to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan and consider, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property. Each originator provides loans primarily to borrowers who do not qualify for loans conforming to Fannie Mae and Freddie Mac credit guidelines. Each originator's underwriting standards do not prohibit a mortgagor from obtaining, at the time of origination of such originator's first lien, additional financing which is subordinate to that first lien, which subordinate financing would reduce the equity the mortgagor would otherwise have in the related mortgaged property as indicated in such originator's loan-to-value ratio determination for such originator's first lien." (PS at S-19.) |
| **CARR 2006-OPT1** | **"The Mortgage Loans were Underwritten to Standards Which Do Not Conform to the Credit Standards of Fannie Mae or Freddie Mac Which May Result in Losses on the Mortgage Loans**<br>The originator's underwriting standards are intended to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan and consider, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property. The originator provides loans primarily to borrowers who do not qualify for loans conforming to Fannie Mae and Freddie Mac credit guidelines. The originator's underwriting standards do not prohibit a mortgagor from obtaining, at the time of origination of the originator's first lien, additional financing which is subordinate to that first lien, which subordinate financing would reduce the equity the mortgagor would otherwise have in the related mortgaged property as indicated in the originator's loan-to-value ratio determination for the originator's |

| | first lien." (PS at S-19.) |
|---|---|
| **CARR 2006-RFC1** | **"Underwriting standards may affect the risk of loss on the mortgage loans.** The mortgage loans have been originated using underwriting standards that are less restrictive than the underwriting requirements used as standards for other first lien and junior lien mortgage loan purchase programs, including other programs of Residential Funding Corporation and the programs of Fannie Mae and Freddie Mac. Applying less restrictive underwriting standards creates additional risks that losses on the mortgage loans will be allocated to certificateholders." (PS at S-17.) |
| **CBASS 2007-CB1** | **"Mortgage Loans Originated According to Non-Agency Underwriting Guidelines May Have Higher Expected Delinquencies** If specified in the related prospectus supplement, the loans may have been originated according to underwriting guidelines that do not comply with Fannie Mae or Freddie Mac guidelines. These types of loans are sometimes referred to as 'subprime,' 'non-prime' or 'non-conforming' mortgage loans. Whereas 'prime' loans are typically made to borrowers who have a strong credit history and can demonstrate a capacity to repay their loans, subprime loans are typically made to borrowers who are perceived as deficient in either or both of these respects. The borrowers may have imperfect credit histories, ranging from minor delinquencies to bankruptcy, or relatively high ratios of monthly mortgage payments to income or relatively high ratios of total monthly credit payments to income. While lenders consider a borrower's credit history when determining whether a loan is other than prime, they also consider the mortgage loan characteristics, such as loan-to-value ratio, or attributes of the property that may cause the loan to carry elevated credit risk." (Pros. at 17.) |
| **CFLX 2006-2** | **"Less Stringent Underwriting Standards and the Resultant Potential for Delinquencies on the Mortgage Loans May Increase Risk of Loss** The underwriting standards used in the origination of the mortgage loans held by the trust are generally less stringent than those of Fannie Mae or Freddie Mac with respect to a borrower's credit history and in certain other respects. Mortgage loan borrowers may have an impaired or unsubstantiated credit history. As a result of this less stringent approach to underwriting, the mortgage loans purchased by the trust may experience higher rates of delinquencies, defaults and foreclosures than mortgage loans underwritten in a manner which is more similar to the Fannie Mae and Freddie Mac guidelines." (PS at S-16.) |
| **JPALT 2006-S4** | "Such Mortgage Loans were not originated in a manner generally consistent with Fannie Mae or Freddie Mac published underwriting guidelines and were originated using underwriting policies (the 'CHF Alternative A Underwriting Policies') that are different from and, in |

| | |
|---|---|
| | certain respects, less stringent than the general underwriting policies of CHF. For example, such Mortgage Loans include mortgage loans secured by non-owner occupied properties, mortgage loans made to borrowers whose income is not required to be provided or verified, mortgage loans with higher loan-to-value ratios or mortgage loans made to borrowers whose ratios of debt service on the mortgage loans to income and total debt service on borrowings to income are higher than for such other programs, or mortgage loans made to international borrowers. Other examples include mortgage loans secured by shares in cooperative housing corporations, 'condotels,' smaller or larger or otherwise unusual parcels of land and mortgage loans with higher loan-to-value ratios than in such other programs. The inclusion of such Mortgage Loans may present certain risks that are not present in such other programs."  (PS at S-27.) |
| **JPMAC 2005-OPT2** | **"The Underwriting Standards of the Originator Are Not as Stringent as those of  Fannie Mae and Freddie Mac, Which May Result in Losses**<br>The originator's underwriting standards are primarily intended to assess the value of the mortgaged property and to evaluate the adequacy of that  property as collateral for the mortgage loan and the applicant's credit standing  and ability to repay. The originator provides loans primarily to borrowers who  do not qualify for loans conforming to Fannie Mae and Freddie Mac guidelines but  who generally have equity in their property. While the primary consideration in  underwriting a mortgage loan is the value and adequacy of the mortgaged property  as collateral, the originator also considers, among other things, a mortgagor's  credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property. The originator's underwriting  standards do not prohibit a mortgagor from obtaining secondary financing at the  time of origination of the first lien, which secondary financing would reduce  the equity the mortgagor would otherwise have in the related mortgaged property as indicated in the originator's loan-to-value ratio determination."  (PS at S-9.) |
| **JPMAC 2006-CW1** | **"The Underwriting Standards of the Originator Are Not as Stringent as those of Fannie Mae and Freddie Mac, Which May Result in Losses**<br>The originator's underwriting standards are primarily intended to assess the value of the mortgaged property and to evaluate the adequacy of that property as collateral for the mortgage loan and the applicant's credit standing and ability to repay. The originator provides loans primarily to borrowers who do not qualify for loans conforming to Fannie Mae and Freddie Mac guidelines but who generally have equity in their property. While the primary consideration in underwriting a mortgage loan is the value and adequacy of the mortgaged property as collateral, the originator also considers, among other things, a |

| | |
|---|---|
| | mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property. The originator's underwriting standards do not prohibit a mortgagor from obtaining secondary financing at the time of origination of the first lien, which secondary financing would reduce the equity the mortgagor would otherwise have in the related mortgaged property as indicated in the originator's loan to value ratio determination."  (PS at S-10.) |
| **JPMAC 2006-CW2** | **"The Underwriting Standards of the Originator Are Not as Stringent as those of Fannie Mae and Freddie Mac, Which May Result in Losses**<br>The originator's underwriting standards are primarily intended to assess the value of the mortgaged property and to evaluate the adequacy of that property as collateral for the mortgage loan and the applicant's credit standing and ability to repay. The originator provides loans primarily to borrowers who do not qualify for loans conforming to Fannie Mae and Freddie Mac guidelines but who generally have equity in their property. While the primary consideration in underwriting a mortgage loan is the value and adequacy of the mortgaged property as collateral, the originator also considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property. The originator's underwriting standards do not prohibit a mortgagor from obtaining secondary financing at the time of origination of the first lien, which secondary financing would reduce the equity the mortgagor would otherwise have in the related mortgaged property as indicated in the originator's loan to value ratio determination."  (PS at S-15.) |
| **JPMAC 2006-FRE2** | **"The Underwriting Standards of the Originator Are Not as Stringent as those of Fannie Mae and Freddie Mac, Which May Result in Losses**<br>The originator's underwriting standards are primarily intended to assess the value of the mortgaged property and to evaluate the adequacy of that property as collateral for the mortgage loan and the applicant's credit standing and ability to repay. The originator provides loans primarily to borrowers who do not qualify for loans conforming to Fannie Mae and Freddie Mac guidelines but who generally have equity in their property. While the primary consideration in underwriting a mortgage loan is the value and adequacy of the mortgaged property as collateral, the originator also considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property. The originator's underwriting standards do not prohibit a mortgagor from obtaining secondary financing at the time of origination of the first lien, which secondary financing would reduce the equity the mortgagor would otherwise have in the related mortgaged property as |

| | indicated in the originator's loan-to-value ratio determination."  (PS at S-11.) |
|---|---|
| **JPMAC 2007-CH1** | **"The Underwriting Standards of the Originator Are Not as Stringent as those of Fannie Mae and Freddie Mac, Which May Result in Losses**<br>The originator's underwriting standards are primarily intended to assess the value of the mortgaged property and to evaluate the adequacy of that property as collateral for the mortgage loan and the applicant's credit standing and ability to repay. The originator provides loans primarily to borrowers who do not qualify for loans conforming to Fannie Mae and Freddie Mac guidelines but who generally have equity in their property. While the primary consideration in underwriting a mortgage loan is the value and adequacy of the mortgaged property as collateral, the originator also considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property. The originator's underwriting standards do not prohibit a mortgagor from obtaining secondary financing at the time of origination of the first lien, which secondary financing would reduce the equity the mortgagor would otherwise have in the related mortgaged property as indicated in the originator's loan to value ratio determination."  (PS at S-15.) |
| **JPMAC 2007-HE1** | **"The Underwriting Standards of the Originators Are Not as Stringent as those of Fannie Mae and Freddie Mac, Which May Result in Losses**<br>The originators' underwriting standards are primarily intended to assess the value of the mortgaged property and to evaluate the adequacy of that property as collateral for the mortgage loan and the applicant's credit standing and ability to repay. The originators provide loans primarily to borrowers who do not qualify for loans conforming to Fannie Mae and Freddie Mac guidelines but who generally have equity in their property. While the primary consideration in underwriting a mortgage loan is the value and adequacy of the mortgaged property as collateral, the originators also consider, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property. The originators' underwriting standards do not prohibit a mortgagor from obtaining secondary financing at the time of origination of the first lien, which secondary financing would reduce the equity the mortgagor would otherwise have in the related mortgaged property as indicated in the originators' loan-to-value ratio determination."  (PS at S-14.) |

| VI.  The Disclosures Warned that a Substantial Portion of the Mortgage Loans Will Represent Exceptions | |
|---|---|
| **Securitization** | **Selected Relevant Disclosures and Page Citations** |
| **BSABS 2007-HE4** | "It is expected that a substantial portion of the mortgage loans in the mortgage pool that were originated by the originators will represent these exceptions."  (PS at S-38.) |
| **BSABS 2007-HE5** | "It is expected that a substantial portion of the mortgage loans in the mortgage pool that were originated by the originators will represent these exceptions."  (PS at S-38.) |
| **CARR 2006-NC5** | "It is expected that a substantial portion of the mortgage loans in the mortgage pool that were originated by the originators will represent these exceptions."  (PS at S-80.) |
| **JPMAC 2006-CW1** | "It is expected that a significant number of the Mortgage Loans will have been originated based on these types of underwriting exceptions." (PS at S-57.) |
| **JPMAC 2006-CW2** | "It is expected that a significant number of the Mortgage Loans will have been originated based on these types of underwriting exceptions." (PS at S-68.) |
| **JPMAC 2006-FRE2** | "It is expected that a substantial portion of the mortgage loans may represent such underwriting exceptions."  (PS at S-59.) |

| VII. | The Disclosures Warned that Many of the Mortgages were Stated Documentation Loans | |
|---|---|---|
| **Securitization** | **Selected Relevant Disclosures and Page Citations** | |
| **JPMAC 2006-CW2** | • **37.41% of the principal value of the mortgage loans consisted of "Stated Documentation" loans as to which "the borrower's income as stated on the application is not independently verified." (PS at S-35.)** | |
| **BALTA 2005-10** | • In Group I, 13.17% of the loans were no documentation loans, and 72.54% of the loans were reduced documentation loans. (PS at A-6). In Group II, 10.50% of the loans were no documentation loans, and 69.14% of the loans were reduced documentation loans. (PS at A-71). | |
| **BALTA 2005-9** | • In Group I, 12.59% of the mortgage loans were no documentation loans, and 75.88% of the mortgage loans were reduced documentation loans. (PS at A-6). In Group II-1 8.33% of the loans were no documentation loans, and 76.60% were reduced documentation loans. (PS at A-17). In Group II-2, 10.71% of the loans were no documentation loans, and 55.91% of the loans were reduced documentation loans. (PS at A-28). In Group II-3, 7.49% of the loans were no documentation loans, and 70.87% of the loans were reduced documentation loans. (PS at A-39). In Group II-4, 4.48% of the loans were no documentation loans, and 72.47% were reduced documentation loans. (PS at A-51). In Group II-5, 5.08% of the loans were no documentation loans, and 62.83% were reduced documentation loans. (PS at A-61). In Group II-6, 2.21% were no documentation loans, and 82.93% were reduced documentation loans. (PS at A-70.). <br>• "Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived." (PS at S-50.) <br>• "Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan file, they are not taken into account for purposes of the underwriting analysis." (PS at S-52.) | |
| **BALTA 2006-4** | • In Group I, 11.83% of the mortgage loans were no documentation, 23.25% were reduced documentation, and 55.82% were stated income loans." (PS at A-6.). "In Group II, 10.94% of the loans were no documentation, 14/06% were reduced documentation loans, and 57.19% were stated income loans. (PS at A-45.) <br>• "Under a stated income/verified asset documentation program, | |

| | more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower than on a verified income of the borrower. Although the income is not verified, the originators obtain a telephonic verification of the borrower's employment without reference to income. Borrower's assets are verified." (PS at S-62.)<br><br>• "Under the no ratio documentation program the borrower's income is not stated and no ratios are calculated. Although the income is not stated nor verified, lenders obtain a telephonic verification of the borrower's employment without reference to income. Borrower's assets are verified." (PS at S-62. )<br><br>• "Under the no income/no asset documentation program, the borrower's income and assets are neither stated nor verified. The underwriting of such mortgage loans may be based entirely on the adequacy of the mortgaged property as collateral and on the credit history of the borrower." (PS at S-62.)<br><br>• "Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived." (PS at S-67.) |
|---|---|
| **BSARM 2005-10** | • 4.26% of the mortgage loans were no documentation, and 44.34% of the mortgage loans were reduced documentation. (PS at A-6.)<br><br>• "Verifications of income, assets or mortgages may be waived under certain programs offered by Wells Fargo, but the Wells Fargo Underwriting Guidelines require, in most instances, a verbal or written verification of employment to be obtained." (PS at S-26.) |
| **BSARM 2005-12** | • In Group I, 3.07% of the loans were no documentation, 51.39% of the loans were reduced documentation loans. (PS at A-5). In Group II, 31.20% of the loans were reduced documentation loans. (PS at A-36.)<br><br>• "A prospective borrower may be eligible for a loan approval process that limits or eliminates Countrywide Home Loans' standard disclosure or verification requirements or both." (PS at S-35) |
| **BSABS 2005-AC9** | • "16.7% of the loans were no documentation, .57% were no income/no asset, 14.24% were no ratio, 45.81% were stated income/verified assets, and 4.66% were stated income/stated assets." (PS at A-5.)<br><br>• "Under a stated income documentation program, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower than on a verified income of the borrower. Although the income is not verified, the originators obtain a telephonic verification of the borrower's employment without reference to income. |

| | |
|---|---|
| | Borrower's assets are verified." (PS at S-36.)<br>• "Under the no income/no asset documentation program, the borrower's income and assets are stated but not verified. The underwriting of such mortgage loans may be based entirely on the adequacy of the mortgaged property as collateral and on the credit history of the borrower." (PS at S-36.)<br>• "Under the no ratio documentation program the borrower's income is not stated and no ratios are calculated. Although the income is not stated nor verified, lenders obtain a telephonic verification of the borrower's employment without reference to income. Borrower's assets are verified." (PS at S-36.) |
| **BSABS 2007-HE4** | • In Group I, 41.99% of the mortgage loans were stated income. (PS at A-5.)  In Group II, 38.66% of the mortgage loans were stated income.  (PS at A-21.)<br>• "Under the stated income documentation program, an applicant may be qualified based upon monthly income as stated on the mortgage loan application if the applicant meets certain criteria. Income stated on the application is not verified under the stated income documentation program." (PS at S-39.) |
| **BSABS 2007-HE5** | • In Group I, 36.26% of the mortgage loans were stated income. (PS at A-12).  In Group II, 27.67% of the loans were stated income.  (PS at A-18).  In Group III, 22.82% of the loans were stated income.  (PS at A-24)<br>• "Under the stated income documentation program, an applicant may be qualified based upon monthly income as stated on the mortgage loan application if the applicant meets certain criteria. Income stated on the application is not verified under the stated income documentation program." (PS at S-39-40.) |
| **CARR 2006-NC5** | • "The mortgage loans include loans that . . . were made to mortgagors whose income is not required to be verified, which constitute approximately 41.05% of the mortgage pool by principal balance of the mortgage loans as of the cut-off date, and may increase the risk that the mortgagor's income is less than that represented." (PS at S-19-20.) |
| **CARR 2006-OPT1** | • "The mortgage loans include loans that . . . were made to mortgagors whose income is not required to be verified, which constitute approximately 46.10% of the mortgage pool by principal balance, and may increase the risk that the mortgagor's income is less than that represented." (PS at S-18.) |
| **CARR 2006-RFC1** | • "The mortgage loans include loans that . . . were made to mortgagors whose income is not required to be verified, which constitute approximately 41.54 % of the mortgage pool by principal balance, and may increase the risk that the mortgagor's income is less than that represented."  (PS at S-17.) |
| **CBASS 2007-CB1** | • 22.01% of the mortgage loans were stated income loans, 12.18% of the mortgage loans were stated income, stated asset. |

| | |
|---|---|
| | (PS at A-2-5.) <ul><li>Under a "No Documentation" program, the originator  does not undertake verification of a mortgagor's income or assets.  (PS at S-60.)</li><li>Under the stated income documentation program, an  applicant may be qualified based upon monthly income as stated on the mortgage  loan application if the applicant meets certain criteria.  (PS at S-63.)</li></ul> |
| **CFLX 2006-2** | <ul><li>20.4% of the mortgage loans were reduced documentation, 13% were reduced documentation-no ratio, 50.6% were no documentation, and 1.4% were stated income/stated asset.  (PS at S-31.)</li><li>"Pursuant to CHF's 'No Doc' program, no employment information, sources of income, income amount or assets are disclosed. Additionally, employment verification is not required.  (PS at S-51.)</li><li>"Pursuant to CHF's Stated Income Stated Asset Program (which is sometimes referred to as CHF's 'SISA' or 'Simply Signature' program), verification of the income and assets, as stated on the application, is not required."  (PS at S-51)</li></ul> |
| **JPALT 2006-S4** | <ul><li>10.63% of loans were no documentation loans, 6.86% of the loans were stated income/stated asset, 5.27% of the loans were no income/no assets verified. (PS at A-3)</li><li>"Generally, under a 'reduced documentation' program, either no verification of a mortgagor's stated income is undertaken by the originator or no verification of a mortgagor's assets is undertaken by the originator."  (PS at S-20)</li><li>"Under a 'stated income/stated assets' program, no verification of either a mortgagor's income or a mortgagor's assets is undertaken by the originator although both income and assets are stated on the loan application and a 'reasonableness test' is applied."  (PS at S-20)</li><li>"Generally, under a 'no income/no asset' program, the mortgagor is not required to state his or her income or assets and therefore, no verification of such mortgagor's income or assets is undertaken by the originator."  (PS at S-20)</li></ul> |
| **JPMAC 2005-OPT2** | <ul><li>46.66% of the loans were stated income loans.  (PS at S-30.)</li><li>"No Documentation, which is only available under the AA+ credit grade, does  not require any statement or proof of income, employment or assets."  (PS at S-57.)</li><li>"Stated Income Documentation applicants are qualified based upon monthly income as stated on the mortgage loan application."  (PS at S-57.)</li></ul> |
| **JPMAC 2006-CW1** | <ul><li>34.5% of the mortgage loans were stated income loans.  (PS at S-39).</li></ul> |

| | |
|---|---|
| | • "Under the Stated Income Program, the borrower's employment and income sources and amounts must be stated on the borrower's application for credit. The borrower's income as stated must be reasonable for the related occupation and the determination as to reasonableness is subject to the loan underwriter's discretion. However, the borrower's income as stated on the application is not independently verified."  (PS at S-58.) |
| **JPMAC 2006-FRE2** | • 41.93% of the mortgage loans were stated income loans. (PS at S-33)<br>• "Under Stated Income, applicants are qualified based on monthly income as stated on the mortgage application. The income is not verified under the Stated Income program; however, the income stated must be reasonable and customary for the applicant's line of work."  (PS at S-59.) |
| **JPMAC 2007-CH1** | • 33.11% of  the  mortgage loans were stated income loans.  (PS at S-39)<br>• "The CHM Stated Income Program is a no income verification program available for credit grades A1/A+ through B2."  (PS at S-90.) |
| **JPMAC 2007-HE1** | • In Group I, 22% of the loans were stated income. (PS at S-36). In Group II, 29.97% of the loans were stated income.  (PS at S-44.)<br>• "Under a 'stated income' or 'streamlined' program, no verification of a mortgagor's income is undertaken by the originator although the mortgagor's income is stated on the loan application and a 'reasonableness test' is applied."  (PS at S-54.) |

| VIII. | The Disclosures Warned that Credit Scores were Not a Substitute for the Underwriter's Judgment |
|---|---|
| **Securitization** | **Selected Relevant Disclosures and Page Citations** |
| **JPMAC 2006-CW2** | **Credit Scores were "Used as an aid to, not a substitute for, the underwriter's judgment."** |
| **BSABS 2005-AC9** | "We cannot assure you that the credit scores of the mortgagors will be an accurate predictor of the likelihood of repayment of the related mortgage loans."  (PS at S-30.) |
| **BSABS 2007-HE4** | "Investors are encouraged to be aware that credit scores are based on past payment history of the borrower. Investors are encouraged not to rely on credit scores as an indicator of future borrower performance. See *'The Mortgage Pool'* in this prospectus supplement."  (PS at S-29.) |
| **BSABS 2007-HE5** | "Investors are encouraged to be aware that credit scores are based on past payment history of the borrower. Investors are encouraged not to rely on credit scores as an indicator of future borrower performance. See *'The Mortgage Pool'* in this prospectus supplement."  (PS at S-29.) |
| **CARR 2006-NC5** | "None of the sponsor, the servicer, the originators, the trustee, the underwriters or the depositor make any representations or warranties as to the actual performance of any mortgage loan or that a particular credit score should be relied upon as a basis for an expectation that the borrower will repay the mortgage loan according to its terms."  (PS at S-79.) |
| **CARR 2006-OPT1** | "None of the sponsor, the servicer, the originator, the trustee, the underwriters or the depositor make any representations or warranties as to the actual performance of any mortgage loan or that a particular credit score should be relied upon as a basis for an expectation that the borrower will repay the mortgage loan according to its terms." (PS at S-72.) |
| **CARR 2006-RFC1** | "None of the sponsor, the servicer, the originator, the trustee, the underwriters or the depositor make any representations or warranties as to the actual performance of any mortgage loan or that a particular credit score should be relied upon as a basis for an expectation that the borrower will repay the mortgage loan according to its terms." (PS at S-90.) |
| **CBASS 2007-CB1** | "In evaluating the credit quality of borrowers, New Century utilizes credit bureau risk scores, or a FICO score, a statistical ranking of likely future credit performance developed by Fair, Isaac & Company and the three national credit data repositories: Equifax, TransUnion and Experian."  (PS at S-63.) |
| **CFLX 2006-2** | "However, a Credit Score purports only to be a measurement of the relative degree of risk a borrower represents to a lender, i.e., that a borrower with a higher score is statistically expected to be less likely to default in payment than a borrower with a lower score. In addition, it should be noted that Credit Scores were developed to indicate a level of default probability over a two-year period which does not correspond to |

| | the life of a mortgage loan. Furthermore, Credit Scores were not developed specifically for use in connection with mortgage loans, but for consumer loans in general. Therefore, a Credit Score does not take into consideration the effect of mortgage loan characteristics on the probability of repayment by the borrower. None of the Depositor, Chase Home Finance LLC or JPMorgan Chase Bank, N.A. makes any representations or warranties as to the actual performance of any Mortgage Loan or that a particular Credit Score should be relied upon as a basis for an expectation that the borrower will repay the Mortgage Loan according to its terms." (PS at S-22.) |
|---|---|
| **JPALT 2006-S4** | "While lenders consider a borrower's credit history when determining whether a loan is other than prime, they also consider the mortgage loan characteristics, such as loan-to-value ratio, or attributes of the property that may cause the loan to carry elevated credit risk." (Pros. at 14.) |
| **JPMAC 2006-CW1** | "The Credit Bureau Risk Scores set forth in Annex A hereto were obtained either at the time of origination of the Mortgage Loan or more recently. The Credit Bureau Risk Score is used as an aid to, not a substitute for, the underwriter's judgment." (PS at S-61.) |
| **JPMAC 2006-FRE2** | "The Scored Programs assess the risk of default by using Credit Scores obtained from third party credit repositories along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratios as an aid to, not a substitute for, the underwriter's judgment." (PS at S-58.) |
| **JPMAC 2007-CH1** | "While lenders consider a borrower's credit history when determining whether a loan is other than prime, they also consider the mortgage loan characteristics, such as loan-to value ratio, or attributes of the property that may cause the loan to carry elevated credit risk." (Pros. at 14.) |
| **JPMAC 2007-HE1** | "The Credit Bureau Risk Score is used in conjunction with, among other factors, mortgage payment history and seasoning on bankruptcy and/or foreclosure and as an aid to, not a substitute for, the loan underwriter's judgment." (PS at S-63.) |

| IX. | The Disclosures Warned that the Seller or Originator May Not Repurchase or Substitute Any Defective Mortgage Loans | |
|---|---|---|
| **Securitization** | **Selected Relevant Disclosures and Page Citations** | |
| **JPMAC 2006-CW2** | "The CW2 PS disclosed a standard procedure for repurchase by the originator of non-conforming loans in the pool and the risk that 'the seller or the originator may not be capable of repurchasing or substituting any defective mortgage loans, for financial or other reasons,' which would 'likely cause the mortgage loans to experience higher rates of delinquencies, defaults and losses.'" (PS at S-23, *see also* S-119-21.) | |
| **BALTA 2005-10** | "In instances where a Seller is unable, or disputes its obligation, to repurchase affected mortgage loans and/or mortgage securities, the master servicer or the trustee, employing the standards set forth in the preceding sentence, may negotiate and enter into one or more settlement agreements with the related Seller that could provide for the repurchase of only a portion of the affected mortgage loans and/or mortgage securities. Any settlement could lead to losses on the mortgage loans and/or mortgage securities which would be borne by the related securities. In accordance with the above described practices, the master servicer or trustee will not be required to enforce any repurchase obligation of a Seller arising from any misrepresentation by the Seller, if the master servicer determines in the reasonable exercise of its business judgment that the matters related to the misrepresentation did not directly cause or are not likely to directly cause a loss on the related mortgage loan or mortgage security. If the Seller fails to repurchase and no breach of any other party's representations has occurred, the Seller's repurchase obligation will not become an obligation of the depositor or any other party." (Pros. at 16.) | |
| **BALTA 2005-9** | "In instances where a Seller is unable, or disputes its obligation, to repurchase affected mortgage loans and/or mortgage securities, the master servicer or the trustee, employing the standards set forth in the preceding sentence, may negotiate and enter into one or more settlement agreements with the related Seller that could provide for the repurchase of only a portion of the affected mortgage loans and/or mortgage securities. Any settlement could lead to losses on the mortgage loans and/or mortgage securities which would be borne by the related securities. In accordance with the above described practices, the master servicer or trustee will not be required to enforce any repurchase obligation of a Seller arising from any misrepresentation by the Seller, if the master servicer determines in the reasonable exercise of its business judgment that the matters related to the misrepresentation did not directly cause or are not likely to directly cause a loss on the related mortgage loan or mortgage security. If the Seller fails to repurchase and no breach of any other party's | |

| | representations has occurred, the Seller's repurchase obligation will not become an obligation of the depositor or any other party." (Pros. at 16.) |
|---|---|
| **BALTA 2006-4** | "In instances where a Seller is unable, or disputes its obligation, to repurchase affected mortgage loans and/or mortgage securities, the master servicer or the trustee, employing the standards set forth in the preceding sentence, may negotiate and enter into one or more settlement agreements with the related Seller that could provide for the repurchase of only a portion of the affected mortgage loans and/or mortgage securities. Any settlement could lead to losses on the mortgage loans and/or mortgage securities which would be borne by the related securities. In accordance with the above described practices, the master servicer or trustee will not be required to enforce any repurchase obligation of a Seller arising from any misrepresentation by the Seller, if the master servicer determines in the reasonable exercise of its business judgment that the matters related to the misrepresentation did not directly cause or are not likely to directly cause a loss on the related mortgage loan or mortgage security. If the Seller fails to repurchase and no breach of any other party's representations has occurred, the Seller's repurchase obligation will not become an obligation of the depositor or any other party." (Pros. at 21.) |
| **BSARM 2005-10** | "In instances where a Seller is unable, or disputes its obligation, to repurchase affected mortgage loans and/or mortgage securities, the master servicer or the trustee, employing the standards set forth in the preceding sentence, may negotiate and enter into one or more settlement agreements with the related Seller that could provide for the repurchase of only a portion of the affected mortgage loans and/or mortgage securities. Any settlement could lead to losses on the mortgage loans and/or mortgage securities which would be borne by the related securities. In accordance with the above described practices, the master servicer or trustee will not be required to enforce any repurchase obligation of a Seller arising from any misrepresentation by the Seller, if the master servicer determines in the reasonable exercise of its business judgment that the matters related to the misrepresentation did not directly cause or are not likely to directly cause a loss on the related mortgage loan or mortgage security. If the Seller fails to repurchase and no breach of any other party's representations has occurred, the Seller's repurchase obligation will not become an obligation of the depositor or any other party." (Pros. at 16.) |
| **BSARM 2005-12** | "In instances where a Seller is unable, or disputes its obligation, to repurchase affected mortgage loans and/or mortgage securities, the master servicer or the trustee, employing the standards set forth in the preceding sentence, may negotiate and enter into one or more settlement agreements with the related Seller that could provide for the |

| | |
|---|---|
| | repurchase of only a portion of the affected mortgage loans and/or mortgage securities. Any settlement could lead to losses on the mortgage loans and/or mortgage securities which would be borne by the related securities. In accordance with the above described practices, the master servicer or trustee will not be required to enforce any repurchase obligation of a Seller arising from any misrepresentation by the Seller, if the master servicer determines in the reasonable exercise of its business judgment that the matters related to the misrepresentation did not directly cause or are not likely to directly cause a loss on the related mortgage loan or mortgage security. If the Seller fails to repurchase and no breach of any other party's representations has occurred, the Seller's repurchase obligation will not become an obligation of the depositor or any other party." (Pros. at 16.) |
| **BSABS 2005-AC9** | "In the event of a breach of such representation, the seller will be obligated to cure such breach or repurchase or replace the affected mortgage loan in the manner described in this prospectus supplement. If the seller is unable or otherwise fails to satisfy such obligations, the yield on the offered certificates may be materially and adversely affected." (PS at S-26.) |
| **BSABS 2007-HE4** | "The sponsor will represent that, as of the closing date, each mortgage loan is in compliance with applicable federal and state laws and regulations. In the event of a breach of such representation, the sponsor will be obligated to cure such breach or repurchase or replace the affected mortgage loan in the manner described in this prospectus supplement. If the sponsor is unable or otherwise fails to satisfy such obligations, the yield on the offered certificates may be materially and adversely affected." (PS at S-25.) |
| **BSABS 2007-HE5** | "The sponsor will represent that, as of the closing date, each mortgage loan is in compliance with applicable federal and state laws and regulations. In the event of a breach of such representation, the sponsor will be obligated to cure such breach or repurchase or replace the affected mortgage loan in the manner described in this prospectus supplement. If the sponsor is unable or otherwise fails to satisfy such obligations, the yield on the offered certificates may be materially and adversely affected." (PS at S-25.) |
| **CARR 2006-NC5** | "In instances where a seller is unable, or disputes its obligation, to purchase affected mortgage loans, the master servicer or servicer, employing the standards described in the preceding paragraph, may negotiate and enter into one or more settlement agreements with that seller that could provide for, among other things, the purchase of only a portion of the affected mortgage loans or coverage of some loss amounts. Any such settlement could lead to losses on the mortgage loans which would be borne by the related credit enhancement, and to the extent not available, on the related certificates." (Pros. at 19.) |
| **CARR 2006-OPT1** | "In instances where a seller is unable, or disputes its obligation, to |

| | purchase affected mortgage loans, the master servicer or servicer, employing the standards described in the preceding paragraph, may negotiate and enter into one or more settlement agreements with that seller that could provide for, among other things, the purchase of only a portion of the affected mortgage loans or coverage of some loss amounts. Any such settlement could lead to losses on the mortgage loans which would be borne by the related credit enhancement, and to the extent not available, on the related certificates." (Pros. at 15.) |
|---|---|
| **CARR 2006-RFC1** | "In instances where a seller is unable, or disputes its obligation, to purchase affected mortgage loans, the master servicer or servicer, employing the standards described in the preceding paragraph, may negotiate and enter into one or more settlement agreements with that seller that could provide for, among other things, the purchase of only a portion of the affected mortgage loans or coverage of some loss amounts. Any such settlement could lead to losses on the mortgage loans which would be borne by the related credit enhancement, and to the extent not available, on the related certificates." (Pros. at 18-19.) |
| **CBASS 2007-CB1** | "However, if the sponsor is unable to fulfill this reimbursement obligation for financial or other reasons, shortfalls in the distributions due on your certificates could occur." (PS at S-17.) |
| **JPALT 2006-S4** | "The only obligation of the seller with respect to a trust will be to repurchase a trust asset if the seller or originator breaches a representation and warranty concerning the related trust asset. There will be no recourse against the originator, the seller, the depositor, the master servicer or the servicers if any required distribution on the securities is not made. Consequently, you will be reliant entirely on the trust assets and any available credit enhancement for payments on the securities. If payments on the trust assets are insufficient to make all payments required on the securities you may incur a loss of your investment." (Pros. at 8.) |
| **JPMAC 2005-OPT2** | The Prospectus Supplement disclosed a standard procedure for repurchase by the originator of non-conforming loans in the pool and the risk that "the seller or the originator may not be capable of repurchasing or substituting any defective mortgage loans, for financial or other reasons," which would "likely cause the mortgage loans to experience higher rates of delinquencies, defaults and losses." (PS at S-18.) |
| **JPMAC 2006-CW1** | The Prospectus Supplement disclosed a standard procedure for repurchase by the originator of non-conforming loans in the pool and the risk that "the seller or the originator may not be capable of repurchasing or substituting any defective mortgage loans, for financial or other reasons," which would "likely cause the mortgage loans to experience higher rates of delinquencies, defaults and losses." (PS at S-17.) |
| **JPMAC 2006-FRE2** | The Prospectus Supplement disclosed a standard procedure for repurchase by the originator of non-conforming loans in the pool and |

| | the risk that "the seller or the originator may not be capable of repurchasing or substituting any defective mortgage loans, for financial or other reasons," which would "likely cause the mortgage loans to experience higher rates of delinquencies, defaults and losses."  (PS at S-20.) |
|---|---|
| **JPMAC 2007-CH1** | The Prospectus Supplement disclosed a standard procedure for repurchase by the originator of non-conforming loans in the pool and the risk that "the seller or the originator may not be capable of repurchasing or substituting any defective mortgage loans, for financial or other reasons," which would "likely cause the mortgage loans to experience higher rates of delinquencies, defaults and losses."  (PS at S-23.) |
| **JPMAC 2007-HE1** | The Prospectus Supplement disclosed a standard procedure for repurchase by the originator of non-conforming loans in the pool and the risk that "the seller or the originator may not be capable of repurchasing or substituting any defective mortgage loans, for financial or other reasons," which would "likely cause the mortgage loans to experience higher rates of delinquencies, defaults and losses."  (PS at S-22.) |

| X. | The Prospectus Supplements Disclosed The Types of Loans Underlying The Trusts |
|---|---|
| **Securitization** | **Selected Relevant Disclosures and Page Citations** |
| **JPMAC 2006-CW2** | **"The assets of the trust fund will primarily consist of a pool of** *subprime***, first and second lien adjustable-rate and fixed-rate mortgage loans." (PS at i.) (emphasis added)** |
| **BALTA 2005-10** | "The trust will consist primarily of a pool of adjustable rate mortgage loans secured by first liens on one- to four family residential properties." (PS at 1; *see also* PS at S-33.) |
| **BALTA 2005-9** | "The trust will consist primarily of a pool of adjustable rate mortgage loans secured by first liens on one- to four family residential properties." (PS at 1; *see also* PS at S-5.) |
| **BALTA 2006-4** | "The trust will consist primarily of a pool of adjustable rate Alt-A type mortgage loans." (PS at 1; *see also* PS at S-5.) |
| **BSARM 2005-10** | "The trust will consist primarily of a pool of adjustable rate mortgage loans." (PS at S-1; *see also* PS at S-6.) |
| **BSARM 2005-12** | "The trust will consist primarily of a pool of adjustable rate mortgage loans." (PS at S-1; *see also* PS at S-6.) |
| **BSABS 2005-AC9** | "The certificates represent interests in a pool of fixed rate, conventional mortgage loans." (PS at S-1; *see also* PS at S-5.) |
| **BSABS 2007-HE4** | "The certificates represent interest in a pool of fixed and adjustable rate, conventional, closed-end *sub-prime* mortgage loans." (PS at S-1; *see also* PS at S-4.) (emphasis added) |
| **BSABS 2007-HE5** | "The certificates represent interest in a pool of fixed and adjustable rate, conventional, closed-end *sub-prime* mortgage loans." (PS at S-1; *see also* PS at S-4.) (emphasis added) |
| **CARR 2006-NC5** | "The trust will consist primarily of a pool of one- to four-family adjustable-rate and fixed-rate, interest-only, balloon and fully amortizing, first lien and second lien, closed-end, *subprime* mortgage loans." (PS at S-1; *see also* PS at S-5.) (emphasis added) |
| **CARR 2006-OPT1** | "The trust will consist primarily of a pool of one-to four-family adjustable-rate and fixed-rate, interest-only, balloon and fully-amortizing, first lien and second lien, closed-end, *subprime* mortgage loans." (PS at S-1; *see also* PS at S-5.) (emphasis added) |
| **CARR 2006-RFC1** | "The trust will consist primarily of a pool of one-to four-family adjustable-rate and fixed-rate, interest-only, balloon and fully-amortizing, first lien and second lien, closed-end, *subprime* mortgage loans." (PS at S-1; *see also* PS at S-4-5.) (emphasis added) |
| **CBASS 2007-CB1** | "The assets of the issuing entity will primarily consist of a pool of first and second lien adjustable-rate and fixed-rate mortgage loans." (PS at i; *see also* PS at S-19.) |
| **CFLX 2006-2** | "The assets of the issuing entity will consist primarily of one pool of fixed rate fully amortizing one- to four-family first lien residential mortgage loans." (PS at S-1; *see also* PS at S-8.) |
| **JPALT 2006-S4** | "The assets of the issuing entity will primarily consist of a pool of fixed |

| | |
|---|---|
| | rate, fully amortizing conventional mortgage loans." (PS at i; *see also* PS at S-16.) |
| **JPMAC 2005-OPT2** | "The assets of the trust fund will primarily consist of a pool of first and second lien adjustable rate and fixed rate mortgage loans." (PS at i.; *see also* PS at S-6.) |
| **JPMAC 2006-CW1** | "The assets of the trust fund will primarily consist of a pool of first and second lien adjustable rate and fixed rate mortgage loans." (PS at i; *see also* PS at S-7.) |
| **JPMAC 2006-FRE2** | "The assets of the trust fund will primarily consist of a pool of first and second lien adjustable rate and fixed rate mortgage loans." (PS at i; *see also* PS at S-8.) |
| **JPMAC 2007-CH1** | "The assets of the trust fund will primarily consist of a pool of first and second lien adjustable and fixed rate mortgage loans." (PS at i; *see also* PS at S-11.) |
| **JPMAC 2007-HE1** | "The assets of the trust fund will primarily consist of a pool of first and second lien adjustable and fixed rate mortgage loans." (PS at i; *see also* PS at S-11.) |

| XI. | The Prospectus Supplements Disclosed Statistical Information Regarding the Mortgage Loans |
|---|---|
| **Securitization** | **Selected Relevant Disclosures and Page Citations** |
| **JPMAC 2006-CW2** | • 63.13% of the Mortgage Loans were adjustable-rate mortgage loans. (PS at S-34.) <br> • 29.36% were interest-only loans. (PS at S-34.) <br> • As many as 12.01% of some subgroups of the Mortgage Loans were "balloon loans," and "[t]he ability of such a borrower to repay a balloon loan at maturity frequently will depend on such borrower's ability either to timely refinance the loan or to timely sell the mortgaged property." (PS at S-26.) <br> • "As many as 26.8% of some subgroups of the Mortgage Loans were on properties with a second lien, another risk factor for higher foreclosure rates." (PS, at S-21.) |
| **BALTA 2005-10** | • 100% of the Mortgage Loans were adjustable-rate mortgage loans. (PS at S-5.) <br> • "Approximately 82.41%, 91.47%, 90.99%, 92.48%, 95.07% and 93.23% of the group I, sub-loan group II-1, sub-loan group II-2, subloan group II-3, sub-loan group II-4 and subloan group II-5 mortgage loans, respectively, will require payment of interest only for the initial period set forth in the related mortgage note." (PS at S-6.) <br> • "With respect to balloon loans, payment of the balloon payment (which, based on the amortization schedule of the mortgage loans, is expected to be a substantial amount) will generally depend on the mortgagor's ability to obtain refinancing of the mortgage loans or to sell the mortgaged property prior to the maturity of the balloon loan. The ability to obtain refinancing will depend on a number of factors prevailing at the time refinancing or sale is required, including real estate values, the mortgagor's financial situation, prevailing mortgage loan interest rates, the mortgagor's equity in the related mortgaged property, tax laws and prevailing general economic conditions. None of the depositor, the master servicer, a servicer or any of their affiliates will be obligated to refinance or repurchase any mortgage loan or to sell the mortgaged property." (Pros. at 67.) <br> • 100% of the Loans were on properties with a first lien. (PS at S-5.) |
| **BALTA 2005-9** | • 100% of the Mortgage Loans were adjustable-rate mortgage loans. (PS at S-5.) <br> • "Approximately 90.38%, 89.17%, 90.52%, 93.30%, 90.78%, 89.43% and 92.11% of the group I, sub-loan group II-1, sub-loan group II-2, sub-loan group II-3, sub-loan group II-4, group II-5 and sub-loan group II-6 mortgage loans, respectively, will require payment of interest only for the initial period set forth in |

|  | <ul><li>the related mortgage note."  (PS at S-6.)</li><li>"With respect to balloon loans, payment of the balloon payment (which, based on the amortization schedule of the mortgage loans, is expected to be a substantial amount) will generally depend on the mortgagor's ability to obtain refinancing of the mortgage loans or to sell the mortgaged property prior to the maturity of the balloon loan. The ability to obtain refinancing will depend on a number of factors prevailing at the time refinancing or sale is required, including real estate values, the mortgagor's financial situation, prevailing mortgage loan interest rates, the mortgagor's equity in the related mortgaged property, tax laws and prevailing general economic conditions. None of the depositor, the master servicer, a servicer or any of their affiliates will be obligated to refinance or repurchase any mortgage loan or to sell the mortgaged property."  (Pros. at 67.)</li><li>100% of the loans were first lien.  (PS at S-5.)</li></ul> |
|---|---|
| **BALTA 2006-4** | <ul><li>100% of the loans were adjustable rate mortgage loans (PS at S-7.)</li><li>"Approximately 84.21%, 85.39%, 87.32%, 79.36%, 89.86%, 91.30%, 85.90%, 91.40% and 91.06% of the sub-loan group I-1, subloan group I-2, sub-loan group I-3, sub-loan group II-1, sub-loan group II-2, sub-loan group II-3, sub-loan group III-1, sub-loan group III-2 and sub-loan group III-3 mortgage loans, respectively, will require payment of interest only for the initial period set forth in the related mortgage note."  (PS at S-7.)</li><li>"With respect to balloon loans, payment of the balloon payment (which, based on the amortization schedule of the mortgage loans, is expected to be a substantial amount) will generally depend on the mortgagor's ability to obtain refinancing of the mortgage loans or to sell the mortgaged property prior to the maturity of the balloon loan. The ability to obtain refinancing will depend on a number of factors prevailing at the time refinancing or sale is required, including real estate values, the mortgagor's financial situation, prevailing mortgage loan interest rates, the mortgagor's equity in the related mortgaged property, tax laws and prevailing general economic conditions. None of the depositor, the master servicer, a servicer or any of their affiliates will be obligated to refinance or repurchase any mortgage loan or to sell the mortgaged property."  (Pros. at 74.)</li><li>100% of the loans were first lien.  (PS at S-7.)</li></ul> |
| **BSARM 2005-10** | <ul><li>100% of the loans were adjustable rate mortgage loans.  (PS at S-7.)</li><li>"Approximately 81.50% of the mortgage loans will receive interest only for the initial period set forth in the related mortgage note."  (PS at S-6.)</li><li>"With respect to balloon loans, payment of the balloon payment</li></ul> |

| | |
|---|---|
| | (which, based on the amortization schedule of the mortgage loans, is expected to be a substantial amount) will generally depend on the mortgagor's ability to obtain refinancing of the mortgage loans or to sell the mortgaged property prior to the maturity of the balloon loan. The ability to obtain refinancing will depend on a number of factors prevailing at the time refinancing or sale is required, including real estate values, the mortgagor's financial situation, prevailing mortgage loan interest rates, the mortgagor's equity in the related mortgaged property, tax laws and prevailing general economic conditions. None of the depositor, the master servicer, a servicer or any of their affiliates will be obligated to refinance or repurchase any mortgage loan or to sell the mortgaged property." (Pros. at 67.)<br>• 100% of the loans were first lien. (PS at S-7.) |
| **BSARM 2005-12** | • 100% of the loans were adjustable rate mortgage loans (PS at S-24)<br>• "Approximately 87.28%, 84.09% and 77.76% of the group I-1, group I-2 and group I-3 mortgage loans, respectively, and approximately 83.48% of the group I mortgage loans in the aggregate, will receive interest only for the initial period set forth in the related mortgage note. All of the group II mortgage loans will receive interest only for the initial period set forth in the related mortgage note." (PS at S-6.)<br>• "With respect to balloon loans, payment of the balloon payment (which, based on the amortization schedule of the mortgage loans, is expected to be a substantial amount) will generally depend on the mortgagor's ability to obtain refinancing of the mortgage loans or to sell the mortgaged property prior to the maturity of the balloon loan. The ability to obtain refinancing will depend on a number of factors prevailing at the time refinancing or sale is required, including real estate values, the mortgagor's financial situation, prevailing mortgage loan interest rates, the mortgagor's equity in the related mortgaged property, tax laws and prevailing general economic conditions. None of the depositor, the master servicer, a servicer or any of their affiliates will be obligated to refinance or repurchase any mortgage loan or to sell the mortgaged property." (Pros. at 67.)<br>• 100% of the loans were first lien. (PS at S-24.) |
| **BSABS 2005-AC9** | • 100% of the loans were fixed rate. (PS at 1.)<br>• "Approximately 49.59% of the mortgage loans, by aggregate principal balance as of the cutoff date, have an initial interest only period for the initial period set forth in the related mortgage note, ranging from three to ten years." (PS at S-5.)<br>• "Certain underlying loans may not be fully amortizing over their terms to maturity and may require a substantial principal payment (a "balloon" payment) at their stated maturity. Loans |

| | |
|---|---|
| | of this type involve greater risk than fully amortizing loans since the borrower generally must be able to refinance the loan or sell the related property prior to the loan's maturity date. The borrower's ability to do so will depend on such factors as the level of available mortgage rates at the time of sale or refinancing, the relative strength of the local housing market, the borrower's equity in the property, the borrower's general financial condition and tax laws."  (Pros. at 6.) <br> • 100% of the loans were first lien.  (PS at 1.) |
| **BSABS 2007-HE4** | • 75.20% of the mortgage loans were adjustable rate and 24.80% of the mortgage loans were fixed rate.  (PS at S-6.) <br> • "Approximately 18.82% and 7.00% of the mortgage loans in Loan Group I and Loan Group II, respectively, and approximately 14.94% of the mortgage loans in the aggregate, will receive interest only for the initial period set forth in the related mortgage note, ranging from two to ten years."  (PS at S-31.) <br> • "Approximately 37.29% and 40.34% of the mortgage loans in loan group I and loan group II, respectively, and approximately 38.29% of the mortgage loans in the aggregate by aggregate principal balance as of the cut-off date, are balloon loans. These mortgage loans will require a substantial payment of principal, or a balloon payment, at their stated maturity in addition to their scheduled monthly payment. Mortgage loans with balloon payments involve a greater degree of risk because the ability of a mortgagor to make a balloon payment typically will depend upon the mortgagor's ability either to fully refinance the loan or to sell the related mortgaged property at a price sufficient to permit the mortgagor to make the balloon payment. The ability of a mortgagor to accomplish either of these goals will be affected by a number of factors, including the value of the related mortgaged property. the level of available mortgage rates at the time of sale or refinancing, the mortgagor's equity in the related mortgaged property, the financial condition of the mortgagor, tax laws and prevailing general economic conditions." (PS at S-25-26.) <br> • 97.37% of the mortgage loans were first lien, 2.63% were second lien.  (PS at S-6.) |
| **BSABS 2007-HE5** | • 71.04% of the mortgage loans were adjustable rate and 28.96% of the mortgage loans were fixed rate.  (PS at S-6.) <br> • "Approximately 11.77%,0.12% and 14.68% of the mortgage loans in Loan Group I, Loan Group II and Loan Group III, respectively, and approximately 10.16% of the mortgage loans in the aggregate will receive interest only for the initial period set forth in the related mortgage note, ranging from two to ten years."  (PS at S-32.) |

|  | • "Approximately 43.05%, 58.50% and 34.00% of the mortgage loans in loan group I, loan group II and loan group III, respectively, and approximately 43.91% of the mortgage loans in the aggregate by aggregate principal balance as of the cut-off date, are balloon loans. These mortgage loans will require a substantial payment of principal, or a balloon payment, at their stated maturity in addition to their scheduled monthly payment. Mortgage loans with balloon payments involve a greater degree of risk because the ability of a mortgagor to make a balloon payment typically will depend upon the mortgagor's ability either to fully refinance the loan or to sell the related mortgaged property at a price sufficient to permit the mortgagor to make the balloon payment. The ability of a mortgagor to accomplish either of these goals will be affected by a number of factors, including the value of the related mortgaged property, the level of available mortgage rates at the time of sale or refinancing, the mortgagor's equity in the related mortgaged property, the financial condition of the mortgagor, tax laws and prevailing general economic conditions."  (PS at S-25-26.)<br>• 99.12% of the mortgage loans were first lien, .88% were second lien.  (PS at S-6.) |
|---|---|
| **CARR 2006-NC5** | • "Approximately 85.62% of the mortgage loans (by aggregate principal balance of the mortgage loans as of the cut-off date) are adjustable-rate mortgage loans whose interest rates increase as the applicable index increases. If market interest rates increase significantly, the likelihood that borrowers may not be able to pay their increased interest payments would increase, resulting in greater defaults on the mortgage loans. In addition, rising interest rates may adversely affect housing prices and the economy generally, thereby increasing the likelihood of defaults and losses on the mortgage loans."  (PS at S-21-22.)<br>• "As of the cut-off date, approximately 23.60% of the mortgage loans (by aggregate principal balance of the mortgage loans as of the cut-off date) require the related borrowers to make monthly payments of accrued interest, but not principal, for the first five years following origination. After such interest-only period, the borrower's monthly payment will be recalculated to cover both interest and principal so that the mortgage loan will amortize fully on its final payment date. The interest-only feature may reduce the likelihood of prepayment for such mortgage loans during the interest-only period due to the smaller monthly payments relative to a fully-amortizing mortgage loan. Because the monthly payment increases following the interest-only period, there is a greater likelihood that the related borrower may not be able to pay the increased amount and may default or may refinance the related mortgage |

| | |
|---|---|
| | loan to avoid the higher payment. In addition, because it is expected that no principal payments will be made on such mortgage loans for an extended period following origination, certificateholders will receive smaller principal distributions during such period than they would have received if the related borrowers were required to make monthly payments of interest and principal for the entire lives of such mortgage loans. This slower rate of principal distributions may reduce the return on an investment in the Class A and Class M Certificates that are purchased at a discount." (PS at S-18.)<br><br>• "Approximately 44.88% of the mortgage loans (by aggregate principal balance of the mortgage loans as of the cut-off date) are not fully amortizing over their terms to maturity and thus, will require substantial principal payments, sometimes called a balloon amount, at their stated maturity. Mortgage loans which require payment of a balloon amount involve a greater degree of risk because the ability of a mortgagor to pay a balloon amount typically will depend upon the mortgagor's ability either to timely refinance the loan or to sell the related mortgaged property." (PS at S-24.)<br><br>• "Approximately 99.06% of the mortgage loans are secured by first liens on fee simple interests in one to four family residential properties, individual condominium units and modular homes, and approximately 0.94% of the mortgage loans are secured by second liens on fee simple interests in one to four family residential properties, individual condominium units and modular homes." (PS at S-40.) |
| **CARR 2006-OPT1** | • "Approximately 83.70% of the mortgage loans (by aggregate principal balance of the mortgage loans as of the cut-off date) are adjustable-rate mortgage loans whose interest rates increase as the applicable index increases. If market interest rates increase significantly, the likelihood that borrowers may not be able to pay their increased interest payments would increase, resulting in greater defaults on the mortgage loans. In addition, rising interest rates may adversely affect housing prices and the economy generally, thereby increasing the likelihood of defaults and losses on the mortgage loans." (PS at S-20.)<br><br>• "Approximately 18.95% of the mortgage loans (by aggregate principal balance of the mortgage loans as of the cut-off date) require the related borrowers to make monthly payments of accrued interest, but not principal, for up to five years following origination. After the interest-only period, the related borrower's monthly payment will be recalculated to cover both interest and principal so that the mortgage loan will be paid in full by its final payment date. As a result, because the monthly payment increases, the related borrower may not be able to pay the |

<table>
<tr><td></td><td>

increased amount and may default or may refinance the loan to avoid the higher payment. In addition, because no scheduled principal payments are required to be made on these mortgage loans for a period of time, the Class A and Class M Certificates will receive smaller scheduled principal distributions during that period than they would have received if the related borrowers were required to make monthly payments of interest and principal from origination of these mortgage loans."  (PS at S-106.)

- "Approximately 19.11% of the mortgage loans are not fully amortizing over their terms to maturity and thus, will require substantial principal payments, sometimes called a balloon amount, at their stated maturity. Mortgage loans which require payment of a balloon amount involve a greater degree of risk because the ability of a mortgagor to pay a balloon amount typically will depend upon the mortgagor's ability either to timely refinance the loan or to sell the related mortgaged property."  (PS at S-23.)

- "Approximately 98.97% of the mortgage loans are secured by first liens on fee simple interests in one to four family residential properties, and approximately 1.03% of the mortgage loans are secured by second liens on fee simple interests in one to four family residential properties."  (PS at S-36.)

</td></tr>
</table>

| **CARR 2006-RFC1** | - "Approximately 86.25% of the mortgage loans (by aggregate principal balance of the mortgage loans as of the cut-off date) are adjustable-rate mortgage loans whose interest rates increase as the applicable index increases. If market interest rates increase significantly, the likelihood that borrowers may not be able to pay their increased interest payments would increase, resulting in greater defaults on the mortgage loans. In addition, rising interest rates may adversely affect housing prices and the economy generally, thereby increasing the likelihood of defaults and losses on the mortgage loans."  (PS at S-20.)<br><br>- "As of the cut-off date, approximately 14.14% of the mortgage loans (by aggregate principal balance of the mortgage loans as of the cut-off date) require the related borrowers to make monthly payments of accrued interest, but not principal, for the first five years following origination. After such interest-only period, the borrower's monthly payment will be recalculated to cover both interest and principal so that the mortgage loan will amortize fully on its final payment date. The interest-only feature may reduce the likelihood of prepayment for such mortgage loans during the interest-only period due to the smaller monthly payments relative to a fully-amortizing mortgage loan. Because the monthly payment increases following the interest-only period, there is a greater likelihood |

that the related borrower may not be able to pay the increased amount and may default or may refinance the related mortgage loan to avoid the higher payment. In addition, because it is expected that no principal payments will be made on such mortgage loans for an extended period following origination, certificateholders will receive smaller principal distributions during such period than they would have received if the related borrowers were required to make monthly payments of interest and principal for the entire lives of such mortgage loans. This slower rate of principal distributions may reduce the return on an investment in the Class A and Class M Certificates that are purchased at a discount."  (PS at S-16.)

- "Approximately 5.84% of the mortgage loans are not fully amortizing over their terms to maturity and thus, will require substantial principal payments, sometimes called a balloon amount, at their stated maturity. Mortgage loans which require payment of a balloon amount involve a greater degree of risk because the ability of a mortgagor to pay a balloon amount typically will depend upon the mortgagor's ability either to timely refinance the loan or to sell the related mortgaged property."  (PS at S-23.)

- "Approximately 98.22% of the mortgage loans are secured by first liens on fee simple interests in one to four family residential properties, and approximately 1.78% of the mortgage loans are secured by second liens on fee simple interests in one to four family residential properties."  (PS at S-38.)

| CBASS 2007-CB1 | <ul><li>57.82% of the mortgage loans were adjustable mortgage loans and 42.18% were fixed rate. (PS at A-2-1)</li><li>Approximately 19.91% of the Mortgage Loans will provide for interest only  Monthly Payments for the first 24, 60, 84 or 120 months of the term of the Interest Only Mortgage Loan.  (PS at S-21.)</li><li>38.04% of the mortgage loans were balloon mortgage loans. (PS at A-2-1.)</li><li>"Approximately 5.04% of the Mortgage Loans are secured by a Second Lien on  the related Mortgaged Property, and approximately 94.96% of the Mortgage Loans are secured by a First Lien on the related Mortgaged Property."  (PS at S-21.)</li></ul> |
|---|---|
| CFLX 2006-2 | <ul><li>100% of the mortgage loans were fixed rate.  (PS at S-8.)</li><li>42.5% of the loans were interest only.  (PS at S-8.)</li></ul> |
| JPALT 2006-S4 | <ul><li>"The assets of the issuing entity will primarily consist of a pool of fixed rate, fully amortizing conventional mortgage loans secured by first liens on one- to four-family residential properties having the characteristics described in Description of the Mortgage Pools" in this prospectus supplement."  (PS at 1.)</li><li>"If specified in the related prospectus supplement, certain loans</li></ul> |

|  | in a trust fund may not fully amortize over their terms to maturity and, thus, may require principal payments, i.e., balloon payments, at their stated maturity. Loans with balloon payments involve greater risk because a borrower's ability to make a balloon payment typically will depend on the borrower's ability to: • timely refinance the loan; or • timely sell the related mortgaged property."  (Pros. at 13.) |
|  | • "Approximately 30.57% of the mortgage loans provide for payment of interest at the related mortgage rate, but no payment of principal, for a period of ten years following the origination of the related mortgage loan. Following the applicable interest-only period, the monthly payment with respect to each such mortgage loan will be increased to an amount sufficient to amortize the principal balance of such mortgage loan over its remaining term, and to pay interest at the related mortgage interest rate."  (PS at S-12.) |
|  | • "With respect to a substantial portion of the mortgage loans, at the time of origination of the first lien mortgage loan, the originator also originated a second lien mortgage loan which is not included in the mortgage pool. With respect to mortgage loans that have second lien mortgage loans encumbering the same mortgaged property, foreclosure frequency may be increased relative to mortgage loans that do not have subordinate financing behind them since mortgagors have less equity in the mortgaged property. In addition, the servicer may declare a default on the second lien loan even though the first lien loan is current which would constitute a default on the first lien loan. In addition to the mortgage loans discussed above that have simultaneous subordinate financing provided by the originator, with respect to certain other mortgage loans, at the time of origination of the first lien mortgage loan, the related mortgaged property may also be encumbered by a second lien mortgage to a mortgagee other than the originator Investors should also note that any mortgagor may obtain subordinate financing at any time subsequent to the date of origination of their mortgage loan from the originator or from any other lender."  (PS at S-12.) |
| **JPMAC 2005-OPT2** | • 75.61% of the Mortgage Loans were adjustable rate, and 24.39% were Fixed Rate.  (PS at S-12.)<br>• 4.19% of the loans were second lien loans. (PS at S-30.)<br>• 14.48% of the loans were interest only.  (PS at S-39.) |
| **JPMAC 2006-CW1** | • "Approximately 5.23%, 47.00% and 31.05% of the mortgage loans in group 1, group 2 and the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable, as of the cut-off date), provide for payment of interest at the related mortgage rate, but |

|  | no payment of principal, for a period ranging from of two to five years following the origination of the related mortgage loan. Following the applicable interest-only period, the monthly payment with respect to each such mortgage loan will be increased to an amount sufficient to amortize the principal balance of such mortgage loan over its remaining term, and to pay interest at the related mortgage interest rate."  (PS at S-11.)<br>• "Approximately 1.47%, 3.55% and 2.76% of the mortgage loans included in group 1, group 2 and the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable, as of the cut-off date), will not fully amortize over their terms to maturity and, thus, will require principal payments at their stated maturity, which may be substantially greater than the monthly payments otherwise due on such mortgage loans (i.e., balloon payments). Mortgage loans with balloon payments involve a greater degree of risk because the ability of a mortgagor to make a balloon payment typically will depend on the mortgagor's ability either to timely refinance the mortgage loan or to timely sell the mortgaged property."  (PS at S-20.)<br>• 3.01% of the loans were second lien.  (PS at S-28.)<br>• As of the Cut-off Date, the weighted average Margin of the Adjustable-Rate Mortgage Loans in the Aggregate Pool is expected to be approximately 6.892 %.  (PS at S-32.) |
|---|---|
| **JPMAC 2006-FRE2** | • "Approximately 10.21% and 18.04% of the mortgage loans in group 1, group 2 and the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable, as of the cut-off date), provide for payment of interest at the related mortgage rate, but no payment of principal, for a period ranging from of two to five years following the origination of the related mortgage loan. Following the applicable interest-only period, the monthly payment with respect to each such mortgage loan will be increased to an amount sufficient to amortize the principal balance of such mortgage loan over its remaining term, and to pay interest at the related mortgage interest rate."  (PS at S-14.)<br>• "Approximately 25.76% and 23.97% of the mortgage loans included in group 1, group 2 and the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable, as of the cut-off date), will not fully amortize over their terms to maturity and, thus, will require principal payments at their stated maturity, which may be substantially greater than the monthly payments otherwise due on such mortgage loans (i.e., balloon payments). Mortgage loans with balloon payments involve a greater degree of risk because the ability of a mortgagor to make a balloon |

| | |
|---|---|
| | payment typically will depend on the mortgagor's ability either to timely refinance the mortgage loan or to timely sell the mortgaged property." (PS at S-22.) <br> • 5.96% of the loans were second lien. (PS at S-32.) <br> • "As of the Cut-off Date, the weighted average Margin of the Adjustable-Rate Mortgage Loans in the Aggregate Pool is expected to be approximately 5.86 %." (PS at S-35.) |
| **JPMAC 2007-CH1** | • "Approximately 5.35% of the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable, as of the cut-off date), provide for payment of interest at the related mortgage rate, but no payment of principal, for a period ranging from of two to five years following the origination of the related mortgage loan. Following the applicable interest-only period, the monthly payment with respect to each such mortgage loan will be increased to an amount sufficient to amortize the principal balance of such mortgage loan over its remaining term, and to pay interest at the related mortgage interest rate." (PS at S-11.) <br> • "If specified in the related prospectus supplement, certain loans in a trust fund may not fully amortize over their terms to maturity and, thus, may require principal payments, *i.e.,* balloon payments, at their stated maturity. Loans with balloon payments involve greater risk because a borrower's ability to make a balloon payment typically will depend on the borrower's ability to: timely refinance the loan; or timely sell the related mortgaged property." (Pros. at 20.) <br> • 4.31% of the loans were second lien (PS at S-50) <br> • "As of the Cut-off Date, the weighted average Margin of the Adjustable-Rate Mortgage Loans in the Aggregate Pool is expected to be approximately 4.568 %." (PS at S-42.) |
| **JPMAC 2007-HE1** | • "None of the mortgage loans in group 1 and approximately 0.07% of the mortgage loans in group 2 (by aggregate principal balance of the group as of the cut-off date), provide for payment of interest at the related mortgage rate, but no payment of principal, for a period of two years following the origination of the related mortgage loan. Approximately 1.80% and 7.21% of the mortgage loans in group 1 and group 2, respectively (I each case, by aggregate principal balance of the related group as of the cut-off date), provide for payment of interest at the related mortgage rate, but no payment of principal, for a period of five years following the origination of the related mortgage loan. None of the mortgage loans in group 1 and approximately 0.06% of the mortgage loans in group 2 (by aggregate principal balance of the group as of the cut-off date), provide for payment of interest at the related mortgage rate, but not payment of principal, for a period of seven years following the origination |

of the related mortgage loan. Approximately 1.91% and 17.44% of the mortgage loans in group 1 and group 2, respectively (in each case, by aggregate principal balance of the related group as of the cut-off date), provide for payment of interest at the related mortgage rate, but no payment of principal, for a period of ten years following the origination of the related mortgage loan. Following the applicable interest-only period, the monthly payment with respect to each such mortgage loan will be increased to an amount sufficient to amortize the principal balance of such mortgage loan over its remaining term, and to pay interest at the related mortgage interest rate." (PS at S-15.)

- "If specified in the related prospectus supplement, certain loans in a trust fund may not fully amortize over their terms to maturity and, thus, may require principal payments, *i.e.,* balloon payments, at their stated maturity. Loans with balloon payments involve greater risk because a borrower's ability to make a balloon payment typically will depend on the borrower's ability to: timely refinance the loan; or timely sell the related mortgaged property." (Pros. at 13.)

- "Approximately 3.90% and 3.04% of the mortgage loans in group 1 and group 2, respectively (in each case, by aggregate principal balance of the related group as of the cut-off date) are secured by a second lien that is subordinate to the rights of the mortgagee under a first mortgage loan on the related mortgaged property. The proceeds from any liquidation, insurance or condemnation proceeding will be available to satisfy the outstanding principal balance of such subordinate mortgage loans only to the extent that the claims of the senior mortgage loans have been satisfied in full, including any foreclosure costs. In certain circumstances where the servicer determines that it would be uneconomical to foreclose on the mortgaged property, the servicer may modify or waive any term of the mortgage loan, including accepting a lesser amount than stated in the mortgage note in satisfaction of the mortgage note. The servicer may charge off any second lien mortgage loan that is 180 days or more delinquent. The foregoing consideration will be particularly applicable to subordinate mortgage loans that have high combined loan-to-value ratios because the servicer is more likely to determine that foreclosure would be uneconomical. You should consider the risk that to the extent losses on second lien mortgage loans are not covered by available credit enhancement, such losses will be borne by the holders of the certificates." (PS at S-20.)

- "As of the Cut-off Date, the weighted average Margin of the Adjustable-Rate Mortgage Loans in the Aggregate Pool is expected to be approximately 45.15 %." (PS at S-47.)

| XII. | The Disclosures Warned that the Concentration of Mortgage Loans in Certain States May Result in Losses. |
|---|---|
| **Securitization** | **Selected Relevant Disclosures and Page Citations** |
| **JPMAC 2006-CW2** | More than 38% were located in just two states, California and Florida. CW 2 PS, at S-37. |
| **BALTA 2005-10** | "**The Mortgage Loans Are Concentrated in the State of California, Which May Result in Losses with Respect to These Mortgage Loans.** As of the cut-off date, approximately 23.99%, 28.57%, 8.73%, 13.97%, 30.12% and 47.20% of the group I, sub-loan group II-1, sub-loan group II-2, sub-loan group II-3, sub-loan group II-4 and sub-loan group II-5 mortgage loans, respectively, are secured by property in the State of California."  (PS at S-27.) |
| **BALTA 2005-9** | "**The Mortgage Loans Are Concentrated in the State of California, Which May Result in Losses with Respect to These Mortgage Loans.** As of the cut-off date, approximately 25.66%, 43.06%, 11.08%, 54.85%, 36.02%, 35.75% and 69.15% of the group I, sub-loan group II-1, sub-loan group II-2, sub-loan group II-3, sub-loan group II-4, sub-loan group II-5 and sub-loan group II-6 mortgage loans, respectively, are secured by property in the State of California."  (PS at S-28-29.) |
| **BALTA 2006-4** | "**The Mortgage Loans Are Concentrated in the State of California, Which May Result in Losses with Respect to These Mortgage Loans.** As of the cut-off date, approximately 32.29%, 13.66%, 25.36%, 28.61%, 25.86%, 33.85%, 32.45%, 29.79% and 60.77%, of the sub-loan group I-1, sub-loan group I-2, sub-loan group I-3, subloan group II-1, sub-loan group II-2, sub-loan group II-3, sub-loan group III-1, sub-loan group III-2 and sub-loan group III-3 mortgage loans, respectively, are secured by property in the State of California."  (PS at S-41.) |
| **BSARM 2005-10** | "**The Mortgage Loans Concentrated in a Specific Region May Present a Greater Risk of Loss with Respect to Such Mortgage Loans.** As of the cut-off date, approximately 82.85% of the mortgage loans are secured by property in the State of California."  (PS at S-15-16.) |
| **BSARM 2005-12** | "**The Mortgage Loans Concentrated in a Specific Region May Present a Greater Risk of Loss with Respect to Such Mortgage Loans.** As of the cut-off date, approximately 42.49%, 33.70% and 34.73% of the group I-1, group I-2 and group I-3 mortgage loans, respectively, and approximately 36.08% of the group I mortgage loans in the aggregate, are secured by property in the State of California."  (PS at S-20.) |
| **BSABS 2005-AC9** | "**Developments in specified regions could have a disproportionate** |

| | |
|---|---|
| | effect on the mortgage loans due to geographic concentration of mortgaged properties<br>Approximately 21.54% and 10.39% of the mortgage loans by aggregate principal balance as of the cut-off date, are secured by mortgaged properties that are located in the state of California and Florida, respectively." (PS at S-23-24.) |
| **BSABS 2007-HE4** | "**Developments in specified regions could have a disproportionate effect on the mortgage loans due to geographic concentration of mortgaged properties**<br>Approximately 29.08% and 23.28% of the mortgage loans in loan group I and loan group II, respectively, and approximately 27.18% of the mortgage loans in the aggregate, by aggregate principal balance as of the cut-off date, are secured by mortgaged properties that are located in the state of California. Approximately 14.61% and 13.72% of the mortgage loans in loan group I and loan group II, respectively, and approximately 14.32% of the mortgage loans in the aggregate, by aggregate principal balance as of the cut-off date, are secured by mortgaged properties that are located in the state of Florida." (PS at S-24.) |
| **BSABS 2007-HE5** | "**Developments in specified regions could have a disproportionate effect on the mortgage loans due to geographic concentration of mortgaged properties**<br>Approximately 28.25%, 23.40% and 18.31% of the mortgage loans in loan group I, loan group II and loan group III, respectively, and approximately 24.85% of the mortgage loans in the aggregate by aggregate principal balance as of the cut-off date are secured by mortgaged properties that are located in the state of California. Approximately 15.72%, 15.56% and 10.01% of the mortgage loans in loan group I, loan group II and loan group III, respectively, and approximately 14.29% of the mortgage loans in the aggregate by aggregate principal balance as of the cut-off date are secured by mortgaged properties that are located in the state of Florida." (PS at S-24.) |
| **CARR 2006-NC5** | "**The return on the Class A and Class M Certificates may be particularly sensitive to changes in real estate markets in specific regions.**<br>One risk associated with investing in mortgage-backed securities is created by any concentration of the related properties in one or more specific geographic regions. Approximately 27.76%, 10.07%, 9.29% and 6.47% of the mortgage loans (by aggregate principal balance of the mortgage loans as of the cut-off date) are located in California, Florida, New York and New Jersey, respectively." (PS at S-22.) |
| **CARR 2006-OPT1** | "**The return on the Class A and Class M Certificates may be particularly sensitive to changes in real estate markets in specific regions.**<br>One risk associated with investing in mortgage-backed securities is |

| | created by any concentration of the related properties in one or more specific geographic regions. Approximately 24.48%, 11.70%, 10.17% and 6.44% of the mortgage loans (by aggregate principal balance of the mortgage loans as of the cut-off date) are located in California, Florida, New York, and Massachusetts, respectively." (PS at S-21.) |
|---|---|
| **CARR 2006-RFC1** | "**The return on the Class A and Class M Certificates may be particularly sensitive to changes in real estate markets in specific regions.** One risk associated with investing in mortgage-backed securities is created by any concentration of the related properties in one or more specific geographic regions. Approximately 13.83%, 13.58%, 5.59%, 5.48%, 5.31% and 5.05% of the mortgage loans (by aggregate principal balance of the mortgage loans as of the cut-off date) are located in California, Florida, Michigan, Texas, Arizona and Illinois, respectively." (PS at S-20-21.) |
| **CBASS 2007-CB1** | "**There Are Risks Relating to Geographic Concentration of the Mortgage Loans** Approximately 27.44% of the mortgage loans by aggregate principal balance of the mortgage pool as of the cut-off date), are secured by mortgaged properties located in California." (PS at S-16.) |
| **CFLX 2006-2** | "**Geographic Concentration of the Mortgaged Properties May Increase Risk of Loss** We expect approximately 22.1%, 13.7%, 12.8% and 6.0% of the mortgage loans (by aggregate principal balance as of the cut-off date) to be secured by mortgaged properties located in the states of Florida, California, New York and Hawaii, respectively." (PS at S-15.) |
| **JPALT 2006-S4** | "**Geographic Concentration of Loans Could Adversely Affect Your Investment** The yield to maturity on your securities may be affected by the geographic concentration of the mortgaged properties securing the loans in the related trust fund. Any significant concentration of the mortgaged properties in particular geographic regions subject to adverse economic conditions or special hazards, such as earthquakes, hurricanes, windstorms, wildfires, mudslides, hurricanes or tornadoes, might increase the rate of delinquencies, defaults and losses on the related loans. Consequently, the geographic concentration of the loans in a trust fund could result in shortfalls in distributions due on your securities or losses on your securities greater than would be the case if the mortgaged properties were more geographically diversified. " (Pros. at 12.) "24.39% of the Mortgage Loans were secured by mortgaged properties in California." (PS at A-3) |
| **JPMAC 2005-OPT2** | "**Geographic Concentration of Mortgage Loans Could Adversely Affect Your Investment** Approximately 20.73% and 42.04% of the aggregate principal balance of the mortgage loans included in group 1 and group 2, respectively, |

| | are secured by mortgaged properties located in California. There are also significant concentrations of mortgage loans in other states as described under 'Description of the Mortgage Pool -- Tabular Characteristics of the Mortgage Loans' in this prospectus supplement." (PS at S-16) |
|---|---|
| **JPMAC 2006-CW1** | **"Geographic Concentration of Mortgage Loans Could Adversely Affect Your Investment**<br>Approximately 11.90%, 32.52% and 24.64% of the mortgage loans included in group 1, group 2 and the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable, as of the cut-off date), are secured by mortgaged properties located in California.. . .  Approximately 10.11%, 11.52% and 10.98% of the mortgage loans included in group 1, group 2 and the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable, as of the cut-off date), are secured by mortgaged properties located in Florida." (PS at S-16.) |
| **JPMAC 2006-FRE2** | **"Geographic Concentration of Mortgage Loans Could Adversely Affect Your Investment**<br>Approximately 12.22% and 32.08% of the aggregate principal balance of the mortgage loans included in group 1 and group 2, respectively, are secured by mortgaged properties located in California and approximately 12.86% and 11.82% of the aggregate principal balance of the mortgage loans included in group 1 and group 2, respectively, are secured by mortgaged properties located in Florida." (PS at S-18.) |
| **JPMAC 2007-CH1** | **"Geographic Concentration of Mortgage Loans Could Adversely Affect Your Investment**<br>Approximately 17.45%, 11.29%, 6.88%, 12.92% and 14.81% of the mortgage loans in group 1, group 2, group 2-A, group 2-B and the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable, as of the cut-off date), are secured by mortgaged properties located in California. . . . Approximately 19.15%, 16.38%, 12.19%, 17.92% and 17.96% of the mortgage loans in group 1, group 2, group 2-A, group 2-B and the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable, as of the cut-off date), are secured by mortgaged properties located in Florida. . . . Approximately 3.34%, 21.80%, 31.40%, 18.26% and 11.26% of the mortgage loans in group 1, group 2, group 2-A, group 2-B and the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable, as of the cut-off date), are secured by mortgaged properties located in New Jersey." (PS at S-22.) |
| **JPMAC 2007-HE1** | **"Geographic Concentration of Mortgage Loans Could Adversely Affect Your Investment**<br>Approximately 13.95% and 23.10% of the mortgage loans included in |

|  | group 1 and group 2, respectively (in each case, by aggregate principal balance of the related group as of the cut-off date), are secured by mortgaged properties located in California. . . . Approximately 11.76% and 11.15% of the mortgage loans included in group 1 and group 2, respectively (in each case, by aggregate principal balance of the related group as of the cut-off date), are secured by mortgaged properties located in Florida. . . . Approximately 12.24% and 3.80% of the mortgage loans in group 1 and group 2, respectively (in each case, by aggregate principal balance of the related group as of the cut-off date), are secured by mortgaged properties located in Texas."  (PS at S-21-22) |
|---|---|

| XIII. | The Disclosures Warned that Appraisal Values May Differ From the Actual Value of the Mortgaged Property |
|---|---|
| **Securitization** | **Selected Relevant Disclosures and Page Citations** |
| **JPMAC 2006-CW2** | "[T]he originator's determination of the value of a mortgaged property used in the calculation of the loan-to-values ratios of the mortgage loans *may differ from the actual value of such mortgaged properties*." (PS at S-21.) |
| **CARR 2006-NC5** | "There can be no assurance that the value of a mortgaged property estimated in any appraisal or review is equal to the actual value of that mortgaged property at the time of that appraisal or review.  (PS at S-21.) |
| **CARR 2006-OPT1** | "There can be no assurance that the value of a mortgaged property estimated in any appraisal or review is equal to the actual value of that mortgaged property at the time of that appraisal or review."  (PS at S-20.) |
| **CARR 2006-RFC1** | "There can be no assurance that the value of a mortgaged property estimated in any appraisal or review is equal to the actual value of that mortgaged property at the time of that appraisal or review."  (PS at S-19.) |
| **CBASS 2007-CB1** | "[A]an originator's determination of the value of a mortgaged property used in the calculation of the combined loan-to-value ratios of the mortgage loans may differ from the appraised value of such mortgaged property or the actual value of such mortgaged property." (PS at S-15) |
| **JPALT 2006-S4** | "The determination of the value of a mortgaged property used in the calculation of the loan-to-value ratios of the loans for the purpose of determining whether primary mortgage insurance is required may differ from the appraised value of such mortgaged properties for loans obtained for the purpose of acquiring the related mortgaged property." (Pros at 14.) |
| **JPMAC 2005-OPT2** | "[T]he originator's determination of the value of a mortgaged property used in the calculation of the loan-to-values ratios of the mortgage loans may differ from the actual value of such mortgaged properties." (PS at S-15.) |
| **JPMAC 2006-CW1** | "[T]he originator's determination of the value of a mortgaged property used in the calculation of the loan-to-values ratios of the mortgage loans may differ from the actual value of such mortgaged properties." (PS at S-15.) |
| **JPMAC 2006-FRE2** | "[T]he originator's determination of the value of a mortgaged property used in the calculation of the loan-to-values ratios of the mortgage loans may differ from the actual value of such mortgaged properties." (PS at S-17.) |
| **JPMAC 2007-CH1** | "[T]he originator's determination of the value of a mortgaged property used in the calculation of the loan-to-values ratios of the mortgage loans may differ from the actual value of such mortgaged properties." |

| | (PS at S-21.) |
|---|---|
| **JPMAC 2007-HE1** | "Additionally, the respective originators' determination of the value of a mortgaged property used in the calculation of the loan-to-values ratios of the mortgage loans may differ from the actual value of such mortgaged properties."  (PS at S-20.) |

| XIV. | The Disclosures Warned that Appraisals were Not a Reliable Estimate of Value For Certain Types of Properties |
|---|---|
| **Securitization** | **Selected Relevant Disclosures and Page Citations** |
| **BALTA 2005-10** | "[E]ven when current, an appraisal is not necessarily a reliable estimate of value for" certain types of properties such as multi-family homes because an appraisal can based on various methods, including automated valuations, each of which present "analytical difficulties;" "[w]here more than one of these appraisal methods are used and provide significantly different results, an accurate determination of value . . . is even more difficult."  (Pros at 13.) |
| **BALTA 2005-9** | "[E]ven when current, an appraisal is not necessarily a reliable estimate of value for" certain types of properties such as multi-family homes because an appraisal can based on various methods, including automated valuations, each of which present "analytical difficulties;" "[w]here more than one of these appraisal methods are used and provide significantly different results, an accurate determination of value . . . is even more difficult."  (Pros at 13.) |
| **BALTA 2006-4** | "[E]ven when current, an appraisal is not necessarily a reliable estimate of value for" certain types of properties such as multi-family homes because an appraisal can based on various methods, including automated valuations, each of which present "analytical difficulties;" "[w]here more than one of these appraisal methods are used and provide significantly different results, an accurate determination of value . . . is even more difficult."  (Pros at 18.) |
| **BSARM 2005-10** | "[E]ven when current, an appraisal is not necessarily a reliable estimate of value for" certain types of properties such as multi-family homes because an appraisal can based on various methods, including automated valuations, each of which present "analytical difficulties;" "[w]here more than one of these appraisal methods are used and provide significantly different results, an accurate determination of value . . . is even more difficult."  (Pros at 13.) |
| **BSARM 2005-12** | "[E]ven when current, an appraisal is not necessarily a reliable estimate of value for" certain types of properties such as multi-family homes because an appraisal can based on various methods, including automated valuations, each of which present "analytical difficulties;" "[w]here more than one of these appraisal methods are used and provide significantly different results, an accurate determination of value . . . is even more difficult."  (Pros at 13.) |

| XV. | The Disclosures Warned that the Appraisal Value at the time of Origination May Be Used to Calculate LTV Ratios for Refinancings |
|---|---|
| **Securitization** | **Selected Relevant Disclosures and Page Citations** |
| **JPMAC 2006-CW2** | "[B]ased solely upon the value determined by an appraisal made for the originator . . . at the time of origination."  (PS at S-30.) |
| **BALTA 2005-9** | "[F]or borrowers who are refinancing . . . appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of 80% or if the loan amount of the new loan being originated is greater than $650,000."  (PS at S-50.) |
| **BALTA 2006-4** | "[F]or borrowers who are refinancing . . . appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of 80% or if the loan amount of the new loan being originated is greater than $650,000."  (PS at S-68.) |
| **BSARM 2005-10** | "[I]s generally determined by reference to an appraisal obtained in connection with the origination."  (PS at S-27.) |
| **BSARM 2005-12** | "[F]or borrowers who are refinancing . . . appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of 80% or if the loan amount of the new loan being originated is greater than $650,000."  (PS at S-37.) |
| **CARR 2006-NC5** | "[T]he appraised value or other valuation of the related mortgaged property determined at origination of the loan."  (Pros at 14.) |
| **CARR 2006-OPT1** | "[T]he appraised value or other valuation of the related mortgaged property determined at origination of the loan."  (Pros at 11.) |
| **CARR 2006-RFC1** | "[T]he appraised value or other valuation of the related mortgaged property determined at origination of the loan."  (Pros at 14.) |
| **CBASS 2007-CB1** | "The originator . . . does not conduct a new appraisal of the property considered for refinancing."  (PS. At S-61) |
| **CFLX 2006-2** | "[G]enerally the appraised value would be used."  (PS at S-51.) |
| **JPALT 2006-S4** | "[F]or borrowers who are refinancing . . . appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of 80% or if the loan amount of the new loan being originated is greater than $650,000."  (PS at S-25.) |
| **JPMAC 2005-OPT2** | "[T]he appraised value or other valuation of the related mortgaged property determined at origination of the loan."  (PS  at S-23.) |
| **JPMAC 2006-FRE2** | "[A]s determined by an appraisal in accordance with the originator's guidelines."  (PS at S-25.) |
| **JPMAC 2007-CH1** | "[B]ased solely upon the value determined by an appraisal made for the originator . . . at the time of origination."  (PS at S-32.) |
| **JPMAC 2007-HE1** | "[B]ased solely upon the value determined by an appraisal made for the originator . . . at the time of origination."  (PS at S-31.) |

| XVI. | The Disclosures Warned that the Values of Mortgage Properties May Not Remain the Same |
|---|---|
| **Securitization** | **Selected Relevant Disclosures and Page Citations** |
| **JPMAC 2006-CW2** | "No assurance can be given that the value of any Mortgaged Property has remained or will remain at the level that existed on the appraisal or sales date. If residential real estate values overall or in a particular geographic area decline, the LTVs might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur on the Mortgage Loans."  (PS at S-30) |
| **BALTA 2005-10** | "No assurance can be given that values of the mortgaged properties have remained or will remain at their levels on the dates of origination of the related mortgage loans. If the residential real estate market should experience an overall decline in property values so that the outstanding balances of the mortgage loans, and any secondary financing on the mortgaged properties, in the mortgage pool become equal to or greater than the value of the mortgaged properties, the actual rates of delinquencies, foreclosures and losses could be higher than those now generally experienced in the mortgage lending industry."  (PS at S-28) |
| **BALTA 2005-9** | "No assurance can be given that values of the mortgaged properties have remained or will remain at their levels on the dates of origination of the related mortgage loans. If the residential real estate market should experience an overall decline in property values so that the outstanding balances of the mortgage loans, and any secondary financing on the mortgaged properties, in the mortgage pool become equal to or greater than the value of the mortgaged properties, the actual rates of delinquencies, foreclosures and losses could be higher than those now generally experienced in the mortgage lending industry."  (PS at S-29) |
| **BALTA 2006-4** | "No assurance can be given that the value of any mortgaged property has remained or will remain at the level that existed on the appraisal or sales date. If residential real estate values generally or in a particular geographic area decline, the Loan-to-Value Ratios might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur with respect to the mortgage loans."  (PS at S-63) |
| **BSARM 2005-10** | "No assurance can be given that values of the mortgaged properties have remained or will remain at their levels on the dates of origination of the related mortgage loans. If the residential real estate market should experience an overall decline in property values so that the outstanding balances of the mortgage loans, and any secondary financing on the mortgaged properties, in the mortgage pool become equal to or greater than the value of the mortgaged properties, the actual rates of delinquencies, foreclosures and losses could be higher than those now generally experienced in the mortgage lending industry."  (PS at S-17) |

59

| BSARM 2005-12 | "No assurance can be given that values of the mortgaged properties have remained or will remain at their levels on the dates of origination of the related mortgage loans. If the residential real estate market should experience an overall decline in property values so that the outstanding balances of the mortgage loans, and any secondary financing on the mortgaged properties, in the mortgage pool become equal to or greater than the value of the mortgaged properties, the actual rates of delinquencies, foreclosures and losses could be higher than those now generally experienced in the mortgage lending industry."  (PS at S-21) |
|---|---|
| BSABS 2005-AC9 | "No assurance can be given that the values of the mortgaged properties have remained or will remain at their levels as of the dates of origination of the related mortgage loans."  (PS at S-30.) |
| BSABS 2007-HE4 | "No assurance can be given that the values of the mortgaged properties have remained or will remain at their levels as of the dates of origination of the mortgage loans."  (PS at S-33.) |
| BSABS 2007-HE5 | "No assurance can be given that the values of the mortgaged properties have remained or will remain at their levels as of the dates of origination of the mortgage loans."  (PS at S-33.) |
| CARR 2006-NC5 | "No assurance can be given that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related mortgage loans."  (PS at S-20.) |
| CARR 2006-OPT1 | "No assurance can be given that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related mortgage loans."  (PS at S-19.) |
| CARR 2006-RFC1 | "No assurance can be given that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related mortgage loans."  (PS at S-18.) |
| CBASS 2007-CB1 | "No assurance can be given that the values of the related  Mortgaged Properties have remained or will remain at the levels in effect on the dates of origination of the related NC Mortgage Loans."  (PS at S-62.) |
| CFLX 2006-2 | "There can be no assurance that real estate values will remain at present levels in the areas in which the Mortgaged Properties will be located." (Pros at 16.) |
| JPALT 2006-S4 | "No assurance can be given that the value of any Mortgaged Property has remained or will remain at the level that existed on the appraisal or sales date. If residential real estate values generally or in a particular geographic area decline, the loan-to-Value Ratios might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur with respect to such Mortgage loans."  (PS at S-16.) |
| JPMAC 2005-OPT2 | "No assurance can be given that the value of any Mortgaged Property has remained or will remain at the level that existed on the appraisal or sales date. If residential real estate values overall or in a particular geographic area decline, the LTVs might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur on the Mortgage Loans."  (PS at S-23-24.) |

| | |
|---|---|
| **JPMAC 2006-CW1** | "No assurance can be given that the value of any Mortgaged Property has remained or will remain at the level that existed on the appraisal or sales date. If residential real estate values overall or in a particular geographic area decline, the LTVs might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur on the Mortgage Loans." (PS at S-23.) |
| **JPMAC 2006-FRE2** | "No assurance can be given that the value of any Mortgaged Property has remained or will remain at the level that existed on the appraisal or sales date. If residential real estate values overall or in a particular geographic area decline, the LTVs might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur on the Mortgage Loans." (PS at S-26.) |
| **JPMAC 2007-CH1** | "No assurance can be given that the value of any Mortgaged Property has remained or will remain at the level that existed on the appraisal or sales date. If residential real estate values overall or in a particular geographic area decline, the LTVs might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur on the Mortgage Loans." (PS at S-32.) |
| **JPMAC 2007-HE1** | "No assurance can be given that the value of any Mortgaged Property has remained or will remain at the level that existed on the appraisal or sales date. If residential real estate values overall or in a particular geographic area decline, the LTVs might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur on the Mortgage Loans." (PS at S-31.) |

| XVII.    Many of the Mortgage Loans were Originated Several Months to Years Prior to the Sale of the Certificates[2] | |
|---|---|
| **Securitization** | **Selected Relevant Disclosures and Page Citations** |
| **JPMAC 2006-CW2** | The CW2 Loan Tape, for example, revealed 69 different loans originated as far back as 2005.  (*See* Ex. 16.) |
| **BALTA 2006-4** | Roughly 290 loans were originated as far back as 2005. |
| **BSABS 2007-HE4** | Roughly 1600 loans were originated as far back as 2006. |
| **BSABS 2007-HE5** | Roughly 132 loans were originated as far back as 2006. |
| **CARR 2006-RFC1** | Roughly 972 loans were originated as far back as 2005. |
| **CBASS 2007-CB1** | Roughly 73 loans were originated as far back as 2005. |
| **CFLX 2006-2** | Roughly 47 loans were originated as far back as 2005. |
| **JPALT 2006-S4** | Roughly 143 loans were originated as far back as 2005. |
| **JPMAC 2006-CW1** | Roughly 681 loans were originated as far back as 2005. |
| **JPMAC 2007-CH1** | Roughly 11418 loans were originated as far back as 2005 and 2004. |
| **JPMAC 2007-HE1** | Roughly 1482 loans were originated as far back as 2006 and 2005. |

---

[2] *See* Exhibit 17.  Full Loan Tapes and Mortgage Loan Schedules are available at http://www.sec.gov/.

| XVIII. | The Disclosures Warned that Owner Occupancy Representations were Based Upon the Representation of the Related Mortgagors at the Time of Origination |
|---|---|
| **Securitization** | **Selected Relevant Disclosures and Page Citations** |
| **JPMAC 2006-CW2** | "Typically, the basis for a representation that a given percentage of the loans is secured by single family properties that are owner-occupied will be either (1) the making of a representation by the borrower at the loan's origination either that the underlying property will be used by the borrower for a period of at least six months every year or that the borrower intends to use the property as a primary residence or (2) a finding that the address of the underlying property is the borrower's mailing address."  (Pros. at 15.) |
| **BSABS 2005-AC9** | "Based upon representation of the related mortgagors at the time of origination."  (PS at A-4.) |
| **BSABS 2007-HE4** | "Based upon representation of the related mortgagors at the time of origination."  (PS at A-4.) |
| **BSABS 2007-HE5** | "Based upon representation of the related mortgagors at the time of origination."  (PS st A-10.) |
| **CARR 2006-NC5** | "The basis for any statement that a given percentage of the mortgage loans are secured by mortgaged properties that are owner-occupied will be one or more of the following:<br>• the making of a representation by the mortgagor at origination of a mortgage loan that the mortgagor intends to use the mortgaged property as a primary residence;<br>• a representation by the originator of the mortgage loan, which may be based solely on the above clause; or<br>• the fact that the mailing address for the mortgagor is the same as the address of the mortgaged property."  (Pros. at 13.) |
| **CARR 2006-OPT1** | "The mortgaged properties may be owner-occupied or non-owner-occupied and may include vacation homes, second homes and investment properties. The percentage of mortgage loans that are owner-occupied will be disclosed in the accompanying prospectus supplement. The basis for any statement that a given percentage of the mortgage loans are secured by mortgaged properties that are owner-occupied will be one or more of the following:<br>• the making of a representation by the mortgagor at origination of a mortgage loan that the mortgagor intends to use the mortgaged property as a primary residence;<br>• a representation by the originator of the mortgage loan, which may be based solely on the above clause; or<br>• the fact that the mailing address for the mortgagor is the same as the address of the mortgaged property."  (Pros. at 11.) |
| **CARR 2006-RFC1** | "The basis for any statement that a given percentage of the mortgage loans are secured by mortgaged properties that are owner-occupied will be one or more of the following: |

| | |
|---|---|
| | • the making of a representation by the mortgagor at origination of a mortgage loan that the mortgagor intends to use the mortgaged property as a primary residence;<br>• a representation by the originator of the mortgage loan, which may be based solely on the above clause; or<br>• the fact that mailing address for the mortgagor is the same as the address of the mortgaged property." (Pros. at 13.) |
| **CBASS 2007-CB1** | "Typically, the basis for a representation that a given percentage of the loans is secured by single family properties that are owner-occupied will be either (1) the making of a representation by the borrower at the loan's origination either that the underlying property will be used by the borrower for a period of at least six months every year or that the borrower intends to use the property as a primary residence or (2) a finding that the address of the underlying property is the borrower's mailing address." (Pros. at 24.) |
| **CFLX 2006-2** | "Based on representations by the obligors on the Mortgage Notes (the 'Mortgagors') at the time of origination of the related Mortgage Loans." (PS at S-30.) |
| **JPALT 2006-S4** | "Based upon representations of the related borrowers at the time of origination." (PS at A-2.) |
| **JPMAC 2005-OPT2** | "Typically, the basis for a representation that a given percentage of the loans is secured by single family properties that are owner-occupied will be either (1) the making of a representation by the borrower at the loan's origination either that the underlying property will be used by the borrower for a period of at least six months every year or that the borrower intends to use the property as a primary residence or (2) a finding that the address of the underlying property is the borrower's mailing address." (Pros. at 15) |
| **JPMAC 2006-CW1** | "Typically, the basis for a representation that a given percentage of the loans is secured by single family properties that are owner-occupied will be either (1) the making of a representation by the borrower at the loan's origination either that the underlying property will be used by the borrower for a period of at least six months every year or that the borrower intends to use the property as a primary residence or (2) a finding that the address of the underlying property is the borrower's mailing address." (Pros. at 19.) |
| **JPMAC 2006-FRE2** | "Typically, the basis for a representation that a given percentage of the loans is secured by single family properties that are owner-occupied will be either (1) the making of a representation by the borrower at the loan's origination either that the underlying property will be used by the borrower for a period of at least six months every year or that the borrower intends to use the property as a primary residence or (2) a finding that the address of the underlying property is the borrower's mailing address." (Pros. at 15.) |
| **JPMAC 2007-CH1** | "Typically, the basis for a representation that a given percentage of the loans is secured by single family properties that are owner-occupied |

| | will be either (1) the making of a representation by the borrower at the loan's origination either that the underlying property will be used by the borrower for a period of at least six months every year or that the borrower intends to use the property as a primary residence or (2) a finding that the address of the underlying property is the borrower's mailing address."  (Pros. at 19.) |
|---|---|
| **JPMAC 2007-HE1** | "Typically, the basis for a representation that a given percentage of the loans is secured by single family properties that are owner-occupied will be either (1) the making of a representation by the borrower at the loan's origination either that the underlying property will be used by the borrower for a period of at least six months every year or that the borrower intends to use the property as a primary residence or (2) a finding that the address of the underlying property is the borrower's mailing address."  (Pros. at 19.) |

| XIX. | The Prospectus Supplements and Prospectuses Disclosed that Transfer and Assignment of the Mortgage Loans and Notes were Made Pursuant to the Pooling and Servicing Agreement |
| --- | --- |
| **Securitization** | **Selected Relevant Disclosures and Page Citations** |
| **BSABS 2007-HE5** | **"Assignment of the Mortgage Loans; Repurchase** At the time of issuance of the certificates, the depositor will cause the mortgage loans, together with all principal and interest due with respect to such mortgage loans after the cut-off date to be sold to the trust. The mortgage loans will be identified in a schedule appearing as an exhibit to the pooling and servicing agreement" or "as described in the Pooling and Service Agreement."  (PS at S-35.) |
| **BALTA 2005-10** | **"Assignment of the Mortgage Loans** At the time of issuance of the Certificates, the Depositor will cause the mortgage loans, together with all principal and interest due on or with respect to such mortgage loans after the Cut-off Date, to be sold to the trust. The mortgage loans in each of the Loan Groups will be identified in a schedule appearing as an exhibit to the Agreement with each Loan Group separately identified."  (PS at S-89.) |
| **BALTA 2005-9** | **"Assignment of the Mortgage Loans** At the time of issuance of the Certificates, the Depositor will cause the mortgage loans, together with all principal and interest due on or with respect to such mortgage loans after the Cut-off Date, to be sold to the trust. The mortgage loans in each of the Loan Groups will be identified in a schedule appearing as an exhibit to the Agreement with each Loan Group separately identified."  (PS at S-103.) |
| **BALTA 2006-4** | **"Assignment of the Mortgage Loans** At the time of issuance of the Certificates, the Depositor will cause the mortgage loans, together with all principal and interest due on or with respect to such mortgage loans after the Cut-off Date, to be sold to the trust. The mortgage loans in each of the Loan Groups will be identified in a schedule appearing as an exhibit to the Agreement with each Loan Group separately identified."  (PS at S-143.) |
| **BSARM 2005-10** | **"Assignment of the Mortgage Loans** At the time of issuance of the Certificates, the Depositor will cause the mortgage loans, together with all principal and interest due on or with respect to such mortgage loans after the Cut-off Date, to be sold to the trust. The mortgage loans will be identified in a schedule appearing as an exhibit to the Agreement."  (PS at S-56.) |
| **BSARM 2005-12** | **"Assignment of the Mortgage Loans** At the time of issuance of the Certificates, the Depositor will cause the mortgage loans, together with all principal and interest due on or with respect to such mortgage loans after the Cut-off Date, to be sold to the trust. The mortgage loans will be identified in a schedule appearing as an exhibit to the Agreement."  (PS at S-76.) |
| **BSABS 2005-AC9** | **"Assignment of the Mortgage Loans; Repurchase** |

| | At the time of issuance of the certificates, the depositor will cause the mortgage loans, together with all principal and interest due with respect to such mortgage loans after the cut-off date to be sold to the trust. The mortgage loans will be identified in a schedule appearing as an exhibit to the pooling and servicing agreement."  (PS at S-31.) |
|---|---|
| **BSABS 2007-HE4** | **"Assignment of the Mortgage Loans; Repurchase** At the time of issuance of the certificates, the depositor will cause the mortgage loans, together with all principal and interest due with respect to such mortgage loans after the cut-off date to be sold to the trust. The mortgage loans will be identified in a schedule appearing as an exhibit to the pooling and servicing agreement."  (PS at S-35.) |
| **CARR 2006-NC5** | **"Assignment of the Mortgage Loans** The trustee will, concurrently with that assignment, deliver a series of certificates to the depositor in exchange for the mortgage loans or mortgage securities. Each mortgage loan or mortgage security will be identified in a schedule appearing as an exhibit to the related pooling and servicing agreement."  (Pros. at 27.) |
| **CARR 2006-OPT1** | **"Assignment of the Mortgage Loans** The trustee will, concurrently with that assignment, deliver a series of certificates to the depositor in exchange for the mortgage loans or mortgage securities. Each mortgage loan or mortgage security will be identified in a schedule appearing as an exhibit to the related pooling and servicing agreement."  (Pros. at 22.) |
| **CARR 2006-RFC1** | **"Assignment of the Mortgage Loans** The trustee will, concurrently with that assignment, deliver a series of certificates to the depositor in exchange for the mortgage loans or mortgage securities. Each mortgage loan or mortgage security will be identified in a schedule appearing as an exhibit to the related pooling and servicing agreement."  (Pros. at 27.) |
| **CBASS 2007-CB1** | "Pursuant to the Pooling and Servicing Agreement, the Depositor will cause the Mortgage Loans to be assigned to the Trustee for the benefit of the certificateholders."  (PS at S-19.) |
| **CFLX 2006-2** | "Under the terms of the Agreement, the Depositor's conveyance of the Mortgage Loans to the Trustee is intended to constitute a purchase and sale and not a loan. However, to the extent that the conveyance of the Mortgage Loans from the Depositor to the Trustee is characterized as a pledge and not a sale, the Agreement will constitute a security agreement such that the Depositor will be deemed to have granted to the Trustee a first priority security interest in all of the Depositor's right, title and interest in, to and under the Mortgage Loans." (PS S-52-53.) |
| **JPALT 2006-S4** | "Pursuant to a Pooling and Servicing Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Issuing Entity, all of its rights to the Mortgage Loans and its rights under the Assignment Agreements (including the right to enforce the Originators' purchase |

| | |
|---|---|
| | obligations).”  (PS at S-17.) |
| **JPMAC 2005-OPT2** | “Pursuant to the Pooling Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to  the Trustee, on behalf of the Trust Fund, all of its rights to the Mortgage  Loans and its rights under the Assignment Agreements (including the right to  enforce the Originators’ purchase obligations).”  (PS at S-87.) |
| **JPMAC 2006-CW1** | “Pursuant to the Pooling Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Trust Fund, all of its rights to the Mortgage Loans and its rights under the Assignment, Assumption and Recognition Agreement (including the right to enforce the Originators’ purchase obligations).”  (PS at S-91.) |
| **JPMAC 2006-CW2** | [T]he transfer and assignment of mortgages and notes would be made “pursuant to the pooling [and servicing] agreements” (“PSAs”) that governed each Securitization.  (PS at S119.) |
| **JPMAC 2006-FRE2** | “Pursuant to a pooling and servicing agreement, dated as of March 1, 2006, among the Seller, the Depositor, JPMorgan Chase Bank, National Association, as servicer, the Securities Administrator, the Trust Oversight Manager and the Trustee (the “Pooling Agreement”), the Depositor will cause the Mortgage Loans to be assigned to the Trust for the benefit of the certificateholders.”  (PS at S-23.) |
| **JPMAC 2007-CH1** | “Pursuant to the Pooling Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Trust Fund, all of its rights to the Mortgage Loans and its rights under the Assignment, Assumption and Recognition Agreement (including the right to enforce CHF’s repurchase obligations).”  (PS at S-148.) |
| **JPMAC 2007-HE1** | “Pursuant to the Pooling Agreement, on the Closing Date the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee, on behalf of the Trust Fund, all of its rights to the Mortgage Loans and its rights under the Assignment Agreements (including the right to enforce the Originators’ purchase obligations).”  (PS at S-103-104.) |

| XX. | The Disclosures Warned that Exceptions to the Underwriting Standards were Permitted Where Compensating Factors were Present. |
|---|---|
| **Securitization** | **Selected Relevant Disclosures and Page Citations** |
| **JPMAC 2006-CW2** | "*On a case by case basis,* Countrywide Home Loans may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception.  Compensating factors *may include* low loan-to-value ratio or combined loan-to-value ratio, as applicable, low debt-to-income ratio, stable employment, time in the same residence or other factors."  (PS at S-68-69.) (emphasis added) |
| **BALTA 2005-10** | "Exceptions to the underwriting standards are permitted where compensating factors are present." (PS at S-40.) |
| **BALTA 2005-9** | "Exceptions to Countrywide's underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." (PS at S-48.) |
| **BALTA 2006-4** | "Exceptions to the underwriting standards are permitted where compensating factors are present and are managed through a formal exception process."  (PS at S-61.) |
| **BSARM 2005-10** | "The Wells Fargo Underwriting Guidelines may vary according to the nature of the borrower or the type of loan, since differing characteristics may be perceived as presenting different levels of risk." (PS at S-25; *see generally* S-25-27.) |
| **BSARM 2005-12** | "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."  (PS at S-35.) |
| **BSABS 2005-AC9** | "Exceptions to the underwriting standards are permitted where compensating factors are present."  (PS at S-34.) |
| **BSABS 2007-HE4** | "On a case by case basis, exceptions to the underwriting guidelines are made where compensating factors exist."  (PS at S-38.) |
| **BSABS 2007-HE5** | "On a case-by-case basis, exceptions to the underwriting guidelines are made where compensating factors exist."  (PS at S-35.) |
| **CARR 2006-NC5** | "On a case-by-case basis, exceptions to the underwriting guidelines are made where compensating factors exist." (PS at S-80.) |
| **CARR 2006-OPT1** | "On a case-by-case basis, exceptions to the Option One Underwriting Guidelines are made where compensating factors exist."  (PS at S-74.) |
| **CARR 2006-RFC1** | "Exceptions to these standards are made, however, on a case by case basis if it is determined, generally based on compensating factors, that an underwriting exception is warranted."  (PS at S-94.) |
| **CBASS 2007-CB1** | "On a case-by-case basis, exceptions to the New  Century Underwriting Guidelines are made where compensating factors exist."  (PS at S-62.) |
| **CFLX 2006-2** | "Exceptions and/or variances may be made only after careful consideration of certain mitigating factors."  (PS at S-51.) |
| **JPALT 2006-S4** | "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a |

| | prospective borrower." (PS at S-22.) |
|---|---|
| **JPMAC 2005-OPT2** | "On a case-by-case basis, exceptions to the Option One Underwriting Guidelines are made where compensating factors exist." (PS at S-56.) |
| **JPMAC 2006-CW1** | "On a case by case basis, Countrywide Home Loans may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception." (PS at S-56.) |
| **JPMAC 2006-FRE2** | "On a case by case basis, Fremont may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception." (PS at S-59.) |
| **JPMAC 2007-CH1** | "On a case by case basis, CHM HLD underwriters may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception." (PS at S-89.) |
| **JPMAC 2007-HE1** | "In addition, certain exceptions to the underwriting standards described herein may be made in the event that compensating factors are demonstrated by a prospective mortgagor." (PS at S-54.) |