# Labaton Sucharow

Mark S. Arisohn
Partner
212 907 0840 direct
212 883 7040 fax
marisohn@labaton.com

April 16, 2014

**By ECF**

The Honorable Laura Taylor Swain
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Re:   *IKB International S.A. in Liquidation, et al. v. JP Morgan Chase & Co., et al.*,
      No. 12 Civ. 4617 (LTS)(KNF)

Dear Judge Swain:

We write respectfully on behalf of Plaintiffs in the above-referenced action in response to Defendants' letter of April 7, 2014 ("Defendants' Letter") concerning two decisions, *IKB International S.A., et al. v. Bank of America, et al.*, 12 Civ. 4036, slip op. (S.D.N.Y. Mar. 31, 2014) ("*IKB v. Merrill Lynch*") and *Space Coast Credit Union v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.*, 2014 WL 1230719 (S.D. Fla. Mar. 25, 2014) ("*Space Coast*"). Neither of these decisions supports dismissal in this case.

## *IKB v. Merrill Lynch*

While Defendants' Letter discusses at length both the Magistrate Judge's report and recommendation ("R&R") and Judge Kaplan's brief decision largely adopting the R&R, Defendants' Letter omits the most relevant passage from those opinions with respect to the case against J.P. Morgan that is before this Court. In fact, Magistrate Judge Pittman, in the portion of the R&R that was adopted by Judge Kaplan, specifically differentiated that case from allegations made ***against JPMorgan***. *See* R&R at 49. Like the Complaint before Judge Cote in which plaintiffs' fraud claims against JPMorgan were sustained, Plaintiffs' complaint here includes allegations concerning the additional evidence of JPMorgan's scienter, such as the now-public internal memorandum from one of JPMorgan's originator affiliates offering step-by-step instructions on how to deliberately falsify borrower information to get a loan approved, and admissions from senior JPMorgan executives concerning poor underwriting standards. *See* Compl. ¶¶ 136 - 151.

Moreover, additional evidence concerning JPMorgan's scienter has surfaced since the Amended Complaint was filed in November 2012, including JPMorgan's admissions made to the U.S.

# Labaton Sucharow

The Honorable Laura Taylor Swain
April 16, 2014
Page 2

Department of Justice that as a result of its "due diligence process, JPMorgan employees were informed by due diligence vendors that a number of the loans included in at least some of the loan pools that it purchased and subsequently securitized did not comply with the originators' underwriting guidelines, and, in the vendors' judgment, did not have sufficient compensating factors." *See* Statement of Facts Annexed to Settlement Agreement Between JPMorgan Chase & Co. and the U.S. Dep't of Justice at 2, attached hereto as Exhibit A.

Additionally, Defendants' Letter also fails to discuss the portion of the R&R finding that IKB's causes of action accrued in Luxembourg, where the securities at issue were purchased by the Luxembourgian Plaintiff IKB International SA, making the German statute of limitations irrelevant. R&R at 13-16.

## *Space Coast*

The *Space Coast* decision is inapposite. The Courts' dismissal in that case, and the finding that the Clayton Report was not sufficiently connected to the CDO offerings at issue there is unsurprising given that the Clayton Report has nothing to do with issuance of CDOs. Rather, the Clayton Report summarizes the loan file diligence that JPMorgan and other banks conducted on a securitization by securitization basis in connection with their issuance of *RMBS*, such as the offerings at issue in this case. The crucial allegations in this case that Defendants had exclusive access to the loan files underlying the Securitizations that Plaintiffs invested in, and that Defendants were aware of the misrepresentations in the offering documents as a result of that due diligence process, is an issue that is not present in CDO cases because CDO issuers do not conduct loan file reviews in connection with the issuance of a CDO, which merely re-packages previously issued bonds.

Moreover, as Defendants' themselves point out, the court there found plaintiffs' loan level analysis deficient in the context of CDOs backed by 900 RMBS trusts containing 4.6 million loans. Here, the claims asserted relate to only 20 RMBS trusts, every one of which was analyzed using a statistically significant sample of loans from the actual pool backing the trust. Plaintiffs are not required to set forth in their Complaint a detailed description of the methodology by which that investigation was conducted. *See Bank Hapoalim BM v. Bank of America Corp.*, 12-CV-4316-MRP (MANx) (C.D. Cal. Dec. 21, 2012) ("The Court must accept as true all factual allegations in the AVM . . . The data in the Plaintiffs' Complaints is therefore sufficient for the Court to deem their allegations of misstatement as to LTV ratios 'plausible' under *Iqbal*.")

# Labaton Sucharow

The Honorable Laura Taylor Swain
April 16, 2014
Page 3

Therefore, neither *IKB v. Merrill Lynch* nor the *Space Coast* supports dismissal here.

Respectfully submitted,

*/s/ Mark S. Arisohn/csr*

Mark S. Arisohn

Attachment
cc:   All Counsel of Record
      (by ECF w/ Att.)

# EXHIBIT A

## Statement of Facts

Between 2005 and 2007, affiliates of each of JPMorgan Chase & Co. ("JPMorgan")[1], The Bear Stearns Companies, Inc. ("Bear Stearns"), and Washington Mutual Bank ("WaMu") securitized large amounts of subprime and Alt-A mortgage loans and sold the resulting residential mortgage-backed securities ("RMBS") to investors, including federally-insured financial institutions.  Each of JPMorgan, Bear Stearns, and WaMu developed and maintained mortgage origination and securitization processes and controls, including processes for conducting credit, compliance, and property valuation due diligence on loans prior to acquisition and/or securitization as well as processes for the monitoring of loan originators and sellers based, in part, on the subsequent performance of loans acquired from those parties. JPMorgan, Bear Stearns, and WaMu described these processes to investors in marketing materials, and represented to investors in offering documents that loans generally complied with underwriting guidelines.  As discussed below, employees of JPMorgan, Bear Stearns, and WaMu received information that, in certain instances, loans that did not comply with underwriting guidelines were included in the RMBS sold and marketed to investors; however, JPMorgan, Bear Stearns, and WaMu did not disclose this to securitization investors.

### JPMorgan

Between 2005 and 2007, JPMorgan purchased loans for the purpose of packaging and selling residential mortgage-backed securities. Before purchasing loans from third parties, employees at JPMorgan conducted "due diligence" to (1) confirm that the mortgage loans were originated consistent with specific origination guidelines provided by the seller, (2) confirm the mortgage loans were originated in compliance with Federal, State, and local laws, rules, and

---

[1] "JPMorgan" is defined herein to include J.P. Morgan Securities LLC (f/k/a J.P. Morgan Securities, Inc.) and affiliated JPMorgan entities.

regulations, and (3) confirm that the property collateral had the value represented in the appraisal at the time of origination.  Through that due diligence process, JPMorgan employees were informed by due diligence vendors that a number of the loans included in at least some of the loan pools that it purchased and subsequently securitized[2] did not comply with the originators' underwriting guidelines, and, in the vendors' judgment, did not have sufficient compensating factors, and that a number of the properties securing the loans had appraised values that were higher than the values derived in due diligence testing from automated valuation models, broker price opinions or other valuation due diligence methods. In addition, JPMorgan represented to investors in various offering documents that loans in the securitized pools were originated "generally" in conformity with the loan originator's underwriting guidelines; and that exceptions were made based on "compensating factors," determined after "careful consideration" on a "case-by-case basis."  The offering documents further represented, with respect to representations and warranties made to JPMorgan by sellers and originators of the loans, that JPMorgan would not include any loan in a pool being securitized "if anything has come to [JPMorgan's] attention that would cause it to believe that the representations and warranties of a seller or originator will not be accurate and complete in all material respects in respect of the loan as of the date of initial issuance of the related series of securities."  Notwithstanding these representations, in certain instances, at the time these representations were made to investors, the loan pools being securitized contained loans that did not comply with the originators' underwriting guidelines.

---

[2] There were loans in each of the RMBS reviewed by the Justice Department that did not comply with underwriting guidelines.  The following securitizations were reviewed by the Justice Department: JPALT2007-A1, JPMAC 2006-WMC1, JPMAC 2006- WMC2, JPMAC 2006-CW1, JPMAC 2006- ACC1, JPMAC 2006-CW2, JPMAC 2006-WMC3, JPMAC 2006-RM1, JPMAC 2006-HE3, JPMAC 2006- WMC4.  The securitizations in question were issued between 2006 and 2007 and had an original unpaid balance of $ 10.28 billion

JPMorgan began the process of creating RMBS by purchasing pools of loans from lending institutions, such as Countrywide Home Loans, Inc., or WMC Mortgage Corporation, that originated residential mortgages by making mortgage loans to individual borrowers. After entering into a contract to purchase loans, but prior to purchase, JPMorgan performed "due diligence" on samples of loans from the pool being acquired to ensure that the loans were originated in compliance with the originator's underwriting guidelines.

JPMorgan salespeople marketed its due diligence process to investors through oral communications that were often scripted by internal sales memoranda, through presentations given at industry conferences, and to certain individual investors. In marketing materials, JPMorgan represented that the originators had a "solid underwriting platform," and that JPMorgan was familiar with and approved the originators' underwriting guidelines; that before purchasing a pool, a "thorough due diligence is undertaken to ensure compliance with [underwriting] guidelines"; and that such due diligence was "performed by industry leading 3rd parties (Clayton and Bohan)."

JPMorgan contracted with industry leading third party due diligence vendors to re-underwrite the loans it was purchasing from loan originators. The vendors assigned one of three grades to each of the loans they reviewed. An Event 1 grade meant that the loan complied with underwriting guidelines. An Event 2 meant that the loans did not comply with underwriting guidelines, but had sufficient compensating factors to justify the extension of credit. An Event 3 meant that the vendor concluded that the loan did not comply with underwriting guidelines and was without sufficient compensating factors to justify the loan, including in certain instances because material documents were missing from the loan file being reviewed. JPMorgan reviewed loans scored Event 3 by the vendors and made the final determination regarding each

loan's score.  Event 3 loans that could not be cured were at times referred to by due diligence personnel at JPMorgan as "rejects."  JPMorgan personnel then made the final purchase decisions.

From January 2006 through September 2007, in the course of JPMorgan's acquisition of certain pools of mortgage loans for subsequent securitization, JPMorgan's due diligence vendors graded numerous loans in the samples as Event 3's, meaning that, in the vendors' judgment, they neither complied with the originators' underwriting guidelines nor had sufficient compensating factors, including in many instances because of missing documentation such as appraisals, or proof of income, employment or assets.  The exceptions identified by the third-party diligence vendors included, among other things, loans with high loan-to-value ratios (some over 100 percent); high debt-to-income ratios; inadequate or missing documentation of income, assets, and rental/mortgage history; stated incomes that the vendors concluded were unreasonable; and missing appraisals or appraisals that varied from the estimates obtained in the diligence process by an amount greater than JPMorgan's fifteen percent established tolerance. The vendors communicated this information to certain JPMorgan employees.

JPMorgan directed that a number of the uncured Event 3 loans be "waived" into the pools facilitating the purchase of loan pools, which then went into JPMorgan inventory for securitization.  In addition to waiving in some of the Event 3 loans on a case-by-case basis, some JPMorgan due diligence managers also ordered "bulk" waivers by directing vendors to override certain exceptions the JPMorgan due diligence managers deemed acceptable across all Event 3 loans with the same exceptions in a pool, without analyzing these loans on a case-by-case basis. JPMorgan due diligence managers sometimes directed these bulk waivers shortly before closing the purchase of a pool.  Further, even though the Event 3 rate in the random samples indicated

that the un-sampled portion of a pool likely contained additional loans with exceptions, JPMorgan purchased and securitized the loan pools without reviewing and eliminating those loans from the un-sampled portions of the pools.

According to a "trending report" prepared for client marketing purposes by one of JPMorgan's due diligence vendors (later described by the vendor to be a "beta" or test report), from the first quarter of 2006 through the second quarter of 2007, of the 23,668 loans the vendor reviewed for JPMorgan, 6,238 of them, or 27 percent, were initially graded Event 3 loans and, according to the report, JPMorgan ultimately accepted or waived 3,238 of these Event 3 loans – 50 percent – to Event 2.

During the course of its due diligence process, JPMorgan also performed a valuation review. JPMorgan hired third-party valuation firms to test the appraisal's estimate of the value of the mortgaged properties through a variety of data points, including (1) automated valuation models, (2) desk reviews of the appraisals by licensed appraisers, and (3) broker price opinions. After reviewing the relevant data, the valuation firm would provide a "final recommendation of value." JPMorgan had a "tolerance" of 15 percent in the valuation review, meaning that JPMorgan would routinely accept loans for securitization, including those with loan-to-value ratios as high as 100 percent, when the valuation firm's "final recommendation of value" was up to 15 percent under the appraised value. In the same marketing communications described above, JPMorgan salespeople disclosed that its property valuation review involved an "Automated review of appraisals, with secondary reviews undertaken for any loans outside of tolerance." JPMorgan did not disclose that its "tolerance" was 15 percent.

In one instance, JPMorgan's due diligence revealed that several pools from a single third-party originator contained numerous stated income loans (i.e., loans originated

5

without written proof of the borrower's income) where the vendor had concluded that borrowers had overstated their incomes. Initially, due diligence employees and at least two JPMorgan managers decided that these pools should be reviewed in their entirety, and all unreasonable stated income loans eliminated before the pools were purchased. After the originator of the loan pools objected, JPMorgan Managing Directors in due diligence, trading, and sales met with representatives of the originator to discuss the loans, then agreed to purchase two loan pools without reviewing those loan pools in their entirety as JPMorgan due diligence employees and managers had previously decided; waived a number of the stated income loans into the pools; purchased the pools; and subsequently securitized hundreds of millions of dollars of loans from those pools into one security. In addition, JPMorgan obtained an agreement from the originator to extend contractual repurchase rights for early payment defaults for an additional three months.

Prior to JPMorgan purchasing the loans, a JPMorgan employee who was involved in this particular loan pool acquisition told an Executive Director in charge of due diligence and a Managing Director in trading that due to their poor quality, the loans should not be purchased and should not be securitized. After the purchase of the loan pools, she submitted a letter memorializing her concerns to another Managing Director, which was distributed to other Managing Directors. JPMorgan nonetheless securitized many of the loans. None of this was disclosed to investors.

On some occasions, prospective investors in mortgage-backed securities marketed by JPMorgan requested specific data on the underlying loan pools, including information on due diligence results and loan characteristics, such as combined-loan-to-value ratios. JPMorgan employees sometimes declined to provide information to such investors concerning such loan data, including combined loan-to-value ratio data. In some instances, JPMorgan employees also

6

provided data on the percentage of defective loans identified in its own due diligence process as a percentage of the pool that was acquired rather than as a percentage of the diligence sample, without disclosing the basis of their calculation.

### Bear Stearns

Throughout the relevant time periods described below, Bear Stearns made various statements concerning the processes by which Bear Stearns monitored third party loan sellers and aspects of the performance of the loans Bear Stearns purchased from those sellers.

Between 2006 and 2007, Bear Stearns purchased, securitized and sold to investors billions of dollars of Alt-A mortgage loans. Some of these loans were acquired by Bear Stearns through what was known as its "flow-conduit." Flow-conduit loans were acquired by EMC Mortgage – a wholly owned Bear Stearns subsidiary – from a wide variety of sellers and mortgage originators ("Flow-Conduit Sellers"). After acquiring these loans, Bear Stearns would generally bundle them, securitize that bundled pool of loans, and sell the securities ("Flow-Conduit Securities") to investors. Investors included federally-insured financial institutions and other institutional investors nationwide.

Between 2006 and 2007, Bear Stearns implemented a program for monitoring Flow- Conduit Sellers. Among other things, Bear Stearns monitored the financial well-being of the Flow-Conduit Sellers, tracked aspects of the performance of loans being originated by individual Flow-Conduit Sellers, and reviewed a sample of the loans post-acquisition to determine whether they complied with certain underwriting and/or origination standards.

Beginning in approximately June 2006 and continuing through 2007, as part of its monitoring program, Bear Stearns assigned "grades" to individual sellers. Bear Stearns employed different grading systems over different time periods. But, at relevant times, the Bear Stearns grading system included a grade of "F" for sellers whose financial condition or credit

7

profile, loan performance, and claims history warranted significant scrutiny and potentially a discontinuation of the business relationship, and also allowed for sellers to be "suspended" or "terminated."

Flow-Conduit Securities typically included loans from many, and in some cases, as many as hundreds, of Flow-Conduit Sellers. Prospectus supplements for Flow-Conduit Securities were required by regulation to identify the Flow-Conduit Sellers only if those sellers exceeded a specified concentration of loans in the security pool. In only one security during the relevant period, a Flow-Conduit Seller exceeded that concentration; in that instance, the prospectus supplement identified the relevant Flow-Conduit Seller. Consistent with the applicable regulatory disclosure requirements, Bear Stearns did not otherwise identify the Flow-Conduit Sellers in any given security.

Bear Stearns discussed its seller monitoring process with certain investors. In some communications with investors, Bear Stearns described its seller approval and seller monitoring processes as a way to filter out poor-performing sellers. Bear Stearns informed certain investors in Flow-Conduit Securities that, as a result of Bear Stearns' seller monitoring, certain Flow-Conduit Sellers had been terminated or suspended. Bear Stearns further communicated that it would not continue to purchase loans originated by terminated or suspended sellers. Certain of this same information was also communicated to rating agencies in January 2007. Between 2006 and 2007, certain Flow-Conduit Securities included a number of loans originated by sellers that, at the time of securitization, had received "F" grades, or had been designated as "suspended" or "terminated." Purchasers of Flow-Conduit Securities were not informed as to the presence of loans from those sellers in Flow-Conduit Securities.

In certain instances, Bear Stearns employed a quality control process to review the loans after they had been purchased, which meant in certain circumstances that the loans were already included in Flow-Conduit Securities (among other securities) when the review took place. In certain investor presentations and communications, Bear Stearns stated that its loan acquisition processes included post-purchase quality control reviews, but, by the end of the relevant time period, once Bear Stearns made a decision to suspend or terminate and discontinue loan purchases from sellers, it did not undertake this post-purchase review for loans that had been originated by those Flow-Conduit Sellers. The absence of a quality control process for such loans meant that Bear Stearns did not take certain steps that might have been undertaken to cure potential exceptions in the underlying loans, or to determine if Bear Stearns had to repurchase them out of the trusts holding them for investors.

Bear Stearns personnel, including certain managers, were aware that Flow-Conduit Securities included a number of loans from poorly graded Flow-Conduit Sellers, and were likewise aware that the loans originated by these poorly graded sellers sometimes experienced high rates of default. At least one Bear Stearns employee questioned the continued inclusion of loans from those sellers in Flow-Conduit Securities.

Certain of the Flow-Conduit Securities also included loans acquired through bulk purchases of pools of loans from larger originators ("bulk purchases") rather than from Flow-Conduit Sellers. For bulk purchases of Alt-A, as well as subprime, loans, Bear Stearns often conducted credit-related due diligence on the loan pool (or, in the case of Alt-A loans, on a sample of the loan pool) to be acquired. Bear Stearns typically hired a third-party due diligence vendor to review the loans selected for diligence and to provide a score reflecting the vendor's

judgment as to whether the loan was originated in accordance with applicable underwriting guidelines or had adequate compensating factors.

Bear Stearns' due diligence managers reviewed the vendor's determinations and made the final decision as to whether Bear Stearns would purchase the loan or not.  In certain circumstances, Bear Stearns due diligence managers or other employees determined after their review of the loans that, notwithstanding a vendor's identification of exceptions to specified underwriting guidelines, Bear Stearns would purchase loans where there was a variance from the guidelines that the managers or other employees deemed acceptable.  In addition, Bear Stearns completed bulk purchases of Alt-A loan pools even though the rate of loans with exceptions in the due diligence samples indicated that the un-sampled portion of a pool likely contained additional loans with exceptions.

The last securitization by Bear Stearns was in 2007.  The conduct described above with respect to Bear Stearns all occurred prior to JPMorgan's acquisition of Bear Stearns in March 2008.

## WaMu

Prior to WaMu's failure and closure by the Office of Thrift Supervision ("OTS") in 2008, internal WaMu reviews indicated specific instances of weaknesses in WaMu's loan origination and underwriting practices, including, at times, non-compliance with underwriting standards; the reviews also revealed instances of borrower fraud and misrepresentations by others involved in the loan origination process with respect to the information provided for loan qualification purposes.  WaMu did not disclose to securitization investors in written offering materials the information from its internal reviews concerning instances of borrower fraud and misrepresentations regarding borrower credit, compliance, and property valuation, in the origination of loans, including as to loans that were sold into securitizations.  WaMu also did not

disclose to investors information regarding instances of fraudulent and/or poor underwriting by certain non-WaMu loan originators who sold loans to WaMu, the fact that certain internal processes and controls were determined by internal reviews to have been ineffective in certain circumstances in preventing weak loan origination practices, or that the systems and data issues led to certain instances of delinquent loans being included in pools that were securitized in RMBS offerings.  The last securitization by Washington Mutual was in 2007.

On September 25, 2008, the OTS seized Washington Mutual Bank and placed it into receivership with the Federal Deposit Insurance Corporation ("FDIC").  After the bank's failure, JPMorgan acquired WaMu's assets and certain specified liabilities from the FDIC. The actions and omissions described above with respect to WaMu occurred prior to OTS's closure of WaMu and JPMorgan's acquisition of the identified WaMu assets and liabilities.